SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL, | Civ. Case No. |
| *Plaintiffs,* | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | (Violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*) |
| UNITED STATES BUREAU OF LAND MANAGEMENT, | |
| *Defendant.* | |

## INTRODUCTION

1.      This is a civil action against the Bureau of Land Management ("BLM"). Plaintiffs allege the BLM violated the National Environmental Policy Act and Administrative Procedure Act when the BLM issued an Environmental Assessment and decision documents approving the North Landscape Project ("North Project") on the Lakeview District in the Klamath Falls Resource Area ("Lakeview BLM").

2.      In 2016, the BLM revised its land management plans, called resource management plans. Among other things, BLM revised its resource management plans to allow for additional timber harvest from the forested lands BLM manages in Oregon.

3.      The North Project is the first project that the Lakeview BLM has prepared under the new resource management plan.

4.      The Lakeview BLM expects the North Project to contribute all of its projected timber sale volume for at least a decade, if not longer, approximately 111 million board feet of timber.

5.      In its haste to increase timber harvest on an extremely fragmented landscape, the Lakeview BLM has unlawfully elevated timber volume production over ecological considerations such as wildfire risk and at-risk species conservation.

6.      On November 6, 2019, Plaintiffs notified the BLM and United States Fish and Wildlife Service ("Fish and Wildlife Service" or "FWS") of violations of the Endangered Species Act associated with the North Project, pursuant to 16 U.S.C. § 1540(g). When the 60 day notice period concludes, Plaintiffs intend to amend this Complaint to add FWS as a federal Defendant to this action and to add legal claims under the Endangered Species Act against FWS and/or the BLM.

7.     Should Plaintiffs prevail, Plaintiffs will seek an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION

8.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), 2201 (injunctive relief), and 2202 (declaratory relief). The current cause of action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*; and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

## VENUE

9.     Venue in this court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. The BLM official who authorized and approved the decision is headquartered in Klamath Falls, Oregon, which is located within this district. Plaintiffs have offices within this district.

10.    This case is properly filed in Medford, Oregon pursuant to Local Rule 3 because the Klamath Falls BLM Resource Area Office is located in Klamath County, Oregon, and the North Landscape Project is located in Klamath County, Oregon.

## PARTIES

11.    Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main offices are in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and

Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by the North Landscape Project.

12.     Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon and with additional offices in Roseburg, Oregon and Cordova, Alaska. Representing over 6,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the North Landscape Project area for a variety of professional and personal pursuits including viewing threatened and endangered species. Implementation of the North Landscape Project would irreparably harm the interests of Cascadia Wildlands and its members.

13.     Plaintiff OREGON WILD is a non-profit corporation with approximately 7,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the North Landscape Project area for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits.

Implementation of the North Landscape Project would irreparably harm the interests of Cascadia Wildlands and its members.

14.    Plaintiff SODA MOUNTAIN WILDERNESS COUNCIL ("Soda Mountain") is a non-profit organization incorporated in Oregon with an office near Ashland, Oregon. Soda Mountain has approximately 325 members and mails to about ten times that many addresses, with most members and addressees concentrated in southern Oregon and some in northwestern California and elsewhere in the United States. Soda Mountain is dedicated to protecting and restoring wildlands and the outstanding biodiversity and important biological connectivity where the botanically significant Siskiyou Mountains join the southern Cascade Range in southwest Oregon and northwest California. Soda Mountain monitors federal public land activities to ensure that management complies with relevant federal laws, including environmental laws. Soda Mountain also proposes designations that would better protect the area. Soda Mountain has a specific interest in the O&C lands managed by the BLM in southwest Oregon. Soda Mountain monitors Medford and Klamath Falls Resource Area BLM projects on O&C lands in the general Cascade-Siskiyou connectivity area, and Soda Mountain educated the public and elected officials, wrote comments, and otherwise advocated for the designation of the Cascade-Siskiyou National Monument, which is directly adjacent to the North Landscape Project area, and for the Monument's expansion.

## LEGAL AND FACTUAL BACKGROUND

**The Administrative Procedure Act**

15.    The APA confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency

actions … found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

**National Environmental Policy Act**

16.    Congress enacted the National Environmental Policy Act ("NEPA") in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

17.    NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to insure that the public has sufficient information to challenge the agency's action.

18.    The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including the BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq*.

