SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL, | Civ. Case No. 19-cv-01810-CL |
| *Plaintiffs,* | **FIRST AMENDED COMPLAINT** |
| vs. | (Violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*; the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*; the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq*; and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*) |
| UNITED STATES BUREAU OF LAND MANAGEMENT, and UNITED STATES FISH AND WILDLIFE SERVICE, | |
| *Defendants.* | |

## INTRODUCTION

1.      This is a civil action against the U.S. Bureau of Land Management ("BLM") and the U.S. Fish and Wildlife Service ("FWS"). Plaintiffs allege BLM violated the National Environmental Policy Act ("NEPA") and Administrative Procedure Act ("APA") when BLM issued an Environmental Assessment and decision documents approving the North Landscape Project ("North Project") in the Klamath Falls Resource Area. Plaintiffs allege FWS violated the Endangered Species Act ("ESA") when it issued a biological opinion finding the North Project would not jeopardize the continued existence of the northern spotted owl and concluded it was unnecessary to authorize any incidental take of the species. Plaintiffs allege further that BLM is violating the ESA by relying on FWS' legally flawed biological opinion. Finally, Plaintiffs allege BLM is violating the Federal Land Policy and Management Act ("FLPMA") by planning and proceeding with an action inconsistent with the applicable resource management plan.

2.      BLM expects the North Project to contribute all (approximately 111 million board feet) of its projected timber sale volume for the Klamath Falls Resource Area for at least a decade.

3.      In its haste to increase timber harvest on an extremely fragmented landscape, BLM has unlawfully elevated timber volume production over ecological considerations such as wildfire risk and at-risk species conservation.

4.      In 2018, BLM and FWS engaged in formal consultation, pursuant to Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2). The consultation resulted in FWS's biological opinion, which concluded that the North Project would not jeopardize the continued existence of the northern spotted owl.

5.      On November 6, 2019, Plaintiffs notified BLM and FWS of violations of the ESA, pursuant to 16 U.S.C. § 1540(g). The 60 day notice period concluded on January 6, 2020.

6.      On January 2, 2020, this Court granted the parties' joint motion to stay proceedings in this case, pending BLM's preparation of a Revised Environmental Assessment ("REA") for the North Project pursuant to NEPA.

7.      On April 1, 2020, BLM released the REA subject to a 30-day public comment period. On April 3, 2020, BLM issued an erratum for the REA. On July 13, 2020, BLM issued its final decision record and Finding of No Significant Impact, and its responses to public comments on the REA.

8.      Plaintiffs submit this amended complaint in order to address information in the REA, and BLM's and FWS's continuing violations of the ESA.

9.      Should Plaintiffs prevail, Plaintiffs will seek an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION

10.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), 2201 (injunctive relief), and 2202 (declaratory relief). The current cause of action arises under the laws of the United States, including the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*; the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*; the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq*; and the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq*. An actual, justiciable controversy exists between Plaintiffs and Defendants. The requested relief is proper under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

## VENUE

11.     Venue in this court is proper under 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. The

PAGE 3 – FIRST AMENDED COMPLAINT

BLM official who authorized and approved the decision is headquartered in Klamath Falls, Oregon, which is located within this district. Plaintiffs have offices within this district.

12.     This case is properly filed in Medford, Oregon pursuant to Local Rule 3, because the Klamath Falls BLM Resource Area Office is located in Klamath County, Oregon, and the North Project is located in Klamath County, Oregon.

**PARTIES**

13.     Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main offices are in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon. KS Wild is a membership organization and has members who would be irreparably injured by the North Project.

14.     Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon. Representing over 6,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing,

outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the North Project area for a variety of professional and personal pursuits including viewing threatened and endangered species. Implementation of the North Project would irreparably harm the interests of Cascadia Wildlands and its members.

15.    Plaintiff OREGON WILD is a non-profit corporation with approximately 7,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the North Project area for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of the North Project would irreparably harm the interests of Oregon Wild and its members.

16.    Plaintiff SODA MOUNTAIN WILDERNESS COUNCIL ("Soda Mountain") is a non-profit organization incorporated in Oregon with an office near Ashland, Oregon. Soda Mountain has approximately 325 members and mails to about ten times that many addresses, with most members and addressees concentrated in southern Oregon and some in northwestern California and elsewhere in the United States. Soda Mountain is dedicated to protecting and restoring wildlands and the outstanding biodiversity and important biological connectivity where the botanically significant Siskiyou Mountains join the southern Cascade Range in southwest Oregon and northwest California. Soda Mountain monitors federal public land activities to ensure that management complies with relevant federal laws, including environmental laws. Soda Mountain also proposes designations that would better protect the area. Soda Mountain has a specific interest in the O&C lands managed by BLM in southwest Oregon. Soda Mountain monitors Medford and Klamath Falls Resource Area BLM projects on O&C lands in the general

Cascade-Siskiyou connectivity area, and Soda Mountain educated the public and elected officials, wrote comments, and otherwise advocated for the designation of the Cascade-Siskiyou National Monument, which is directly adjacent to the North Project area, and for the Monument's expansion.

## LEGAL AND FACTUAL BACKGROUND

**The Administrative Procedure Act ("APA")**

17.    The APA confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702. Upon review, the court shall "hold unlawful and set aside agency actions … found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

**National Environmental Policy Act ("NEPA")**

18.    Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

19.    NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to insure that the public has sufficient information to challenge the agency's action.

20.    The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq*. (1978).

21.    NEPA requires the agencies to prepare an Environmental Impact Statement ("EIS") when a major federal action is proposed that *may* significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1501.4(a)(1) (1978).

22.    An EIS is a "detailed written statement" that "provide[s] full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §§ 1508.11, 1502.1 (1978).

23.    In determining whether a proposed action may significantly impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27 (1978).

24.    In evaluating intensity, federal agencies must consider numerous "significance" factors including impacts that may be both beneficial and adverse; the degree to which the proposed action affects public health or safety; unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment. 40 C.F.R. §§ 1508.27(b)(1)–(10) (1978).

25.     If an agency is unsure if a federal action will have a significant effect on the human environment, it must prepare an Environmental Assessment ("EA") to determine if an EIS is required. 40 C.F.R. § 1501.4 (1978).