19.    NEPA requires the agencies to prepare an Environmental Impact Statement ("EIS") when a major federal action is proposed that *may* significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1501.4(a)(1).

20.    An EIS is a "detailed written statement" that "provide[s] full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §§ 1508.11, 1502.1.

21.    In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27.

22.    In evaluating intensity, federal agencies must consider numerous "significance" factors including impacts that may be both beneficial and adverse; the degree to which the proposed

action affects public health or safety; unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1)–(10).

23.    If an agency is unsure if a federal action will have a significant effect on the human environment, it must prepare an Environmental Assessment ("EA") to determine if an EIS is required. 40 C.F.R. § 1501.4.

24.    For an agency's decision to be considered reasonable, a decision notice and finding of no significant impact (DN/FONSI) must contain sufficient evidence and analysis to show the decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision rendered. If the agency fails to consider important aspects of the problem in its EA, its decision is arbitrary and capricious.

25.     The CEQ regulations require that action agencies prepare a supplemental NEPA analysis when "major federal action" remains to occur and the initial NEPA document does not adequately discuss "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

**Federal Land Management and Policy Act**

26.     Congress enacted the Federal Land Policy and Management Act (FLPMA) in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq*. Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). Furthermore, Congress expressed its belief that our public land should "be managed in a manner that will protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

27.     FLPMA requires the BLM to develop land use plans called "resource management plans" ("RMP") that govern the use of the land it manages. 43 U.S.C. § 1712. Once a land use plan has been developed, the BLM is required to manage its lands in compliance with the plan. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

28.     The BLM revised the RMP for the Klamath Falls Resource Area of the Lakeview District in 2016. The 2016 RMP is applicable to the North Landscape Project area.

**The Northern Spotted Owl**

29.     The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks. The northern spotted owl occupies late-successional and old-growth

forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County.

30.     Spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

31.     Spotted owls also require habitat to disperse to new territories. Dispersal habitat may include younger and less diverse forest stands than foraging habitat, such as even-aged, pole-sized stands, but such stand should contain some roosting structures and foraging habitat to allow for temporary resting and feeding for dispersing juvenile owls. Dispersal habitat is essential to maintaining stable populations of owls by filling territorial vacancies when resident northern spotted owls die or leave their territories, and to providing adequate gene glow across the range of the species.

32.     Due to concerns over its widespread habitat loss and habitat modification, and the lack of regulatory mechanisms to protect the species, the FWS listed the northern spotted owl as a threatened species under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

33.     Critical habitat was designated for the species in 1992, and revised in 2008. *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Final Rule*, 73 Fed. Reg. 47,325 (Aug. 13, 2008). A draft revised northern spotted owl critical habitat rule was published on March 8, 2012, and finalized on December 4, 2012. *Endangered and Threatened Wildlife and Plants; Revised Critical Habitat for the Northern Spotted Owl: Final Rule*, 77 Fed. Reg. 71,876 (December 4, 2012).

34.     The expectation of critical habitat is to ameliorate habitat-based threats.

35.     The "primary constituent elements" (PCEs) of northern spotted owl critical nesting habitat "typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly." 77 Fed. Reg. 71,905.

36.     The critical habitat rule suggests the following restoration principles for land management in the Eastern Cascades: 1) Conserve older stands that support northern spotted owl occupancy or high value habitat (recovery action 10); 2) Emphasize vegetation management activities outside of northern spotted owl territories or highly suitable habitat; 3) Design and implement restoration treatments at the landscape scale; 4) Retain and restore key structural elements (e.g., large and old trees, large snags, and downed logs); 5) Retain and restore heterogeneity within stands; 6) Retain and restore heterogeneity among stands; 7) Manage roads to address fire risk; and 8) Consider vegetation management objectives when managing wildfires.

37.    The East Cascades South Critical Habitat Unit 8 overlaps the North Project area, and there are 6,869 acres of designated critical habitat in the Project area. This critical habitat unit is expected to function primarily for demographic support to the overall population, as well as north-south and east-west connectivity between subunits and critical habitat units. The United States Fish and Wildlife Service determined that all occupied and unoccupied habitats within this unit are essential to the conservation of the species to meet the recovery criterion that calls for the continued maintenance and recruitment of habitat. "The increase and enhancement of northern spotted owl habitat is necessary to provide for viable populations of northern spotted owls over the long term by providing for population growth, successful dispersal, and buffering from competition with the barred owl."