26.     For an agency's decision to be considered reasonable, a Decision Record and Finding of No Significant Impact must contain sufficient evidence and analysis to show the decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision rendered. If the agency fails to consider important aspects of the problem in its EA, its decision is arbitrary and capricious.

**Endangered Species Act ("ESA")**

27.     Congress enacted the ESA in 1973 in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Congress further declared its policy that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the ESA's purposes. 16 U.S.C. § 1531(c).

28.     The ESA requires every federal agency, in consultation with FWS, to ensure that its actions are "not likely to jeopardize the continued existence of any endangered … or threatened species or result in the destruction or adverse modification of such species." 16 U.S.C. § 1536(a)(2). The result of consultation is a "biological opinion," with a determination either that an action is likely or is not likely to jeopardize the continued existence of a listed species. 16 U.S.C. § 1536(b).

29.     Once FWS has determined that an action is not likely to jeopardize a listed species or result in the destruction or adverse modification of its critical habitat, it must determine whether

an action is likely to result in any "incidental take" of endangered or threatened species. If FWS

determines that an action "is reasonably certain" to result in incidental take of that species, it

must issue an "Incidental Take Statement." 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).

The Incidental Take Statement must (i) specify the impact of incidental taking; (ii) specify

reasonable and prudent measures that are necessary or appropriate to minimize such impact; and

(iv) set forth the terms and conditions that the agency and/or third party must comply with in

order to implement specified reasonable and prudent measures. 16 U.S.C. § 1536(b)(4). Once

issued, an Incidental Take Statement "functions as a safe harbor provision immunizing persons"

and agencies from liability under Section 9 of the ESA, 16 U.S.C. § 1540.

30.    In carrying out consultation under the ESA, FWS must consider whether a proposed

action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood

of both the survival and recovery of a listed species in the wild." 50 C.F.R. § 402.02.

31.    An action jeopardizes the continued existence of a listed species if it "reasonably would

be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and

recovery of a listed species in the wild." 50 C.F.R. § 402.02.

32.    An agency may not abrogate its duty to avoid jeopardizing the continued existence of

ESA-listed species by relying on a biological opinion, and violates this duty when it relies on a

legally flawed biological opinion. *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698

F.3d 1101, 1127–28 (9th Cir. 2012).

**Federal Land Policy and Management Act ("FLPMA")**

33.    Congress enacted FLPMA in 1976, in part "to provide for the management, protection,

development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701

*et seq*. Congress enacted FLPMA to ensure that the present and future use of public lands be

"projected through a land use planning process." 43 U.S.C. § 1701(a)(2). Furthermore, Congress

expressed its belief that our public land should "be managed in a manner that will protect the

quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and

archeological values." 43 U.S.C. § 1701(a)(8).

34.     FLPMA requires BLM to develop land use plans, called "resource management plans"

("RMP"), that govern the use of the land it manages. 43 U.S.C. § 1712. Once a land use plan has

been developed, BLM is required to manage its lands in conformity with the plan. 43 U.S.C. §

1732(a); 43 C.F.R. § 1610.5–3(a). Conformity means that an action "shall be specifically

provided for in the plan, or if not specifically mentioned, shall be clearly consistent with the

terms, conditions, and decisions of the approved plan or plan amendment." 43 C.F.R. § 1601.0–

5(b).

35.     BLM revised the RMP for the Klamath Falls Resource Area in 2016 ("2016 RMP"). The

2016 RMP is applicable to the North Project area.

**The Northern Spotted Owl** (*Strix occidentalis caurina*)

36.     The northern spotted owl (*Strix occidentalis caurina*) is a medium-sized dark brown owl,

with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by

prominent facial disks. The northern spotted owl occupies late-successional and old-growth

forest habitat from southern British Columbia through Washington, Oregon, and California as far

south as Marin County.

37.     Northern spotted owls rely on older forest habitats because they generally contain the

structures and characteristics required for the owl's essential biological functions of nesting,

roosting, foraging, and dispersal. These structures include: a multi-layered and multi-species tree

canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of

trees with large cavities and other types of deformities; numerous large snags; an abundance of large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as "nesting, roosting, and foraging" or "NRF" habitat.

38.    Northern spotted owls also require habitat to disperse to new territories. Dispersal habitat may include younger and less diverse forest stands than foraging habitat, such as even-aged, pole-sized stands, but such stand should contain some roosting structures and foraging habitat to allow for temporary resting and feeding for dispersing juvenile owls. Dispersal habitat is essential to maintaining stable populations of owls by filling territorial vacancies when resident northern spotted owls die or leave their territories, and to providing adequate gene flow across the range of the species.

39.    Due to concerns over its widespread habitat loss and habitat modification, and the lack of regulatory mechanisms to protect the species, FWS listed the northern spotted owl as a threatened species under the ESA on June 26, 1990. 16 U.S.C. § 1533(a); *Determination of Threatened Status for the Northern Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (*codified at* 50 C.F.R. § 17.11(h)).

40.    Critical habitat was designated for the species in 1992, and revised in 2008. *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Final Rule*, 73 Fed. Reg. 47,325 (Aug. 13, 2008). A draft revised northern spotted owl critical habitat rule was finalized in 2012. *Endangered and Threatened Wildlife and Plants; Revised Critical Habitat for the Northern Spotted Owl: Final Rule*, 77 Fed. Reg. 71,876 (December 4, 2012).

41.    Designation of critical habitat is intended to ameliorate habitat-based threats.

42.    The "primary constituent elements" ("PCEs") of northern spotted owl critical nesting

habitat "typically include a moderate to high canopy cover (60 to over 80 percent); a

multilayered, multispecies canopy with large (greater than 30 inches (76 cm) diameter at breast

height ("dbh")) overstory trees; a high incidence of large trees with various deformities (e.g.,

large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags;

large accumulations of fallen trees and other woody debris on the ground; and sufficient open

space below the canopy for northern spotted owls to fly." 77 Fed. Reg. 71,905.

43.    The critical habitat rule provides the following restoration principles for land

management in the Eastern Cascades: 1) Conserve older stands that support northern spotted owl

occupancy or high value habitat (Recovery Action 10); 2) Emphasize vegetation management

activities outside of northern spotted owl territories or highly suitable habitat; 3) Design and

implement restoration treatments at the landscape scale; 4) Retain and restore key structural

elements (e.g., large and old trees, large snags, and downed logs); 5) Retain and restore

heterogeneity within stands; 6) Retain and restore heterogeneity among stands; 7) Manage roads

to address fire risk; and 8) Consider vegetation management objectives when managing

wildfires.