38.    Inside and outside of designated critical habitat, literature suggests that spotted owl "core areas" should contain 50 percent (250 acres) or more combined acres of nesting/roosting and foraging habitats; "home ranges" should contain 40 percent (1,158 acres) or more combined acres of nesting/roosting and foraging habitats. This is not meant to suggest that northern spotted owls will not be present with lesser amounts of habitat, rather the overall fitness of owls may be less in those territories.

39.    A spotted owl "activity center" or "territory" includes a spotted owl core area surrounded by a larger home range.

40.    In the North Project area, all activity centers (core areas plus home ranges) are below the recommended thresholds at the core area or the home range scale or both.

41.    Spotted owl occupancy of a territory is determined based on a series of protocol surveys that take place over a period of two years. *See*, USDI USFWS, *Protocol for Surveying Proposed*

*Management Activities that may Impact Northern Spotted Owls* (Feb. 7, 2011; revised Jan. 9, 2012).

42.    The probability of occupancy is increased when core areas contain a range of habitat conditions suitable for use by spotted owls, and the survival and fitness of spotted owls is positively correlated with larger patch sizes or proportion of older forests (Franklin et al. 2000, p. 573; Dugger et al. 2005, p. 876). Depending on the availability of habitat, fitness may be compromised when additional habitat losses occur. Habitat-fitness and landscape models have demonstrated the importance of having sufficient amounts of nesting/roosting/foraging habitat within core use areas to adequately provide for spotted owl survival and reproduction along with access to prey. For example, Franklin et al. (2000, p. 573) found that the proportion of good habitat was around 60 percent to lesser quality habitat for owl core use areas in northwest California. In a recently published study of spotted owls in the Oregon Klamath Province, survival was negatively correlated with forest fragmentation (Shilling et al. 2013, p. 12).

43.    Given the continued decline of northern spotted owl populations, the apparent increase in severity of the threat from barred owls, and information indicating a recent loss of genetic diversity for the subspecies, retaining both occupied northern spotted owl sites and unoccupied, high-value northern spotted owl habitat across the spotted owl's range are key components for recovery. 77 Fed. Reg. 71,876-01.

44.    The Recovery Plan for the Northern Spotted Owl states: "Because spotted owls on established territories are likely to be more successful if they remain in those locations (Franklin et al. 2000), managing to retain spotted owls at existing sites should be the most effective approach to bolstering the demographic contribution of a habitat conservation network and the highest priority for land managers."

45.     The spotted owl Recovery Plan includes "Recovery Actions" that are necessary to conserve and recover the species. Recovery Action 10 requires agencies to "[c]onserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population."

46.     There are 12 spotted owl territories in the North Project area, 5 of which are known to be currently occupied.

47.     BLM expects zero (0) of 12 sites to be occupied in 10 years, after implementation of the North Project.

48.     Recovery Action 32 states: "Because spotted owl recovery requires well distributed, older and more structurally complex multi-layered conifer forests on Federal and non-federal lands across its range, land managers should work with the Service as described below to maintain and restore such habitat while allowing for other threats, such as fire and insects, to be addressed by restoration management actions. These high-quality spotted owl habitat stands are characterized as having large diameter trees, high amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoe, cavities, large snags, and fallen trees."

49.     Through timber harvest, the North Project completely removes 9,073 acres of suitable spotted owl habitat, including 6,869 acres of designated critical habitat, from the planning area.

50.     The northern spotted owl is one of the most studied birds in the world. In the Pacific Northwest, researchers have been tracking the demography of the spotted owl for decades, including tracking estimated populations across the range of the species. Despite the protections afforded by listing under the Endangered Species Act, the spotted owl continues to decline. In 2016, researchers estimated that the spotted owl population has declined 3.8% per year

rangewide. In 2018, researchers estimated that populations in all 11 demography study sites are now declining, and at an accelerated rate.

51.     The nearest demography study area to the North Project area is the Southern Oregon Cascades Demographic Study Area, which has been gathering data on the population of the northern spotted owl for 29 years. This population of spotted owls is declining at a rate of 3.7% per year. The percent population change in the Southern Oregon Cascades Demographic Study Area was a 44% reduction between 1985 and 2011.