44.    The East Cascades South Critical Habitat Unit 8 overlaps the North Project area, and

there are 6,869 acres of designated critical habitat in the project area. This critical habitat unit is

expected to function primarily for demographic support to the overall population, as well as

north-south and east-west connectivity between subunits and critical habitat units. FWS

determined that all occupied and unoccupied habitats within this unit are essential to the

conservation of the species to meet the recovery criterion that calls for the continued

maintenance and recruitment of habitat. "The increase and enhancement of northern spotted owl

habitat is necessary to provide for viable populations of northern spotted owls over the long term by providing for population growth, successful dispersal, and buffering from competition with the barred owl."

45.     Inside and outside of designated critical habitat, literature suggests that spotted owl "core areas" should contain 50 percent (250 acres) or more combined acres of nesting/roosting and foraging habitats; "home ranges" should contain 40 percent (1,158 acres) or more combined acres of nesting/roosting and foraging habitats. This is not meant to suggest that northern spotted owls will not be present with lesser amounts of habitat, rather the overall fitness of owls may be less in those territories.

46.     A spotted owl "activity center" or "territory" includes a spotted owl core area surrounded by a larger home range.

47.     In the North Project area, all activity centers (core areas plus home ranges) are below the recommended thresholds at the core area scale, the home range scale, or both.

48.     Spotted owl occupancy of a territory is determined based on a series of protocol surveys that take place over a period of two years. *See* FWS, *Protocol for Surveying Proposed Management Activities that may Impact Northern Spotted Owls* (Feb. 7, 2011; revised Jan. 9, 2012).

49.     The probability of occupancy is increased when core areas contain a range of habitat conditions suitable for use by spotted owls, and the survival and fitness of spotted owls is positively correlated with larger patch sizes or proportion of older forests (Franklin et al. 2000, p. 573; Dugger et al. 2005, p. 876). Depending on the availability of habitat, fitness may be compromised when additional habitat losses occur. Habitat-fitness and landscape models have demonstrated the importance of having sufficient amounts of nesting/roosting/foraging habitat

within core use areas to adequately provide for spotted owl survival and reproduction along with access to prey. For example, Franklin et al. (2000, p. 573) found that the proportion of good habitat was around 60 percent to lesser quality habitat for owl core use areas in northwest California. In a recently published study of spotted owls in the Oregon Klamath Province, survival was negatively correlated with forest fragmentation (Shilling et al. 2013, p. 12).

50.    Given the continued decline of northern spotted owl populations, the apparent increase in severity of the threat from barred owls, and information indicating a recent loss of genetic diversity for the subspecies, retaining both occupied northern spotted owl sites and unoccupied, high-value northern spotted owl habitat across the northern spotted owl's range are key components for recovery. 77 Fed. Reg. 71,876-01.

51.    The Recovery Plan for the northern spotted owl states: "Because spotted owls on established territories are likely to be more successful if they remain in those locations (Franklin et al. 2000), managing to retain spotted owls at existing sites should be the most effective approach to bolstering the demographic contribution of a habitat conservation network and the highest priority for land managers." U.S. Fish & Wildlife Service, *Revised Recovery Plan for the Northern Spotted Owl*, III-43 (June 28, 2011).

52.    Recovery of the northern spotted owl depends on the retention of all suitable habitat in the near term, development of suitable habitat in the longer term, and successful barred owl control.

53.    The spotted owl Recovery Plan includes "Recovery Actions" that are necessary to conserve and recover the species. Recovery Action 10 requires agencies to "[c]onserve spotted owl sites and high value spotted owl habitat to provide additional demographic support to the spotted owl population."

54.    There are 12 spotted owl territories in the North Project area, 5 of which are known to be currently occupied.

55.    BLM expects zero (0) of 12 sites to be occupied in 10 years, after implementation of the North Project.

56.    Recovery Action 32 states: "Because spotted owl recovery requires well distributed, older and more structurally complex multi-layered conifer forests on Federal and non-federal lands across its range, land managers should work with the Service as described below to maintain and restore such habitat while allowing for other threats, such as fire and insects, to be addressed by restoration management actions. These high-quality spotted owl habitat stands are characterized as having large diameter trees, high amounts of canopy cover, and decadence components such as broken-topped live trees, mistletoe, cavities, large snags, and fallen trees." It continues: "This recovery action may be temporary in nature, until such time as the competitive pressures of the barred owl on the spotted owl can be reduced to an extent that retention of these stands or patches is not necessary for spotted owl recovery." Recovery Plan, III-68 (2011).

57.    Through timber harvest, the North Project will completely remove 9,073 acres of suitable spotted owl habitat, including 6,869 acres of designated critical habitat, from the planning area. These acres will be unsuitable habitat post-project.

58.    The northern spotted owl is one of the most studied birds in the world. In the Pacific Northwest, researchers have been tracking the demography of the spotted owl for decades, including tracking estimated populations across the range of the species. Despite the protections afforded by listing under the Endangered Species Act, the spotted owl continues to decline. In 2016, researchers estimated that the spotted owl population has declined 3.8% per year

rangewide. In 2018, researchers estimated that populations in all 11 demography study sites are now declining, and at an accelerated rate.

59.    The Southern Oregon Cascades Demographic Study Area has been gathering data on the population of the northern spotted owl for 29 years. This population of spotted owls is declining at a rate of 3.7% per year. The percent population change in the Southern Oregon Cascades Demographic Study Area was a 44% reduction between 1985 and 2011.

60.    The North Project is located in the Southern Oregon Cascades Demographic Study Area.

61.    The North Project is located adjacent to the Southern Oregon Cascades Demographic Study Area.

62.    In March 2019, researchers published spotted owl demography data collected in 2018. Dugger et al., *Demographic Characteristics and Ecology of Northern Spotted Owls (Strix occidentalis caurina) in the Southern Oregon Cascades Annual Research Report FY18* (March 2019) (Dugger et al. 2019). Disturbingly, the researchers observed that "In 2018 we did not identify any nesting attempts or fledged young. This represented the lowest breeding propensity documented during the study."