52.     The North Project is located in the Southern Oregon Cascades Demographic Study Area.

53.     The North Project is located adjacent to the Southern Oregon Cascades Demographic Study Area.

54.     In March 2019, researchers published spotted owl demography data collected in 2018. Dugger et al., *Demographic Characteristics and Ecology of Northern Spotted Owls (Strix occidentalis caurina) in the Southern Oregon Cascades Annual Research Report FY18* (March 2019) (Dugger et al. 2019). Dugger et al. 2019 states that "There was a large decline in the proportion of pairs in 2018 (12%) compared to 2017 (19%) and this was much lower than the long-term average (46.4%)" (Dugger et al. 2019,  p. 5). The following chart demonstrates this decline:

///        ///        ///

///        ///        ///

///        ///        ///



(Dugger et al. 2019, p. 22.)

55.     Disturbingly, the researchers observed that "In 2018 we did not identify any nesting attempts or fledged young. This represented the lowest breeding propensity documented during the study." The following chart demonstrates this decline:

///        ///        ///

///        ///        ///

///        ///        ///



(Dugger et al. 2019, p. 23.)

56.    The lack of successful nesting or fledged owls means that the spotted owl population will be unable to sustain itself over time, leading to extinction.

57.    Barred owls (*Strix varia*) are native to North America, but only recently arrived in the West. They were first documented in the range of the northern spotted owl in Canada in 1959 and in western Washington in 1973. Barred owls are slightly larger and more aggressive than spotted owls, and compete for the same habitat.

58.    According to the spotted owl Recovery Plan, "managing sufficient habitat for the spotted owl now and into the future is important for its recovery … Based on the best available scientific information, competition from the barred owl (*S. varia*) poses a significant and complex threat to the spotted owl."

59.     Within the Southern Oregon Cascades Demographic Study Area, the annual percentage of historic northern spotted owl territories with both northern spotted owls and barred owls or barred owls alone has increased from 4.1 percent in 1990 to 38 percent in 2015 (Dugger et al. 2018, p. 7). Cumulatively within the Southern Oregon Cascades Demographic Study Area, 82 percent of sites have had at least one barred owl detection during the course of the study (Dugger et al. 2018, p. 7). In summary, barred owls have been detected within the action area. As barred owls continue to expand, their presence in the action area is expected to result in reduced northern spotted site occupancy and rates of survival. Detectability of northern spotted owls is also known to decrease in the presence of barred owls.

60.     Recent research is also documenting the importance of maintaining important habitats in landscapes where barred owls are present. Wiens et al. (2014, p. 38) corroborated work by others who found that the "loss of habitat will likely further constrain the two species to the same set of limited resources, thereby increasing competitive pressure and leading to additional negative impacts on spotted owls." The findings of Dugger et al. (2016, p. 98) were also consistent with others who provided "recommendations to preserve as much high-quality habitat in late successional forests as possible across the range of the subspecies."

61.     Reduced habitat and increased habitat fragmentation will also increase the potential for competitive interactions with barred owls. The action area and the larger landscape in which it occurs are highly fragmented by a checkerboard ownership with private industrial timber lands that are mostly composed of non-habitat. As the amount of available habitat decreases during the course of Project implementation, competition with barred owls for habitat and prey is expected to increase in Project units where habitat has yet to be harvested and in suitable habitat outside the Project area.

PAGE 17 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Wildfire Risk in Southwestern Oregon**

62.     The best available science indicates that forests in western North America are significantly departed from historical conditions. Intensive timber harvest has removed large-diameter fire-resilient tree species, and the advent of fire suppression in the early 20th century has removed the primary disturbance agent—wildfire—from the landscape. Because the region evolved with wildfire, the absence of this disturbance agent, plus historic timber harvest, has resulted in dense, overstocked forests that are especially prone to wildfire.

63.     The best available science also indicates that intensive timber harvest that removes all or most of the forest canopy and establishes young, second-growth early seral stands increases the risk of future wildfire. This wildfire risk effect is especially pronounced in checkerboard landownership patterns such as the North Project area.

64.     The nearby Medford District of the BLM recently observed in an environmental assessment for the Griffin Half Moon Project that regeneration harvest techniques increase wildfire hazard, explaining that "For the first one to five years after harvest, these stands would remain a slash fuel type until the shrubs, grasses, and planted trees become established. After establishment of regeneration, these stands would move into a brush fuel type. Brush fuel types are more volatile and are susceptible to high rates of fire-caused mortality. Stands could exhibit higher flame lengths, rates of spread, and fire intensity during this time. Fires started within these stands could be difficult to initially attack and control." This type of short-term effects analysis and disclosure is absent from the North EA.