63.    In 2020, the researchers published spotted owl demography data collected in 2019. Dugger et al., *Demographic Characteristics and Ecology of Northern Spotted Owls (Strix occidentalis caurina) in the Southern Oregon Cascades Annual Research Report FY19* (February 2020) (Dugger et al. 2020). The researchers observed continuing decline in the proportion of pairs in 2019 (10%) compared to 2018 (12%) and 2017 (19%), which is "much lower than the long-term average" (Dugger et al 2020, p. 5). The percentage of sites where spotted owls were detected decreased from 26% in 2018 to 22% in 2019. The following chart depicts the decline in

the percentage of sites surveyed with at least one spotted owl detected, from 1990 to 2019:



(Dugger et al 2020, p. 21).

64.     Northern spotted owl demography data often indicates a pattern of between-year variance. When a northern spotted owl population is stable, it can be expected to alternate between low-population years and high-population years relative to the long-term average. When a population is decreasing, this pattern may appear as alternating between years of drastic reduction and years of less drastic reduction, maintenance from the preceding year, or even a relative increase in population.

65.     There is likely to continue to be little to no successful fledging in low-population years, followed by little to no successful fledging in high-population years in the near future. When this occurs, the spotted owl population will be unable to sustain itself over time, leading to extinction.

**The Barred Owl (*"Strix varia"*) Threat**

66.     Barred owls (*Strix varia*) are native to North America, but only recently arrived in the West. They were first documented in the range of the northern spotted owl in Canada in 1959

and in western Washington in 1973. Barred owls are slightly larger and more aggressive than spotted owls, and compete for the same habitat.

67.    According to the spotted owl Recovery Plan, "managing sufficient habitat for the spotted owl now and into the future is important for its recovery … Based on the best available scientific information, competition from the barred owl (*S. varia*) poses a significant and complex threat to the spotted owl."

68.    A primary reason why barred owl incursion poses such a grave threat to northern spotted owl survival and recovery is that barred owls outcompete northern spotted owls across habitat classes, while adapting to inferior habitat much more readily than northern spotted owls. *See* FWS, Oregon Fish and Wildlife Office, BARRED OWL THREAT, *available at* https://www.fws.gov/oregonfwo/articles.cfm?id=149489615. In particular, reduced forest canopy cover can be expected to disproportionately affect northern spotted owls, leaving barred owls better adapted to the post-logging landscape than northern spotted owls.

69.    Within the Southern Oregon Cascades Demographic Study Area, the annual percentage of historic northern spotted owl territories with both northern spotted owls and barred owls or barred owls alone has increased from 4.1 percent in 1990 to 38 percent in 2015 (Dugger et al. 2018, p. 7). Cumulatively within the Southern Oregon Cascades Demographic Study Area, 82 percent of sites have had at least one barred owl detection during the course of the study (Dugger et al. 2018, p. 7).

70.    In summary, barred owls have been detected within the action area. As barred owls continue to expand, their presence in the action area is expected to result in reduced northern spotted site occupancy and rates of survival. Detectability of northern spotted owls is also known to decrease in the presence of barred owls.

PAGE 18 – FIRST AMENDED COMPLAINT

71.     Recent research is also documenting the importance of maintaining habitats important to the northern spotted owl in landscapes where barred owls are present. Wiens et al. (2014, p. 38) corroborated work by others who found that the "loss of habitat will likely further constrain the two species to the same set of limited resources, thereby increasing competitive pressure and leading to additional negative impacts on spotted owls." The findings of Dugger et al. (2016, p. 98) were also consistent with others who provided "recommendations to preserve as much high-quality habitat in late successional forests as possible across the range of the subspecies."

72.     Reduced habitat and increased habitat fragmentation will also increase the potential for competitive interactions with barred owls. The action area and the larger landscape in which it occurs are highly fragmented by a checkerboard ownership with private industrial timber lands that are mostly composed of non-habitat. As the amount of available habitat decreases during the course of Project implementation, competition with barred owls for habitat and prey is expected to increase in North Project units where habitat has yet to be harvested and in suitable habitat outside the North Project area.

73.     The biological opinion acknowledges that the population of northern spotted owls in the North planning area are severely declining, and increased habitat loss and fragmentation, and barred owl encroachment, will cause the extirpation of all owls in the planning area.

**Wildfire Risk in Southwestern Oregon**

74.     The best available science indicates that forests in western North America are significantly departed from historical conditions. Intensive timber harvest has removed large-diameter fire-resilient tree species, and the advent of fire suppression in the early 20th century has removed the primary disturbance agent—wildfire—from the landscape. Because the region

evolved with wildfire, the absence of this disturbance agent, plus historic timber harvest, has resulted in dense, overstocked forests that are especially prone to wildfire.

75.     The best available science also indicates that intensive timber harvest that removes all or most of the forest canopy and establishes young, second-growth early seral stands increases the risk of future wildfire. This wildfire risk effect is especially pronounced in checkerboard landownership patterns such as the North Project area.

76.     The nearby Medford District of BLM recently observed in an environmental assessment for the Griffin Half Moon Project that regeneration harvest techniques increase wildfire hazard, explaining that "For the first one to five years after harvest, these stands would remain a slash fuel type until the shrubs, grasses, and planted trees become established. After establishment of regeneration, these stands would move into a brush fuel type. Brush fuel types are more volatile and are susceptible to high rates of fire-caused mortality. Stands could exhibit higher flame lengths, rates of spread, and fire intensity during this time. Fires started within these stands could be difficult to initially attack and control." This type of short-term effects analysis and disclosure is absent from the North REA.

77.     BLM's analysis for the Griffin Half Moon Project goes on to explain "After establishment of regeneration, increases in fire hazard and fire behavior are expected for five to twenty years following initial treatment and planting due to the conversion to brush-fuel type as young trees and shrubs become established." This type of long-term effects analysis and disclosure is absent from the North REA.

78.     Moreover, the effects of global climate change in the region is resulting in hotter, drier summers, and less snow accumulation during the winters. As a result, "fire season" in southern Oregon has grown longer and more unpredictable.

79.    The planned Pacific Connector Gas Pipeline would traverse the North Project area. As

planned, a fifty-foot right-of-way would be permanently cleared and maintained vegetation-free.