65.     The BLM's analysis for the Griffin Half Moon Project goes on to explain "After establishment of regeneration, increases in fire hazard and fire behavior are expected for five to twenty years following initial treatment and planting due to the conversion to brush-fuel type as

PAGE 18 – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

young trees and shrubs become established." This type of of long-term effects analysis and disclosure is absent from the North EA.

66.    Moreover, the effects of global climate change in the region is resulting in hotter, drier summers, and less snow accumulation during the winters. As a result, "fire season" in southern Oregon has grown longer and more unpredictable.

67.    In addition, humans have proliferated into the "wildland-urban interface," or the area between human development and undeveloped forestlands: this zone has increased by 41%— or 46 million acres—over the past 20 years. United States Forest Service, *Areas where homes, forests mix increased rapidly over two decades*, NORTHERN RESEARCH STATION (May 19, 2019), https://www.nrs.fs.fed.us/news/release/wui-increase.

**The North Landscape Project**

68.    In June 2018, the Klamath Falls Resource Area of the Lakeview District of the Bureau of Land Management published for public comment the North Landscape Project Environmental Assessment ("North EA" or "North Project").

69.    The North Project is located in southwest Oregon, directly adjacent to the Cascade-Siskiyou National Monument, which was designated by President Clinton in 2000 and expanded by President Obama in 2017. The Cascade-Siskiyou National Monument contains some of the only intact forest habitat in the Klamath Falls Resource Area, and is the only National Monument designated to protect the outstanding biological diversity of the area.

70.    The North Project (outlined in neon green) is located on BLM land that is heavily "checkerboarded:" every other square mile of land owned and managed by the BLM alternates with lands managed by other landowners, primarily industry timberland owners:



71.    The North EA authorizes the harvest of 9,073 acres of forest, 8,562 acres of which will occur through ground-based harvest methods.

72.    Currently, all 9,073 acres identified for timber harvest are suitable northern spotted owl habitat.

73.    The North EA authorizes the harvest of 6,869 acres of designated critical habitat for the northern spotted owl.

74.    Approximately 111 million board feet ("MMbf") of timber will be harvested under the North EA. This amount of timber comprises the Klamath Falls Resource Area's total decadal "allowable sale quantity" ("ASQ"), or amount of timber the Klamath Falls Resource Area proposes to harvest over the next decade.

75.    Timber harvest techniques employed include commercial thinning and "regeneration harvest," also known as clear cutting.

76.    The BLM proposes to use timber harvest techniques that will reduce the "basal area," or the area of a timber stand occupied by trees, of the harvested stands to 5–15% of their pre-harvest condition. These stands will be "non-habitat" for northern spotted owls post-harvest.

77.    There are 12 northern spotted owl territories in the North Project area. Five of these sites are considered occupied by northern spotted owl pairs or territorial single owls. One of these sites is considered abandoned.

78.    In addition, spotted owl surveyors noted two nighttime detections of spotted owls adjacent to proposed timber sale units; however, the BLM states that because these detections were not confirmed with daytime surveys, these detections do not result in the designation of an occupied territory, and the BLM will take no steps to ensure that the spotted owl in question is not harmed or killed by the agency's timber sale activities.

79.    The BLM has prioritized for logging the 7 currently unoccupied northern spotted owl territories. These sites will have all currently suitable owl habitat removed through timber harvest.

80.    Given the cumulative effects of historic timber harvest on federal and nonfederal lands, the lack of suitable northern spotted owl habitat on adjacent nonfederal land, loss of suitable habitat from wildfire, barred owl encroachment, and the effects of the North Project, the BLM expects that the 5 currently occupied northern spotted owl territories will become unoccupied— i.e. extirpated—over the next decade as the North Project is implemented.

81.    As the 5 currently occupied northern spotted owl territories become unoccupied and locally extirpated, the North Project EA authorizes the harvest of all suitable habitat within these territories.

82.    After the completion of the North Project, there will be zero (0) acres of functional suitable northern spotted owl habitat in the project area, and all 6,869 acres of designated critical habitat will no longer provide the biological features essential to the conservation and recovery of the species. This condition will persist for up to 120 years. Northern spotted owls are not expected to recolonize the area until suitable habitat develops in 120 years.