This right-of-way would operate as a "wick" for fire to travel along, including into, through, and

out of the North Project area. The Final Environmental Impact Statement ("FEIS") for the

Pacific Connector Gas Pipeline Project acknowledges that the pipeline will "create fire

suppression complexity by creation of a continuous corridor of seral plant communities,"

resulting from the removal of "mature stands and developing stands," including in areas that

have "had reoccurring lightning strikes" and the "potential for stand replacement fires." Federal

Energy Regulatory Commission, CP13-483 2, 2-60 (Sept. 2015),

https://elibrary.ferc.gov/idmws/file_list.asp?accession_num=20150930-4002.

80.    In addition, humans have proliferated into the "wildland-urban interface," or the area

between human development and undeveloped forestlands: this zone has increased by 41%— or

46 million acres—over the past 20 years. United States Forest Service, *Areas where homes,*

*forests mix increased rapidly over two decades*, NORTHERN RESEARCH STATION (May 19, 2019),

https://www.nrs.fs.fed.us/news/release/wui-increase.

**The North Landscape Project**

81.    In June 2018, the Klamath BLM published for public comment its EA for the North

Project ("North EA"). On April 1, 2020, the Klamath BLM published for public comment its

Revised EA for the North Project ("North REA"). On July 13, 2020, the Klamath BLM

published its response to comments on the North REA, as well as its final Decision Record and

Finding of No Significant Impact for the North Project.

82.    The North Project is located in southwest Oregon, directly adjacent to the Cascade-

Siskiyou National Monument, which was designated by President Clinton in 2000 and expanded

by President Obama in 2017. The Cascade-Siskiyou National Monument contains some of the
only intact forest habitat in the Klamath Falls Resource Area, and is the first National Monument
designated to specifically protect biological diversity.

83.    The North Project (outlined in neon green) is located on BLM land that is heavily
"checkerboarded:" every other square mile of land owned and managed by BLM alternates with
lands managed by other landowners, primarily industry timberland owners:



84.     The North REA authorizes the harvest of 9,073 acres of forest, 8,562 acres of which will occur through ground-based harvest methods.

85.     Currently, all 9,073 acres identified for timber harvest are suitable northern spotted owl habitat.

86.     The North REA authorizes the harvest of 6,869 acres of designated critical habitat for the northern spotted owl.

87.     Up to 111 million board feet ("MMbf") of timber will be harvested under the North REA. This amount of timber comprises the Klamath Falls Resource Area's total decadal "allowable sale quantity" ("ASQ"), or amount of timber the Klamath Falls Resource Area proposes to harvest over the next decade.

88.     Timber harvest techniques employed include commercial thinning and "regeneration harvest," also known as clear cutting.

89.     BLM proposes to use timber harvest techniques that will reduce the "basal area," or the area of a timber stand occupied by trees, of the harvested stands to 5–15% of their pre-harvest condition. These stands will be "non-habitat" for northern spotted owls post-harvest.

90.     There are 12 northern spotted owl territories in the North Project area. Five of these sites are considered occupied by northern spotted owl pairs or territorial single owls. One of these sites is considered abandoned.

91.     In addition, spotted owl surveyors noted two nighttime detections of spotted owls adjacent to proposed timber sale units; however, BLM states that because these detections were not confirmed with daytime surveys, these detections do not result in the designation of an occupied territory, and BLM will take no steps to ensure that the spotted owls in question are not harmed or killed by the agency's timber sale activities.

92.     BLM has prioritized for logging the 7 currently unoccupied northern spotted owl territories. These sites will have all currently suitable owl habitat removed through timber harvest.

93.     Given the cumulative effects of historic timber harvest on federal and nonfederal lands, the lack of suitable northern spotted owl habitat on adjacent nonfederal land, loss of suitable habitat from wildfire, barred owl encroachment, and the effects of the North Project, BLM expects that the 5 currently occupied northern spotted owl territories will become unoccupied— i.e. extirpated—over the next decade as the North Project is implemented.

94.     Plaintiffs' public comments suggested that BLM retain "refugia" for northern spotted owls displaced by the project to find and then occupy. Rejecting this proposal, the North REA contends that proposed refugia are all already either A) occupied by northern spotted owls; B) occupied by barred owls; or C) occupied by both species. The North REA states it is unnecessary to protect type (A) areas, because such areas are already protected under the Project Design Feature that prohibits removing or downgrading habitat in occupied northern spotted owl sites.

95.     According to the North REA, northern spotted owl populations are determined by the effect of barred owls on northern spotted owl survival, and greater forest retention would not alter the predicted decline of northern spotted owl populations. This is inconsistent with the best available science.

96.     As the 5 currently occupied northern spotted owl territories become unoccupied and locally extirpated due to the lack of sufficient suitable habitat and barred owl encroachment, the North REA authorizes the harvest of all suitable habitat within these territories.

97.     After the completion of the North Project, there will be zero (0) acres of functional suitable northern spotted owl habitat in the timber sale units, and all 6,869 acres of designated

critical habitat will no longer provide the biological features essential to the conservation and recovery of the species. This condition will persist for up to 120 years. Northern spotted owls are not expected to recolonize the area until suitable habitat develops in 120 years.

98.    The North REA identified two issues that were analyzed in the North EA: 1) how efficiently the proposed project would meet the Klamath Falls Resource Area's ASQ; and 2) how the proposed project would affect the Threatened northern spotted owl and its designated critical habitat.

99.    The North REA does not address the direct, indirect, or cumulative effects of the project on any other issues or resources, including those raised by Plaintiffs during the public comment and administrative review process.

100.    The North REA does not sufficiently address the environmental consequences of the project on public health or safety, particularly from elevated wildfire risk as a result of timber harvest activities; the unique characteristics of the geographic area including the project's proximity to the Cascade-Siskiyou National Monument, which is an ecologically critical area; the controversial and precedential nature of a single project authorizing the entire decadal harvest for a BLM Resource Area; the unknown or uncertain effects of the project on natural resources such as watershed health and native wildlife; or the cumulative effects of the project, particularly on the continued viability of the northern spotted owl and on wildfire risk in the planning area.