83.    The North EA identified two issues that were analyzed in the EA: 1) how efficiently the proposed project would meet the Klamath Falls Resource Area's ASQ; and 2) how the proposed project would affect the Threatened northern spotted owl and its designated critical habitat.

84.    The North EA does not address the direct, indirect, or cumulative effects of the project on any other issues or resources, including those raised by Plaintiffs during the public comment and administrative review process.

85.     The North EA does not address the environmental consequences of the project on public health or safety, particularly from elevated wildfire risk as a result of timber harvest activities; the unique characteristics of the geographic area including the project's proximity to the Cascade-Siskiyou National Monument, which is an ecologically critical area; the controversial and precedential nature of a single project authorizing the entire decadal harvest for a BLM Resource Area; the unknown or uncertain effects of the project on natural resources such as watershed health and native wildlife; or the cumulative effects of the project, particularly on the continued viability of the northern spotted owl and on wildfire risk in the planning area.

86.     Even though no spotted owl territories will be occupied post-project, and all acres of designated critical habitat will cease to provide essential biological features for the conservation and recovery of the species, with respect to the North Project's effects to the northern spotted owl and its critical habitat, the North EA states "Because the harvest rate under the North EA is planned to be within the FEIS-assumed (and analyzed) and RMP directed, harvest rate range, the North Project would not have the potential for significant effects to NSO designated critical habitat above and beyond those identified in the EIS and accepted in the RMP."

87.     Plaintiffs submitted timely comments on the North EA.

88.     Plaintiffs have exhausted their administrative remedies with respect to the North Project.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Failure to Consider Direct, Indirect, and Cumulative Effects Violates the National Environmental Policy Act

89.     Plaintiffs incorporate by reference all preceding paragraphs.

90.     Among other things, NEPA requires that an adequate EA analyze "direct effects," which are "caused by the action and occur at the same time and place," as well as "indirect effects

which ... are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8.

91.     An EA must also assess the cumulative impacts, i.e., those resulting "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. §§ 1508.7–1508.8.

92.     The North EA fails to consider the direct, indirect, and cumulative effects of the Project on the northern spotted owl and its continued viability and recovery given the complete removal of 9,073 acres of currently suitable habitat, including the complete removal of 6,869 acres of designated critical habitat for the species; the increased occupancy of barred owls as a result of habitat removal for spotted owls that facilitates spotted owl non-occupancy; and the lack of suitable spotted owl habitat and occupied sites on adjacent nonfederal lands. Instead, the North EA unlawfully relies on the 2016 RMP and FEIS for the requisite site-specific analysis; but the 2016 RMP and FEIS do not contain any site-specific analysis pertaining to the North Landscape Project area.

93.     The North EA fails to consider the direct, indirect, and cumulative effects of the Project on the wildfire risk in the planning area, despite the fact that the project will remove mature trees and increase brush and pole-sized vegetation on 9,073 acres, a condition that will persist for more than a century. Because the Project area is checkerboarded with industrial private timberlands that are already represent a high wildfire risk, the likelihood that the North Project will increase the risk of future uncharacteristic wildfire to the landscape and adjacent human communities is high. The North EA does not address wildfire hazard and risk.

94.    The failure to consider the direct, indirect, and cumulative effects of the North Project is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

95.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

**SECOND CLAIM FOR RELIEF**

**Failure to Prepare New or Supplemental Environmental Analysis Violates the National Environmental Policy Act**

96.    Plaintiffs incorporate by reference all preceding paragraphs.

97.    NEPA requires an agency to prepare a supplemental NEPA analysis when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or … [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed actions or its impacts." 40 C.F.R. § 1502.9(c)(1).

98.    In March 2019, northern spotted owl researchers released their annual research report with demographic data for the northern spotted owl in the Southern Oregon Cascades Northern Spotted Owl Demography study area. Dugger et al., *Demographic Characteristics and Ecology of Northern Spotted Owls (Strix occidentalis caurina) in the Southern Oregon Cascades* (March 2019). The data was collected in 2018. The data reveals that there were zero (0) nesting attempts or fledged juvenile spotted owls in the demography study area.

99.    The Southern Oregon Cascades Northern Spotted Owl Demography study area provides the relevant spotted owl data for the North Project.