101.    Even though no spotted owl territories will be occupied post-project, and all acres of designated critical habitat will cease to provide essential biological features for the conservation and recovery of the species, with respect to the North Project's effects to the northern spotted owl and its critical habitat, the North REA states "Because the harvest rate under the North EA is planned to be within the FEIS-assumed (and analyzed) and RMP directed, harvest rate range, the

North Project would not have the potential for significant effects to NSO designated critical habitat above and beyond those identified in the EIS and accepted in the RMP."

102.    Plaintiffs submitted timely comments on the North EA and the North REA.

103.    Plaintiffs have exhausted their administrative remedies with respect to the North Project.

104.    On November 6, 2019, Plaintiffs notified BLM and FWS of these violations of the ESA, pursuant to 16 U.S.C. § 1540(g). The 60 day notice period concluded on January 6, 2020.

105.    Plaintiffs file this amended complaint to add challenges to BLM's ongoing violation of FLPMA and NEPA, and BLM and FWS' ongoing violations of the ESA, and to address issues raised in the North REA.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**BLM's Failure to Consider Direct, Indirect, and Cumulative Effects of the North Project Violates the National Environmental Policy Act.**

106.    Plaintiffs incorporate by reference all preceding paragraphs.

107.    Among other things, NEPA requires that an adequate EA analyze "direct effects," which are "caused by the action and occur at the same time and place," as well as "indirect effects which ... are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8 (1978).

108.    An EA must also assess the cumulative impacts, i.e., those resulting "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. §§ 1508.7–1508.8 (1978).

109.    The North REA fails to consider the direct, indirect, and cumulative effects of the North Project on the northern spotted owl and its continued viability and recovery given the complete

removal of 9,073 acres of currently suitable habitat, including the complete removal of 6,869 acres of designated critical habitat for the species; the increased occupancy of barred owls as a result of habitat removal for spotted owls that facilitates spotted owl non-occupancy; and the lack of suitable spotted owl habitat and occupied sites on adjacent nonfederal lands. Instead, the North REA unlawfully relies on the 2016 RMP and FEIS for the requisite site-specific analysis; but the 2016 RMP and FEIS do not contain any site-specific analysis pertaining to the North Project area.

110.    The North REA fails to consider the direct, indirect, and cumulative effects of the North Project on northern spotted owl survival and recovery in the event that the experimental barred owl control program is successful. According to the North REA, barred owls will eliminate northern spotted owls in the project area regardless of how fast BLM destroys suitable northern spotted owl habitat through logging. However, the experimental barred owl control program is underway, and BLM and FWS have previously considered the possibility that the barred owl control program may be successful. If the experimental barred owl control program is successful and leads to a permanent barred owl control program, the availability of suitable habitat will be the primary limiting factor for northern spotted owl survival and recovery.

111.    The North REA fails to consider the possible value of retaining currently occupied sites as refugia for displaced northern spotted owls. The North REA contends it is unnecessary to protect areas currently occupied by northern spotted owls, because such areas are already protected under the Project Design Feature that prohibits removing or downgrading habitat in occupied northern spotted owl sites. However, under the terms of the North REA, these areas will be logged as soon as they become unoccupied. Thus, protecting such areas as refugia would add meaningful long-term protection beyond the Project Design Feature's temporary protection.

BLM failed to take the requisite "hard look" at the value of retaining currently occupied sites as refugia.

112.    The North REA fails to consider the direct, indirect, and cumulative effects of the North Project on barred owls, and the accompanying indirect effects of such effects to northern spotted owls. In contending that the North Project is not likely to increase the barred owl threat to northern spotted owls, the North REA states without further explanation that the North Project's reduction in forest cover is likely to have similar effects on barred owls as on northern spotted owls. However, barred owls are known to adapt to inferior habitat much more readily than northern spotted owls. The reduction in forest cover can be expected to disproportionately affect northern spotted owls relative to barred owls, leaving barred owls better adapted to the post-logging landscape than northern spotted owls. This possible effect of habitat removal and downgrading is likely to compound the barred owl threat to northern spotted owls in the project areas for decades to come.

113.    The North REA fails to adequately consider the direct, indirect, and cumulative effects of the North Project on the wildfire risk in the planning area, despite the fact that the project will remove mature trees and increase brush and pole-sized vegetation on 9,073 acres, a condition that will persist for decades. Because the project area is checkerboarded with industrial private timberlands that are already represent a high wildfire risk, the likelihood that the North Project will increase the risk of future uncharacteristic wildfire to the landscape and adjacent human communities is high.

114.    The North REA also fails to analyze the cumulative effects of the North Project on wildfire risk in light of the planned Pacific Connector Gas Pipeline. The planned Pacific Connector Gas Pipeline and its permanently-cleared 50-foot right-of-way would cross the North

Project area, including through logging units and areas with high lightning strike frequency. This permanently-cleared right-of-way is likely to act as a wick for fire to travel into, through, and out of the North Project area, increasing the risk of stand replacement fire and the complexity of fire suppression and fire management. Moreover, should a rupture of the pipeline occur, highly pressurized and non-odorized natural gas would spill into the atmosphere, representing an extremely flammable source of fuel. If such a rupture occurred during a wildfire, the results would likely be catastrophic. The North REA acknowledges the existence of the planned pipeline, but fails to discuss the cumulative effects of the North Project and the pipeline project on wildfire risk.

115.    BLM's failure to consider the direct, indirect, and cumulative effects of the North Project is arbitrary, capricious, and violates NEPA. 5 U.S.C. § 706(2)(A).

116.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF

### BLM's Failure to Prepare an Environmental Impact Statement Violates the National Environmental Policy Act.

117.    Plaintiffs incorporate by reference all preceding paragraphs.

118.    NEPA requires federal defendants to prepare an EIS when a major federal action is proposed that *may* significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

119.    In determining whether a proposed action may "significantly" impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27 (1978).

120.    In evaluating intensity, federal defendants must consider numerous "significance" factors including the degree to which the proposed action affects public health or safety; unique characteristics of the geographic area such as proximity to ecologically critical areas; the degree

to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973; and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. 40 C.F.R. §§ 1508.27(b)(2)–(7) (1978).

121.    The North Project proposes regeneration and other timber harvest that is likely to increase the fire hazard and risk in the project area, which threatens public health and safety. 40 C.F.R. §§ 1508.27(b)(2) (1978).