100.    The North Project EA does not address the Dugger at al. 2019 demography study or its findings that spotted owls are no longer reproducing in the region.

101.    The information contained in Dugger at al. 2019 is relevant to how the North Project, which will eliminate 9,073 acres of suitable spotted owl habitat for up to 120 years, may affect the continued viability and recovery of the northern spotted owl.

102.    The BLM's failure to prepare a new or supplemental EA for the North Project in light of this new information is arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A). In the alternative, the BLM's failure to prepare a new or supplemental EA for the Trapper Timber Sale in light of this new information is agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

103.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## THIRD CLAIM FOR RELIEF

### The Failure to Prepare an Environmental Impact Statement Violates the National Environmental Policy Act

104.    Plaintiffs incorporate by reference all preceding paragraphs.

105.    NEPA requires federal defendants to prepare an EIS when a major federal action is proposed that *may* significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

106.    In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27.

107.    In evaluating intensity, federal defendants must consider numerous "significance" factors including the degree to which the proposed action affects public health or safety; unique characteristics of the geographic area such as proximity to ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a

precedent for future actions with significant effects or represents a decision in principle about a future consideration; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. 40 C.F.R. §§ 1508.27(b)(2)–(7).

108.    The Project proposes regeneration and other timber harvest that is likely to increase the fire hazard and risk in the Project area, which threatens public health and safety. 40 C.F.R. §§ 1508.27(b)(2)

109.    The Project proposes regeneration and other timber harvest adjacent to the Cascade-Siskiyou National Monument, which is an ecologically critical area. 40 C.F.R. § 1508.27(b)(3).

110.    The Project proposes regeneration and other timber harvest that is scientifically highly controversial in terms of harvest method and ecological impact, including on northern spotted owls. 40 C.F.R. § 1508.27(b)(4).

111.    The Project is precedential in nature because it is a single project authorizing the entire decadal harvest for a BLM Resource Area, a planning strategy that BLM has not used in the past. 40 C.F.R. § 1508.27(b)(5).

112.    The Project will have unknown or uncertain effects on natural resources such as wildfire risk, northern spotted owl viability, watershed health, and native wildlife. 40 C.F.R. § 1508.27(b)(6).

113.    The Project will result in the extirpation of 5 currently occupied spotted owl territories, and the elimination of 6,869 acres of spotted owl critical habitat, an effect that will persist for up to 120 years. 40 C.F.R. § 1508.27(b)(7).

114.    The Project may result in adverse cumulative effects, particularly with respect to the viability of the northern spotted owl and increased wildfire hazard and risk. 40 C.F.R. § 1508.27(b)(7).

115.    The BLM failed to prepare an EIS for the Project, despite the significant context and intensity of the Project as measured against several significance factors. BLM's decision to implement and proceed with the proposed action without first preparing an EIS is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

116.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Declare that the North Landscape Environmental Assessment and associated Decision Records and Finding of No Significant Impact violate NEPA and its implementing regulations;

2.    Declare that the North Landscape Environmental Assessment and associated Decision Records and Finding of No Significant Impact are arbitrary, capricious, an abuse of agency discretion, and contrary to law, in violation of Section 706(2)(A) of the APA;

3.    Vacate and set aside the North Landscape Environmental Assessment and associated Decision Records and Finding of No Significant Impact and remand the North Landscape Environmental Assessment and associated Decision Records and Finding of No Significant Impact to the BLM until such time as the BLM demonstrates to this court that it has adequately complied with the law;

4.    Enjoin the BLM and its contractors, assigns, etc. from implementation of the North Landscape Environmental Assessment and associated Decision Records and Finding of No

Significant Impact;

5.      Award Plaintiffs their costs of suit and attorneys' fees; and

6.      Grant Plaintiffs such other and further relief as the Court deems just and equitable.


Respectfully submitted and dated this 11th day of November, 2019.

/s/ Susan Jane M. Brown
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon  97232
Ph. (503) 914-1323
brown@westernlaw.org

Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

*Attorneys for Plaintiffs*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to FRCP 7.1, Plaintiffs state that they have not issued shares to the public and have no affiliates, parent companies, or subsidiaries issuing shares to the public.

Respectfully submitted and dated this 11th day of November, 2019.

/s/ Susan Jane M. Brown
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon  97232
Ph. (503) 914-1323
brown@westernlaw.org

Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

*Attorneys for Plaintiffs*