122.    The North Project proposes regeneration and other timber harvest adjacent to the Cascade-Siskiyou National Monument, which is an ecologically critical area. 40 C.F.R. § 1508.27(b)(3) (1978).

123.    The North Project proposes regeneration and other timber harvest that is scientifically highly controversial in terms of harvest method and ecological impact, including on northern spotted owls. 40 C.F.R. § 1508.27(b)(4.

124.    The North Project is precedential in nature because it is a single project authorizing the entire decadal harvest for a BLM Resource Area, a planning strategy that BLM has not used in the past. 40 C.F.R. § 1508.27(b)(5).

125.    The North Project will have unknown or uncertain effects on natural resources, including on northern spotted owl viability and wildfire risk. 40 C.F.R. § 1508.27(b)(6).

126.    The North Project will result in the extirpation of 5 currently occupied spotted owl

territories, and the elimination of 6,869 acres of spotted owl critical habitat, an effect that will

persist for up to 120 years. 40 C.F.R. § 1508.27(b)(7).

127.    The North Project may result in adverse cumulative effects, particularly with respect to

the viability of the northern spotted owl and increased wildfire hazard and risk. 40 C.F.R. §

1508.27(b)(7).

128.    BLM failed to prepare an EIS for the North Project, despite the significant context and

intensity of the project as measured against several significance factors.

129.    BLM's decision to implement and proceed with the proposed action without first

preparing an EIS is arbitrary, capricious, and violates NEPA. 5 U.S.C. § 706(2)(A).

130.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this

litigation pursuant to the EAJA. 28 U.S.C. § 2412.

### THIRD CLAIM FOR RELIEF

### FWS's Biological Opinion Violates the Endangered Species Act.

131.    Plaintiffs incorporate by reference all preceding paragraphs.

132.    The ESA requires BLM, in consultation with FWS, to insure its actions are not "likely to

jeopardize the continued existence of" any listed species. 16 U.S.C. § 1536(a)(2). When engaged

in consultation, FWS must consider whether a proposed action "reasonably would be expected,

directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a

listed species in the wild." 50 C.F.R. § 402.02.

133.    Recovery of the northern spotted owl depends on the retention of all suitable habitat in

the near term, and development of suitable habitat in the longer term. 55 Fed. Reg. 26,114.

134.    In reaching its determination that the North Project would not jeopardize the continued existence of spotted owl, FWS' biological opinion focused exclusively on survival of the northern spotted owl, and fails to consider how the North Project could impact the likelihood of the species' recovery.

135.    Despite acknowledging that "all occupied and unoccupied habitats within [the North subunit] are essential to the conservation of the [northern spotted owl]," and that "[t]he increase and enhancement of northern spotted owl habitat is necessary to provide for viable populations of northern spotted owls over the long terms by providing for population growth, successful dispersal, and buffering from competition from the barred owl," the North biological opinion authorizes the elimination of 9,654 acres of suitable northern spotted owl habitat.

136.    Harvest in unoccupied northern spotted owl habitat will preclude occupancy of such habitat by spotted owls in the future.

137.    In justifying the project's elimination of suitable owl habitat, FWS relies on late-successional reserve allocations and future barred owl management to support the recovery of the northern spotted owl.

138.    The use of RMP land allocations to meet recovery goals cannot substitute for the protection of northern spotted owl habitat, or an analysis of how the elimination of such habitat will impact the survival <u>and</u> recovery of the species.

139.    The North biological opinion acknowledges that the North Project will result in the elimination of 6,869 acres of northern spotted owl habitat for up to 120 years, but fails to address how this is consistent with the needs of the species given its life-span, which is much less than 120 years. In other words, spotted owls in the North Project area will not survive long enough to realize any speculative habitat regrowth in 2139, 120 years from now.

140.    According to the best available science, barred owls can adapt to inferior habitat more
readily than northern spotted owls. The North Project's reduction in forest cover is likely to
disproportionately affect northern spotted owls relative to barred owls in the project area, leaving
barred owls better able to utilize the post-logging landscape than northern spotted owls.
Consequently, the North Project is likely to compound the barred owl threat to northern spotted
owls in the project area for decades to come. The North biological opinion fails to analyze this
likely indirect effect of the North project on northern spotted owl.

141.    The North biological opinion incidental take statement authorizes no incidental take of
northern spotted owls based on the rationale that no currently occupied northern spotted owl sites
will be logged under the Project. However, the North Project authorizes the removal of habitat as
soon as a site becomes unoccupied. Given the marked between-year variance observed in
northern spotted owl populations, the potential for northern spotted owls to recolonize
unoccupied sites, and the need for dispersing juvenile owls to find and establish new territories,
removing sites found to be unoccupied in "down" years is likely to harm, and therefore take,
northern spotted owls the following year. Moreover, the North Project will further fragment the
already fragmented nature of existing suitable habitat, exacerbate barred owl encroachment, and
likely cause abandonment of currently occupied sites, effects that amount to take and will result
in the elimination of spotted owls from the planning area. The elimination of spotted owls from
the planning area is an indirect effect of the proposed action for which FWS should have issued
an incidental take statement.

142.    The North biological opinion concludes that there will be no adverse effects to individual
northern spotted owls, despite the loss of 31% of nesting/roosting and foraging habitat and 65%
of dispersal habitat in an action area where, prior to project implementation, habitat amounts

were already below the recommended threshold of 50% at the core area scale and 40% at the home range scale.

143.    FWS' failure to analyze and explain how the North Project comports with the northern spotted owl's recovery requirements is arbitrary, capricious, and violates the ESA. 5 U.S.C. § 706(2)(A).

144.    FWS' reliance on Late-Successional Reserve land use allocations as a surrogate for analyzing the effects to designated northern spotted owl critical habitat is arbitrary, capricious, and violates the ESA. 5 U.S.C. § 706(2)(A).

145.    FWS' failure to consider the life-cycle of the species in its analysis of the North Project is arbitrary, capricious, and violates the ESA. 5 U.S.C. § 706(2)(A).

146.    FWS' determination that the North Project will not jeopardize the continued existence of the northern spotted owl is arbitrary, capricious, and violates the ESA. 5 U.S.C. § 706(2)(A).

147.    FWS' conclusion that no incidental take authorization is required is arbitrary, capricious, and violates the ESA. 5 U.S.C. § 706(2)(A).

148.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## FOURTH CLAIM FOR RELIEF

### BLM's Reliance on the Legally Flawed North Biological Opinion Violates the Endangered Species Act.

149.    Plaintiffs incorporate by reference all preceding paragraphs.

150.    Section 7(a)(2) of the ESA requires all federal agencies to insure actions they take are not likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). The ultimate responsibility for compliance with this mandate falls on the agency taking the action. *Pyramid Lake Paiute Tribe v. U.S. Dept. of Navy*, 898 F.2d

1410, 1415 (9th Cir. 1990). An agency violates the ESA when it relies on a "legally flawed" biological opinion or "fail[s] to discuss information that would undercut the opinion's conclusions." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012).

151.    The North biological opinion and BLM's project documents fail to analyze and explain how the North Project comports with the northern spotted owl's recovery requirements.

152.    The North biological opinion and BLM's project documents fail to consider the life-cycle of the northern spotted owl and the near-term importance of conserving all suitable habitat for the survival and recovery of the species.

153.    The North biological opinion and BLM's project documents fail to consider the likely indirect effect on northern spotted owls of creating habitat conditions that further boost barred owls' competitive advantage over northern spotted owls.

154.    The North biological opinion unlawfully relies on the existence of the Late-Successional Reserve land use allocations as a surrogate for analyzing the effects to designated northern spotted owl critical habitat.

155.    The North biological opinion's conclusion that the project is unlikely to result in incidental take is arbitrary and capricious, because the North Project will further fragment the already fragmented nature of existing suitable habitat, exacerbate barred owl encroachment, and likely cause abandonment of currently occupied sites, effects that amount to take and will result in the elimination of spotted owls from the project area.

156.    BLM's decision to proceed with the North Project under the legally flawed North biological opinion is arbitrary and capricious, and not in accordance with law, 5 U.S.C. § 706(2)(A); and violates BLM's substantive duty under the ESA to insure that the North Project

will not jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2).

157.     BLM's failure to discuss information about the North Project that would undercut the North biological opinion's conclusions is arbitrary and capricious, and not in accordance with law, 5 U.S.C. § 706(2)(A); and violates BLM's substantive duty under the ESA to insure that the North Project will not jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2).

158.     Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

### FIFTH CLAIM FOR RELIEF

**BLM's Failure to Comply with the 2016 RMP
Violates the Federal Land Policy and Management Act.**

159.     Plaintiffs incorporate by reference all preceding paragraphs.

160.     To comply with FLPMA, BLM is required to manage its lands in conformity with the applicable RMP. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5–3(a). An action is in conformance with the RMP if it is "specifically provided for in the plan, or if not specifically mentioned," if it is "clearly consistent with the terms, conditions, and decisions of the approved plan or plan amendment." 43 C.F.R. § 1601.0–5(b).

161.     The 2016 RMP directs BLM to "[m]anage habitat for species that are ESA-listed … consistent with recovery plans … ." 2016 RMP, 115. In pertinent part, the Recovery Plan states that retaining stands meeting the criteria for Recovery Action 32 ("RA 32 stands") to be "necessary," "until such time as the competitive pressures of the barred owl on the spotted owl can be reduced to an extent that retention of these stands or patches is not <u>necessary</u> for spotted owl recovery." Recovery Plan, III-67 (emphasis added).

162.    Rather than retaining RA 32 stands, the North REA proposes to harvest these stands on the basis that retaining suitable northern spotted owl habitat is <u>futile</u> as long as the barred owl threat persists. This is the opposite approach recommended by the Recovery Plan and therefore required by the RMP.

163.    BLM's decision to remove and downgrade of RA 32 stands under the North Project, and its rationale for doing so, is inconsistent with the Recovery Plan. Because the 2016 RMP requires that BLM's actions be consistent with the Recovery Plan, BLM has failed to comply with the 2016 RMP.

164.    BLM's failure to comply with the 2016 RMP is arbitrary and capricious, 5 U.S.C. § 706(2)(A); and violates FLMPA. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5–3(a).

165.    BLM's failure to explain its departure from the rationale for retaining RA 32 stands set forth by FWS in the Recovery Plan and adopted by reference in the 2016 RMP is arbitrary and capricious, 5 U.S.C. § 706(2)(A); and violates FLPMA. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5–3(a).

166.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## PLAINTIFFS' PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Declare that the North Landscape Final Revised Environmental Assessment and associated Decision Records and Findings of No Significant Impact violate the National Environmental Policy Act and its implementing regulations;

2.      Declare that the North Landscape Final Revised Environmental Assessment and associated Decision Records and Findings of No Significant Impact violate Federal Land Policy and Management Act and its implementing regulations;

3.      Declare that the North Landscape Final Revised Environmental Assessment and associated Decision Records and Findings of No Significant Impact are arbitrary, capricious, an abuse of agency discretion, and contrary to law, in violation of Section 706(2)(A) of the Administrative Procedure Act;

4.      Vacate and set aside the North Landscape Final Revised Environmental Assessment and associated Decision Records and Findings of No Significant Impact and remand the North Landscape Final Revised Environmental Assessment and associated Decision Records and Findings of No Significant Impact to BLM until such time as BLM demonstrates to this Court that it has adequately complied with the law;

5.      Enjoin BLM and its contractors, assigns, etc. from implementation of the North Landscape Final Revised Environmental Assessment and associated Decision Records and Findings of No Significant Impact;

6.      Vacate and set aside the North Landscape Biological Opinion and Incidental Take Statement;

7.      Award Plaintiffs their costs of suit and attorneys' fees; and

8.      Grant Plaintiffs such other and further relief as the Court deems just and equitable.


Respectfully submitted and dated this 30th day of July, 2020.

/s/ Susan Jane M. Brown
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.

Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Ph. (541) 778-6626
sangyeij@westernlaw.org

*Attorneys for Plaintiffs*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRCP 7.1, Plaintiffs state that they have not issued shares to the public and have no affiliates, parent companies, or subsidiaries issuing shares to the public.

Respectfully submitted and dated this 30th day of July, 2020.

/s/ Susan Jane M. Brown
Susan Jane M. Brown (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, Oregon 97232
Ph. (503) 914-1323
brown@westernlaw.org

Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
Ph. (541) 778-6626
sangyeij@westernlaw.org

*Attorneys for Plaintiffs*