SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, Oregon 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL, | Civ. Case No. 19-cv-01810-CL |
| *Plaintiffs,* | PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPENING MEMORANDUM IN SUPPORT OF MOTION |
| vs. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, and UNITED STATES FISH AND WILDLIFE SERVICE, | ORAL ARGUMENT REQUESTED |
| *Defendants.* | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................iii

MOTION .........................................................................................................................1

  I.  INTRODUCTION ...............................................................................................1

  II.  JURISDICTION .................................................................................................2

  III. STANDARD OF REVIEW ...............................................................................3

  IV. LEGAL AND FACTUAL BACKGROUND .....................................................4

       A.  The Federal Land Policy and Management Act (FLPMA) .......................4

       B.  The National Environmental Policy Act (NEPA) ....................................4

       C.  The Endangered Species Act (ESA) ........................................................6

       D.  The Northern Spotted Owl (*Strix occidentalis caurina*) ........................8

       E.  The North Landscape Project ..................................................................10

  V.  ARGUMENT ...................................................................................................11

       A.  FWS's Biological Opinion Violates the ESA .......................................11

          1.  FWS failed to consider the life-cycle of northern spotted owl ......................11

          2.  FWS unlawfully relied on the Late-Successional Reserve allocation in its analysis of effects to critical habitat and for northern spotted owl recovery ... 14

          3.  FWS's determination that the North Project would not result in incidental take is arbitrary and capricious ..........................................................................17

       B.  BLM's Reliance on the Legally Flawed Biological Opinion violates the ESA .... 23

       C.  The North Revised Environmental Assessment Fails to Consider the Direct, Indirect, and Cumulative Effects of the North Project in Violation of NEPA ...... 24

       D.  BLM's Failure to Prepare an Environmental Impact Statement Violates NEPA . 28

          1.  The degree to which the effects on the quality of the human environment are likely to be highly controversial, highly uncertain, or involve unique or unknown risks (40 C.F.R. §§ 1508.27(b)(4)-(b)(5)). .....................................28

2.  The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration (40 C.F.R. § 1508.27(b)(6)). ...................................................32

3.  The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973 (40 C.F.R. § 1508.27(b)(9)). ................34

VI. CONCLUSION ...........................................................................................35

# TABLE OF AUTHORITIES

**Cases**

### United States Supreme Court

*Bennett v. Spear*, 520 U.S. 154 (1997)................................................................8

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) .............................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983).....................23

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)...........................................................2, 6, 7, 23

### United States Courts of Appeals

*Alaska Wilderness League v. Kempthorne*, 548 F.3d 815 (9th Cir. 2008)..................................35

*Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845 (9th Cir. 1997)....................................................4

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,

    273 F.3d 1229 (9th Cir. 2001)...................................................................4, 8, 18

*Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010)......................................16

*Arrington v. Daniels*, 516 F.3d 1106 (9th Cir. 2008) ..................................................................20

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020).........................................................28, 29

*Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124 (9th Cir. 2011)..................................................33

*Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208 (9th Cir. 1998) ......... 5, 27, 32

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988)........................................................................8

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

    698 F.3d 1101 (9th Cir. 2012)............................................................... 7, 23, 24

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157 (9th Cir. 2003).........................4

*Defs. of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 2000)............................................................7

*Defs. of Wildlife v. Dept. of the Interior*, 931 F.3d 339 (4th Cir. 2019) .....................................23

*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) ....................7

*Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003)........................................ 27, 28

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004)... *passim*

*Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010)................................4

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ................................32

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012) .....................................3

*KS Wild v. U.S. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004)..........................................27

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) .................................................. 3, 6, 32

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ...........................................................6

*Nat. Res. Def. Council, Inc. v. Winter*, 518 F.3d 658 (9th Cir. 2008)........................................35

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ..............................32

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) ..................14

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108 (9th Cir. 2004) ...................5, 28

*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007) ....................................................17

*Or. Nat. Res. Council v. Lowe*, 109 F.3d 521 (9th Cir. 1997)........................................................4

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) ..........................22

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,

     265 F.3d 1028 (9th Cir. 2001) ............................................................................... 12, 13

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,

     426 F.3d 1082 (9th Cir. 2005).....................................................................11, 12, 13, 14

*Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153 (9th Cir. 1998) ......................................33

*Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029 (9th Cir. 2019)............................... 27, 28

*San Luis & Delta-Mendoza Water Auth. v. Locke*, 776 F.3d 971 (9th Cir. 2014)........................8

*Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985)...............................................................25

*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988) ..................................32

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)................................27, 28

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010)................................24

**United States District Courts**

*Cascadia Wildlands v. Carlton*, 2017 WL 1807607 (D. Or. Mar. 20, 2017)........................28, 34

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 410 F. Supp. 3d 1146 (D. Or. 2019)

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

 422 F. Supp. 2d 1115 (N.D. Cal. 2006)........................................................................8

*Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F. Supp. 2d 1199 (D. Mont. 2012) ..............33

*KS Wild v. Symons*, No. 03-3124, 2005 WL 8176608 (D. Or. June 6, 2005) ..............................17

*KS Wild v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069 (N.D. Cal. 2004)..................................17, 35

*Or. Wild v. U.S. Bureau of Land Mgmt.*, 2015 WL 1190131 (D. Or. Mar. 14, 2015)...........34, 35

*Rock Creek Alliance v. U.S. Fish and Wildlife Serv.*, 390 F. Supp. 2d 993 (D. Mont. 2005).......23

*W. Watersheds Project v. U.S. Bureau of Land Mgmt.*,

 552 F. Supp. 2d 1113 (D. Nev. 2008) .................................................................29, 32

**Federal Statutes**

5 U.S.C. § 701 ...........................................................................................................2

5 U.S.C. § 706 .......................................................................................................2, 3

5 U.S.C. § 706(2)(A)...............................................................................................3, 28

16 U.S.C. § 1531........................................................................................................2

16 U.S.C. § 1531(b) ....................................................................................................6

16 U.S.C. § 1531(c) ................................................................................................6

16 U.S.C. § 1532 ...................................................................................................7

16 U.S.C. § 1536(a)(2) ...................................................................................6, 8, 23

16 U.S.C. § 1536(b) ........................................................................................6, 7, 8

16 U.S.C. § 1538(a)(1)(B) .......................................................................................7

28 U.S.C. § 1331

28 U.S.C. § 1391(e)(1) ...........................................................................................2

28 U.S.C. § 2201 ...................................................................................................2

28 U.S.C. § 2202 ...................................................................................................2

42 U.S.C. § 4321 ...................................................................................................2

42 U.S.C. § 4332(2)(C) ...........................................................................................5

42 U.S.C. § 4342 ...................................................................................................5

43 U.S.C. § 1701 ...................................................................................................4

43 U.S.C. § 1701(a)(2) ...........................................................................................4

43 U.S.C. § 1712 ...................................................................................................4

43 U.S.C. § 1732 ...................................................................................................4

Pub. L. 94-579 .....................................................................................................4

**Federal Regulations**

40 C.F.R. § 1500.1 .............................................................................................5, 28

40 C.F.R. § 1501.4 ...............................................................................................6

40 C.F.R. § 1501.4(a)(1) .........................................................................................5

40 C.F.R. § 1502.1 ...............................................................................................5

40 C.F.R. § 1508.7 ...............................................................................................24

40 C.F.R. § 1508.8 ..................................................................................................... 24

40 C.F.R. § 1508.11 ..................................................................................................... 5

40 C.F.R. § 1508.27 ..................................................................................................... 5

40 C.F.R. § 1508.27(b)(4) ........................................................................................... 28

40 C.F.R. § 1508.27(b)(5) ........................................................................................... 28

40 C.F.R. § 1508.27(b)(6) ........................................................................................... 32

40 C.F.R. § 1508.27(b)(9) ........................................................................................... 34

43 C.F.R. § 1610.5-3 .................................................................................................... 4

50 C.F.R. § 402.02 .............................................................................................. 6, 7, 14

50 C.F.R. § 402.14(g) ............................................................................................... 7, 8

## Miscellaneous

Fed. R. Civ. P. Rule 56(a) .......................................................................................1, 3

*Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Proposed Rule*, 85 Fed. Reg. 48,487 (Aug. 11, 2020) ................ 9

## MOTION

Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, Cascadia Wildlands, and Soda Mountain Wilderness Council (collectively, KS Wild) respectfully move the Court pursuant to FED. R. CIV. P. RULE 56(a) for summary judgment on claims One through Four in its First Amended Complaint, Dkt. No. 26, against Federal Defendants U.S. Bureau of Land Management (BLM) and U.S. Fish and Wildlife Service (FWS).[1] This Motion is supported by the following Memorandum and the First Declarations of George Sexton, Dave Willis, and Josh Laughlin, filed herewith.

KS Wild seeks a declaration that the Biological Opinion for the North Revised Environmental Assessment and the accompanying Incidental Take Statement violate the Endangered Species Act (ESA), the Administrative Procedure Act (APA), and their implementing regulations, and that the North Landscape Final Revised Environmental Assessment, Decision Record, and Finding of No Significant Impact violate the National Environmental Policy Act (NEPA), the APA, and their implementing regulations. To remedy these violations of law, KS Wild asks the Court to vacate the North Landscape Final Revised Environmental Assessment, Decision Record, Finding of No Significant Impact, Biological Opinion, and Incidental Take Statement, and remand the decisions to BLM and FWS.

## I.    INTRODUCTION.

The Klamath Falls Bureau of Land Management is stuck between the proverbial rock and a hard place. On one hand, past and current intensive logging on both public and private "checkerboard" lands in southern Oregon means that there is very little primary or ancient forest remaining on public lands, and no such forest on private lands. The northern spotted owl, a

---

[1] Plaintiffs abandon Claim Five in their First Amended Complaint.

species that depends on this ancient forest and is threatened with extinction, still makes its home here, but given the land management history and other stressors, continues to plummet towards extinction. At the same time, BLM has dramatically increased the amount of industrial logging allowed under its land management plan: with the North Landscape Project challenged in this litigation, BLM has offered for sale its entire decadal timber quota, 111 million board feet.

On the other hand is the law. In particular, the Endangered Species Act requires BLM and FWS to conserve and recover listed species such as the northern spotted owl at all costs, including meeting an arbitrary timber target for private commercial gain. The National Environmental Policy Act requires BLM to fully assess and disclose the effects of logging a decade-worth of timber, including upon the spotted owl's ability to persist and recover.

Instead of meeting these legal requirements, BLM and FWS have elevated commercial logging over listed species conservation and environmental disclosure. There is no question that the agencies face a difficult challenge, but as the Supreme Court has stated, the ESA makes "it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities . . . ." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). Because federal defendants have failed to correctly strike this balance, the Court should grant KS Wild's Motion for Summary Judgment.

## II.    JURISDICTION.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 (federal question). The causes of action arise under the laws of the United States, including the APA, 5 U.S.C. §§ 701 *et seq.*; the ESA, 16 U.S.C. § 1531 *et seq.*; NEPA, 42 U.S.C. §§ 4321 *et seq.*; and their implementing regulations. The requested relief is proper under 28 U.S.C. §§ 2201–02, and 5 U.S.C. § 706. An actual, justiciable controversy exists between Plaintiffs and Defendants.

Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. The official who authorized and approved the BLM decision is headquartered in Klamath Falls, Oregon, which is located within this district; and the FWS official who authorized and approved the FWS decision is headquartered in Klamath Falls, Oregon. Plaintiffs have offices within this district. This case is properly filed in Medford, Oregon pursuant to Local Rule 3-2(a)(4) because the Klamath Falls BLM Resource Area Office is located in Klamath County, Oregon, and the North Timber Sale is located on lands in Klamath County, Oregon.

## III.    STANDARD OF REVIEW.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and…the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judicial review of agency actions under NEPA, FLPMA, the ESA, and their implementing regulations is governed by the APA. 5 U.S.C. § 706; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (internal citations omitted). The arbitrary and capricious standard is deferential, but it does not shield agency decisions from a "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S.

402, 415 (1971). BLM must articulate "a rational connection between the facts found and the conclusions made." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). It is not entitled to deference where its conclusions "do not have a basis in fact[.]" *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001).

An agency's decision can be upheld only on the basis of the reasoning found in that decision; the reviewing court cannot substitute reasons for agency action that are not in the record. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). Rationales for agency decision-making appearing for the first time in litigation are post hoc explanations that cannot be used to justify agency action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010) (internal citation omitted). Review for compliance with NEPA consists of "ensuring that the agency has taken a 'hard look' at the environmental effects of the proposed action." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citing *Churchill Cty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)).

## IV.     LEGAL AND FACTUAL BACKGROUND.

### A.     The Federal Land Policy and Management Act (FLPMA).

Congress enacted FLPMA in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq*. Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process." 43 U.S.C. § 1701(a)(2). FLPMA requires BLM to develop land use plans called "resource management plans" (RMPs) that govern the use of the land BLM manages. *Id*. § 1712. To comply with FLPMA, BLM must manage its lands in conformity with the applicable RMP. *Id*. § 1732(a); 43 C.F.R. § 1610.5-3(a).

### B.     The National Environmental Policy Act (NEPA).

Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impact of proposed actions that significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C). NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to insure that the public has sufficient information to challenge the agency's action. The Council on Environmental Quality (CEQ) promulgated uniform regulations to implement NEPA that are binding on all federal agencies, including BLM. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500.1 *et seq*. (1978). NEPA requires the agencies to prepare an Environmental Impact Statement (EIS) when a major federal action is proposed that may significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1) (1978). *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998) (holding that a "plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the environment") (internal citation omitted).

An EIS is a "detailed written statement" that "provide[s] full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. §§ 1508.11, 1502.1 (1978). In determining whether a proposed action may significantly impact the environment, both the context and intensity of the action must be considered. 40 C.F.R. §1508.27 (1978). In evaluating intensity, federal agencies must consider numerous "significance" factors, the presence of which compels the need to prepare an environmental impact statement. 40 C.F.R. §§ 1508.27(b)(1)–(10) (1978); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1124–25 (9th Cir. 2004).

If an agency is unsure if a federal action will have a significant effect on the human environment, it must prepare an Environmental Assessment (EA) to determine if an EIS is required. 40 C.F.R. § 1501.4 (1978). For an agency's decision to be considered reasonable, a Decision Record and Finding of No Significant Impact must contain sufficient evidence and analysis to show the decision is reasonably supported by the facts. The agency must show a rational connection between the facts found and the decision rendered. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). If the agency fails to consider important aspects of the problem in its EA, its decision is arbitrary and capricious. *Lands Council*, 537 F.3d 981.

      **C.**      **The Endangered Species Act (ESA).**

Congress enacted the ESA in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species[.]" 16 U.S.C. § 1531(b). Congress further declared its policy that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of the ESA's purposes. *Id*. § 1531(c)(1). The ESA obligates federal agencies "to afford first priority to the declared national policy of saving endangered species." *Hill*, 437 U.S. at 185.

Section 7 of the ESA requires every federal agency, in consultation with FWS, to ensure that its actions are "not likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification of" a species' critical habitat. 16 U.S.C. § 1536(a)(2). [2] The result of consultation is a "biological opinion," with a

---

[2] A proposed action jeopardizes the continued existence of a species when it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. A proposed action destroys or adversely modifies a species'

determination either that an action is likely or is not likely to jeopardize the continued existence

of a listed species and either is likely or is not likely to result in the destruction or adverse

modification of a species' critical habitat. 16 U.S.C. § 1536(b). Section 7 "reveals a conscious

decision by Congress to give endangered species priority over the 'primary missions' of federal

agencies." *Hill*, 437 U.S. at 185. An agency, such as BLM, may not abrogate its duty to avoid

jeopardizing the continued existence of ESA-listed species by relying on a biological opinion,

and violates this duty when it relies on a legally flawed biological opinion. *Ctr. for Biological

Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012).

      The ESA also prohibits the "take" of endangered and threatened species. 16 U.S.C. §

1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or

collect . . . ." *Id.* § 1532(19). "Harming a species may be indirect, in that the harm may be caused

by habitat modification, but habitat modification does not constitute harm unless it 'actually kills

or injures wildlife.'" *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 924–25 (9th Cir. 2000). "Habitat

modification that is reasonably certain to injure an endangered species by impairing their

essential behavioral patterns satisfie[s] the actual injury requirement . . . ." *Id.* at 925 (citing

*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir. 1995)).

      Once FWS has determined that an action is not likely to jeopardize a listed species or

result in the destruction or adverse modification of its critical habitat, it must determine whether

an action is likely to result in any "incidental take" of endangered or threatened species. If FWS

determines that an action "is reasonably certain" to result in incidental take of that species, it

must issue an "Incidental Take Statement." 50 C.F.R. § 402.14(g)(7); 16 U.S.C. § 1536(b)(4).

---

critical habitat when it directly or indirectly alters it in a way that "appreciably diminishes the
value of critical habitat for the conservation of a listed species." *Id*.

The Incidental Take Statement must (i) specify the impact of incidental taking; (ii) specify reasonable and prudent measures that are necessary or appropriate to minimize such impact; . . . and (iv) set forth the terms and conditions that the agency and/or third party must comply with in order to implement specified reasonable and prudent measures. 16 U.S.C. § 1536(b)(4). Once issued, an "Incidental Take Statement functions as a safe harbor provision immunizing persons" and agencies from . . . liability" for take. *Ariz. Cattle Growers'*, 273 F.3d at 1239.

In carrying out consultation under the ESA, FWS must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). "[F]ailure to do so violates the APA." *San Luis & Delta-Mendoza Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). The purpose of the best-available-data standard is to ensure a Biological Opinion is not based on "speculation and surmise." *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 176 (1997)); *see also Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1127 (N.D. Cal. 2006) ("To the extent that there is any uncertainty as to what constitutes the best available scientific information, Congress intended 'to give the benefit of the doubt to the species.'" (quoting *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988))).

### D.    The Northern Spotted Owl (*Strix occidentalis caurina*).

The northern spotted owl (*Strix occidentalis caurina*) occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County. Northern spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. Northern spotted owls also require habitat to disperse to new territories.

Due to concerns over its widespread habitat loss and habitat modification, and the lack of regulatory mechanisms to protect the species, FWS listed the northern spotted owl pursuant to court order as a threatened species under the ESA on June 26, 1990. FWS Administrative Record (AR) 014918. Critical habitat was designated for the species in 1992, and revised in 2008 and 2012. *Id.* at 016544. Despite the best available science establishing that more spotted owl habitat, not less, warrants federal protection, FWS has proposed to reduce spotted owl critical habitat by approximately 200,000 acres on federal lands pursuant to a settlement agreement with the timber industry. *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Proposed Rule*, 85 Fed. Reg. 48,487 (Aug. 11, 2020).

Barred owls (*Strix varia*) are native to North America, but only recently arrived in the West. Barred owls are slightly larger and more aggressive than spotted owls and compete for similar habitat. A primary reason why barred owl incursion poses such a grave threat to northern spotted owl survival and recovery is that barred owls outcompete northern spotted owls across habitat classes, while adapting to inferior habitat much more readily than northern spotted owls. BLM AR 012576–77; FWS AR 001579. FWS is currently engaged in an experimental control program for barred owls involving lethal removal of the invader that is scheduled to continue through August 2021. BLM AR 012576–77.

Given the continued decline of northern spotted owl populations, BLM AR 012569, the apparent increase in severity of the threat from barred owls, and information indicating a recent loss of genetic diversity for the subspecies, FWS has determined that retaining both occupied northern spotted owl sites and unoccupied, high-value northern spotted owl habitat across the northern spotted owl's range are key components for recovery. FWS AR 016546–47. The 2011 Northern Spotted Owl Recovery Plan states: "Because spotted owls on established territories are

likely to be more successful if they remain in those locations (Franklin et al. 2000), managing to retain spotted owls at existing sites should be the most effective approach to bolstering the demographic contribution of a habitat conservation network and the highest priority for land managers." BLM AR 020546. Recovery of the northern spotted owl depends on the retention of all suitable habitat in the near term, development of suitable habitat in the longer term, and successful barred owl control. *Id.*

E.        **The North Landscape Project.**

The North Landscape Project (North Project) is located in southwest Oregon, adjacent to the Cascade-Siskiyou National Monument. The North Project is located on BLM land that is heavily "checkerboarded": every other square mile of land owned and managed by BLM alternates with lands managed by other landowners, primarily industry timberland owners. *See* BLM AR 000447. The North Revised Environmental Assessment (REA) authorizes logging of 9,073 acres of forest. *Id.* at 000060. Up to 111 million board feet of timber will logged under the North REA. *Id.* at 000067. This amount of timber comprises the Klamath Falls Resource Area's total decadal "allowable sale quantity" (ASQ), or the amount of timber the Klamath Falls Resource Area proposes to log over the next decade. *Id.* at 000058.

All 9,073 acres authorized for logging are suitable northern spotted owl habitat. *Id.* at 001078. Within these 9,073 acres, the North REA authorizes logging of 4,864 acres of designated critical habitat for the northern spotted owl. *Id.* at 000079; FWS AR 001595. After the North Project is completed, there will be *zero* (0) acres of suitable northern spotted owl habitat in the project area, and all 4,864 acres of designated critical habitat will no longer provide the biological features essential to the conservation and recovery of the species. FWS AR

10

001595. Northern spotted owls are not expected to be able to recolonize the area until suitable

habitat develops in more than a century: 120 years. *Id*. at 001566–67.

## V.    ARGUMENT.

### A.    FWS's Biological Opinion Violates the ESA.

FWS's Biological Opinion violates the ESA for at least three reasons. First, FWS failed

to properly consider the life-cycle of northern spotted owls in the Biological Opinion in

determining that the North Project will not jeopardize the northern spotted owl or destroy or

adversely modify its critical habitat. Second, when it analyzed whether the North Project would

jeopardize the northern spotted owl in the context of recovery, FWS unlawfully relied on the

Late-Successional Reserve land use allocation; and it failed to consider impacts to recovery at all

in its analysis of effects to critical habitat. Third, FWS improperly determined that the North

Project would not result in any incidental take of northern spotted owl. For these same three

reasons, BLM's reliance on the Biological Opinion also violates the ESA.

### 1.    FWS failed to consider the life-cycle of northern spotted owl.

When consulting under Section 7(a)(2), FWS "must consider near-term habitat loss to

populations with short life cycles." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of

Reclamation* (*PCFFA II*), 426 F.3d 1082, 1094 (9th Cir. 2005). According to the best available

science, northern spotted owls that have reached one year of age have a mean lifespan of 6.5

years, and typically begin to breed when they are between 2 and 5 years of age. FWS AR

010709, 1510. However, FWS has given BLM its imprimatur to proceed with logging that would

eliminate 9,654 acres of northern spotted owl habitat for up to 120 years, and may result in

abandonment of all spotted owl sites in the 11,879 acre project area. FWS AR 001499, 1579; *see

also* BLM AR 000557 ("the expected life of this [project] is long enough that currently occupied

[northern spotted owl] territories may become unoccupied within the life of the [project] which

11

would potentially 'free up' currently . . . encumbered proposed sale acres"). FWS unlawfully
failed to analyze how these dire effects enduring for many decades is consistent with the far
shorter life cycle of the northern spotted owl, rendering its "no jeopardy" Biological Opinion
arbitrary and capricious. *PCFFA II*, 426 F.3d at 1094.

In *PCFFA II*, the Ninth Circuit admonished that a consulting agency "does not avoid the
likelihood of jeopardy to a listed species when it disregards the life cycle of the species in
crafting the measures designed to protect it. Nor can the agency provide only partial protection
for a species for several generations without any analysis of how doing so will affect the
species." *Id*. at 1094. In that case, the consulting agency concluded that a federal irrigation
project would jeopardize ESA-listed coho salmon, and proposed a Reasonable and Prudent
Alternative to avoid jeopardy through a three-phase plan. *Id*. Under this plan, the coho salmon's
water flow needs would not be met for the first two phases, lasting eight years, while the action
agency developed a "water bank," developed a governmental task force, and conducted scientific
studies. *Id*. at 1088–89. The Ninth Circuit found that the consulting agency failed to consider
what effect the first two phases of the plan would have on coho salmon survival and recovery,
during which the species would experience multiple generational cycles without its long-term
flow needs met. *Id*. at 1093. The Ninth Circuit found it "evident that the agency 'entirely failed
to consider an important aspect of the problem'—namely, that the species it must protect will
experience five generational cycles over the time span [of the project]." *Id*. at 1094.

Similarly, in *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*
(*PCFFA I*), 265 F.3d 1028 (9th Cir. 2001), the Ninth Circuit affirmed the district court's holding
that NMFS "failed to adequately assess the short term impacts of . . . timber sales" on listed fish
when it only considered the effects of timber harvest after 10 years, explaining that "[t]his

generous time frame ignores the life cycle and migration cycle of anadromous fish," which was shorter than 10 years. *Id*. at 1037. The Ninth Circuit concluded that "[g]iven the importance of the near-term period on listed species survival it is difficult to justify NMFS's choice not to assess degradation over a time frame that takes into account the actual behavior of the species in danger." *Id*. at 1038.

Here, the Biological Opinion acknowledges that "[i]mplementation of the proposed action will result in the loss of 31 percent of the nesting/roosting and foraging habitat in the action area[,]" FWS AR 001578, and that the 9,654 "treated areas will not function as habitat for the northern spotted owl for 100 to 120 years," *id*. at 001562–64, precluding northern spotted owl occupation or reoccupation during that period. *Id*. at 001578, 1581. This century-long timeline is inconsistent with the life-span of the species, and disregards the near-term importance of conserving all suitable habitat for northern spotted owls. Given that the mean lifespan of northern spotted owls is 6.5 years, between 10 and 20 generations of spotted owls could live and die before the treated areas may again function as suitable habitat.

As in *PCFFA I*, the "generous time frame" for the Project's adverse effects to terminate "ignores the life cycle" of northern spotted owls. *PCFFA I*, 265 F.3d at 1037. Here, as in that case, "[g]iven the importance of the near-term period on listed species survival it is difficult to justify [FWS's] choice not to assess degradation over a time frame that takes into account the actual behavior of the species in danger." *Id*. at 1038. And, like in *PCFFA II*, BLM here has failed to consider the possibility that the Project's short-term adverse effects on northern spotted owls will never be ameliorated, because the effects of the Project may cause the local extirpation of northern spotted owls. Here, as in *PCFFA II*, BLM "entirely failed to consider an important

13

aspect of the problem—namely, that the species it must protect will experience [10 to 20] generational cycles" before the project's harms begin to dissipate. *PCFFA II*, 426 F.3d at 1094.

As the Spotted Owl Recovery Plan explains, "given the continued decline of the species, the apparent increase in severity of the threat from barred owls, and information indicating a recent loss of genetic diversity for the species," FWS "recommend[ed] retaining more occupied spotted owl sites and unoccupied, high value spotted owl habitat on all lands." FWS AR 016284. While the Recovery Plan contemplated that short-term risks to the species may be necessary "to achieve long-term benefits," it cautioned that land managers "should also not be so aggressive that they subject spotted owls and their habitat to treatments where the long-term benefits do not clearly outweigh the short-term risks." *Id*. at 016296. FWS failed in the Biological Opinion to rationally explain why the Project's purported long-term benefits outweigh its dire short-term risks for northern spotted owl.

> **2.      FWS unlawfully relied on the Late-Successional Reserve allocation in its analysis of effects to critical habitat and for northern spotted owl recovery.**

In the consultation process, FWS must consider whether a proposed action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild . . . ." 50 C.F.R. § 402.02. This regulation requires FWS "to consider both recovery and survival impacts." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004) (FWS must consider how a proposed action will affect the value of critical habitat for both the survival and recovery), *superseded on other grounds*, *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017). In considering impacts to survival and recovery, FWS may not rely on land use allocations in a land

management plan. *Gifford Pinchot*, 378 F.3d at 1075–76 (rejecting FWS' reliance on Late-Successional Reserves in its jeopardy and recovery analysis).

As a threshold matter, the Biological Opinion contains no discussion of impacts to northern spotted owl recovery in analyzing the North Project's effects on northern spotted owl critical habitat, FWS AR 001594–1601, of which the North Project will remove 4,864 acres (2,102 acres nesting/roosting/foraging habitat + 2,852 acres dispersal habitat). *Id*. at 001598. This omission is important, given that FWS has "determined that all occupied and unoccupied habitats within" the affected critical habitat subunits "are essential to the conservation of the species to meet the recovery criterion that calls for the continued maintenance and recruitment of habitat." *Id*. at 001593. Moreover, the Biological Opinion notes that "[t]he increase and enhancement of northern spotted owl habitat is necessary to provide for viable populations of northern spotted owls over the long term by providing for population growth, successful dispersal, and buffering from competition with the barred owl." *Id*. FWS's failure to analyze and discuss the impact removing critical habitat will have on northern spotted owl recovery is arbitrary and capricious and violates the ESA. 50 C.F.R. § 402.02; *Gifford Pinchot*, 378 F.3d at 1069; *Nat'l Wildlife Fed'n*, 524 F.3d at 932.

The only discussion of recovery impacts is found in the section of the Biological Opinion addressing effects to northern spotted owl, where the Biological Opinion relies unlawfully on the Late-Successional Reserve land use allocation. Here, FWS recites from its Biological Opinion for the 2016 RMP for Western Oregon that logging unoccupied spotted owl habitat has "the potential to preclude the occupancy of these areas by spotted owls in the future[,]" dismissing this risk by stating that "[t]he Harvest Land Base, however, is not where the recovery of the spotted owl will be focused." FWS AR 001579–80. Rather, "[f]uture development of spotted owl

15

habitat and management of barred owls in the [Late-Successional and Riparian] reserves is expected to provide for territories that will support future spotted owl populations in the RMP action area." *Id*. at 001580; *see also id*. at 001581 ("[T]he Harvest Land Base is not expected to support reproductive populations of northern spotted owls; rather other land use allocations are intended to support the recovery of the species."). However, implementation of the North Project "is expected to result in impacts for 50 to 120 years, suggesting that the treated activity centers may not be able to support reproductive or territorial northern spotted owls for many decades." *Id*. at 001581. In discounting this effect by relying on the RMP land use allocations, FWS "focuses too narrowly on owl survival and ignores" impacts to recovery. *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1166 (9th Cir. 2010).

FWS ultimately admits its error in the plainest of language: "the Service is relying on other RMP land use allocations (e.g. [Late-Successional and Riparian] reserves) and future barred owl management to support the recovery of the northern spotted owl." FWS AR 001580; *contra Gifford Pinchot*, 378 F.3d at 1076. This claim is on all fours with *Gifford Pinchot*. In that case, the Ninth Circuit explained that designating critical habitat requires "extensive study, detailed analysis, and ultimately notice and comment rulemaking[,]" and, [o]nce designated, critical habitat receives its legal protection because it is subject to the exact Section 7 consultations at issue in this case." *Id*. "[I]f we allow the survival and recovery benefits derived from a parallel habitat conservation project . . . that is not designated critical habitat to stand in for the loss of designated critical habitat in the adverse modification analysis, we would impair Congress' unmistakable aim that critical habitat analysis focus on the actual critical habitat." *Id*. (citing *Hill*, 437 U.S. at 171–72). Therefore, suitable habitat in Late-Successional Reserves "is no substitute for designated critical habitat[,]" and "[t]hat the spotted owl has suitable alternative

habitat (e.g., noncritical habitat LSRs) has, strictly speaking, no bearing on whether there is adverse modification of critical habitat." *Id*. Subsequent district court orders have reinforced this holding. *See KS Wild v. Symons*, No. 03-3124, 2005 WL 8176608 *21–22 (D. Or. June 6, 2005) (holding that BLM and FWS violated the ESA where the Biological Opinion depended on late-successional reserves and other lands to substitute for the functions of spotted owl critical habitat), *dismissed as moot*, 2006 WL 448714 (D. Or. Feb. 21, 2006); *KS Wild v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1083 (N.D. Cal. 2004) (agency cannot discount lost spotted owl critical habitat under NEPA by relying on protections afforded by the late-successional reserve land use allocation). In sum, the Biological Opinion violates the ESA because it relies unlawfully on the Late-Successional Reserve land use allocation to meet the recovery needs of the species, and as a substitute for critical habitat.

### 3.   FWS's determination that the North Project would not result in incidental take is arbitrary and capricious.

When FWS concludes that an action is not likely to jeopardize the existence of a listed species or adversely modify its habitat, but is likely to cause incidental take, FWS must issue an incidental take statement. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007). Here, FWS found that "[b]ecause sites will only be harvested once a site has been determined to be unoccupied by territorial or resident northern spotted owls for two consecutive years, take of individual northern spotted owls is not anticipated as a result of the proposed action." FWS AR 001604. This conclusion is arbitrary and capricious because it fails to account for numerous different causes of take, is based on a flawed survey protocol that deviates from past protocols FWS approved, and is based on factors that Congress did not intend FWS to consider.

First, the Biological Opinion is clear that habitat loss and fragmentation, not only as a direct effect but also through the indirect effect of creating a competitive advantage for the

17

barred owl, will result in a lack of habitat for the northern spotted owl that compromises its ability to survive and recover in the North Project area. The Project's "reduction in northern spotted owl habitats [will] decrease[] the capacity of the local landscape to provide both demographic (breeding) and dispersal (recruitment) support for resident and floater northern spotted owls[,]" and increased fragmentation "will also increase the potential for competitive interactions with barred owls" for habitat and prey "in Project units where habitat has yet to be harvested, and in suitable habitat outside the Project area." FWS AR 001579. "Because the capability of the local landscape to provide suitable habitat to breed, feed, and shelter will be significantly impacted, adverse effects to northern spotted owl habitat are expected as a result of the implementation of the proposed action." *Id*. These adverse effects constitute incidental take. *Ariz. Cattle Growers'*, 273 F.3d at 1238 ("significant impairment of the species' breeding or feeding habits" accompanied by habitat degradation that "retards . . . recovery of the species" may constitute take) (quoting *Nat'l Wildlife Fed'n v. Burlington Northern R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994)).

Instead of taking habitat fitness into account in evaluating the potential for incidental take, FWS instead concluded that incidental take is precluded for logging in sites where two consecutive surveys have found no spotted owls. But the best available science—and extensive guidance from both FWS and BLM—indicates that inferring non-occupancy from two consecutive surveys without northern spotted owl detections, standing alone, is insufficient to determine that potential take is precluded. As the Biological Opinion acknowledges, "[s]ite occupancy varies among years; historic spotted owl sites may be unoccupied for more than three years, and then are subsequently reoccupied by owls. . . . sites that are unoccupied for a number of years may be reoccupied in the future." FWS AR 001544. FWS has observed that at least 4 of

the 11 northern spotted owl sites in the action area have had 3-4 year periods without detections, but they were followed by reoccupancy that could not be accounted for by any change in habitat condition. *Id*. at 000324. Precisely this situation occurred in the Terminus timber sale in 2020 when an unoccupied site was reoccupied by a single owl. BLM AR 005001.

The inherent problems of determining incidental take on the basis of occupancy data derived through surveys alone is further confounded by the well-established fact that the presence of barred owls makes northern spotted owls less likely to respond to surveyors' calls and thus not located in the survey despite its actual presence and occupancy of the site. As the Biological Opinion notes, "many research biologists have found reduced spotted owl responses (detection rates) when barred owls are present, which can lead to false negative survey results . . . ." FWS AR 001544; *see also id.* at 001519.

Because surveys alone may fail to detect occupancy or account for other causes of take, BLM's own RMP and guidance mandates a project-specific, case-by-case analysis of take. BLM's 2016 RMP states that "[w]hether a specific timber harvest would result in incidental take will be determined on a case-by-case basis." BLM AR 014533. To apply the 2016 RMP for site-specific projects like the North Project, BLM issued an Information Bulletin to guide BLM staff on avoiding take, *id.* at 006049, explaining that a determination of take "would depend on site-specific conditions, including information on owl occupancy, stand-specific habitat conditions, landscape habitat conditions, and timing of actions," *id.* at 006057, and "timber sale planning will need to consider and accommodate the dynamic nature of owl occupancy information." *id.* at 006055. The Information Bulletin recognizes a "strong body of literature supporting conditions generally associated with owl occupancy and reproduction that can be used to assess the likelihood that an action would interfere with continued use of the site for survival and

reproduction," and "provides a summarization of … the scientific information that has been used by the U.S. Fish and Wildlife Service in other owl consultations." *Id.* at 006057.

The Information Bulletin specifies that "[a]ny estimate of [incidental take] needs to take into account variance in actual home range/core areas estimated from empirical studies and the composition and arrangement of habitat elements," and notes "[t]his is consistent with past and expected future Level 1 Team analysis." *Id.* at 006063. Further, survey history is "not the only source of best available information in determining spotted owl site occupancy[,]" and "other sources of information could include site history (including history of re-occupancy and habitat availability), quantity, quality, and distribution." *Id.* Contrary to BLM's position in the North Project, and FWS's Biological Opinion, habitat metrics and not just surveys are highly relevant to accurately assess incidental take. Habitat fitness is a factor that FWS should have considered in assessing whether the North Project will lead to incidental take of spotted owls. *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (agency action is valid only if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made").

The arbitrary and capricious nature of the Incidental Take Statement becomes more apparent viewed in the light of the competing demands placed on BLM that permeate the record in this case. The 2016 RMP directs the Klamath Falls Resource Area BLM to meet an Allowable Sale Quantity (ASQ) of 6 million board feet per year. BLM AR 001084. In a memo to district managers, BLM declared it "extremely important that the BLM demonstrate success" in meeting the ASQs. *Id.* at 004824. "To achieve these goals, [BLM] need[s] to utilize all options for sustained yield management as anticipated in the RMPs, including regeneration harvest." *Id.* at 004825. The expansion of the Cascade-Siskiyou National Monument removed approximately

25% of the harvestable acres from the Resource Area's timber base, which consisted of approximately 40-50% of BLM's potential timber volume at the time, yet the ASQ remained unchanged. FWS AR 000008. Meanwhile, the 2016 RMP prohibits timber sales that would cause incidental take of northern spotted owls. BLM AR 001075. It appears to be out of the intense pressure of these competing demands that the new methodology for determining occupancy and take emerged. FWS AR 000008–09.

The responsible FWS biologist repeatedly voiced concerns that the Survey Protocol was insufficient to determine occupancy and was an inadequate basis for determining take. She asserted "there may be situations, based on available habitat within a known territory [home range] or based on past occupancy and the possibility of re-occupancy, that a determination of incidental take may be warranted for future owls that could potentially re-occupy the territory even though current surveys (to protocol standards) indicate non-occupancy." FWS AR 000245. BLM staff responded that "we need to move forward with this project and our time is limited and as of right now the project would not be able to go forward based on [FWS biologist's] interpretation of incidental take." *Id.*

BLM voiced frustration with being "unable to convince" the FWS biologist that the two-year occupancy methodology was sufficient, and asserted "[t]his project is the sole source of our ASQ for 2018 and for the next ten years so this needs to be resolved quickly if we are to meet our targets." BLM AR 004272. On the FWS side, responsible officials at the state level acknowledged BLM's dilemma, FWS AR 000319–20, but also noted that another BLM resource area was willing to adopt a more protective methodology for determining incidental take, "show[ing] flexibility on BLM's part that we are not seeing with the [Klamath Falls Resource Area, KFRA] office[,]" and recommended the FWS biologist "see if there is similar flexibility on

KFRA's part." FWS AR 000324. Consequently, the FWS biologist asked whether BLM could utilize a more protective method of determining no take as other BLM Resource Areas had done. FWS AR 000431; BLM AR 005883. BLM declined, citing, among other reasons, that that doing so "could result in failure to meet annual ASQ targets." BLM AR 005883–84.

In the Biological Opinion, FWS departed from its established method for determining occupancy and take, including for other Klamath Falls BLM projects, and failed to explain its reasons for doing so. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (when a federal agency departs from long-standing policy and practice, it must "display[] awareness that it is changing its position" and "if the new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must provide a "reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy"). In this case, FWS' incidental take methodology "is inconsistent with how [FWS] has conducted past consultations with BLM[,]" where the agencies "relied on habitat quantity and distribution in addition to surveys[.]" FWS AR 000324. FWS "[i]n the past . . . would have authorized take" for timber harvest based on several biological factors, but adopted a different methodology for the North Project. *Id.* at 000167–68. FWS noted that this methodology "appears to be a departure from the way in which the [FWS] has assessed the potential for take on previous section 7 consultations with the [Klamath Falls BLM] and other federal agencies." *Id.* at 000250. "In the recent past, prior to the latest BLM RMP revision, [FWS] was calling incidental take even though recent two year surveys didn't turn up anything. The basis was largely the likelihood of reoccupation . . . ." *Id.* at 000319.

The Biological Opinion fails to acknowledge that FWS has adopted a substantially different methodology for determining take than past biological opinions, let alone offered a

reason for this departure. Of inconsistent biological opinions, the Fourth Circuit has held, "[w]hile FWS is 'entitled to change its view, . . . it is obligated to explain its reasons for doing so.'" *Defs. of Wildlife v. Dept. of the Interior*, 931 F.3d 339, 362 (4th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 56 (1983)); *see also Rock Creek Alliance v. U.S. Fish and Wildlife Serv.*, 390 F. Supp. 2d 993, 1010 (D. Mont. 2005) (agency must explain a change in conclusions between biological opinions).

The record shows FWS's decision to adopt a new method of determining occupancy and incidental take was driven primarily by BLM's goal of meeting an arbitrary timber quota. Rather than utilize a case-by-case method considering such factors as habitat quality and quantity, history of occupancy and reoccupancy, and barred owl presence—consistent with the best available science and BLM's own Information Bulletin—FWS chose a methodology that would fast-track logging at the expense of protecting the northern spotted owl. In doing so, FWS failed to use the best available science as required under the ESA, 16 U.S.C. § 1536(a)(2), and unlawfully "relied on factors which Congress had not intended it to consider." *State Farm*, 463 U.S. at 43. As the Supreme Court has held, "the plain language of the [ESA], buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable[,]'" and courts "emphatically do not" have the authority to balance economic concerns "against a congressionally declared 'incalculable' value.'" *Hill*, 437 U.S. at 186, 188. Likewise, here, BLM elevated a timber target over its ESA obligations, and FWS succumbed to internal pressure to likewise elevate logging over species conservation, in violation of the ESA.

**B.    BLM's Reliance on the Legally Flawed Biological Opinion Violates the ESA.**

Section 7(a)(2) of the ESA requires all federal agencies to insure their actions are not likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). The ultimate responsibility for compliance with this mandate

falls on the action agency. *Ctr. for Biological Diversity*, 698 F.3d at 1127–28. An agency violates the ESA when it relies on a "legally flawed" biological opinion or "fail[s] to discuss information that would undercut the opinion's conclusions." *Id.*

As discussed above, the Biological Opinion fails to consider the life-cycle of northern spotted owls, unlawfully relies on the Late-Successional Reserve land use allocation of the 2016 RMPs, and unlawfully concluded that the Project will cause no take of northern spotted owls. These deficiencies are "legal in nature," and "discerning them requires no technical or scientific expertise." [3] *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010). By relying on the legally flawed Biological Opinion, BLM has violated its substantive duty under Section 7(a)(2) to insure the North Project is not likely to jeopardize listed species or result in the destruction or adverse modification of critical habitat. *Id.*

### C.   The North Revised Environmental Assessment Fails to Consider the Direct, Indirect, and Cumulative Effects of the North Project in Violation of NEPA.

NEPA requires that an EA analyze "direct effects," which are "caused by the action and occur at the same time and place," as well as "indirect effects which . . . are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8 (1978). An EA must also assess the cumulative impacts of agency action, those effects resulting "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. §§ 1508.7–1508.8 (1978).

The North REA fails to consider the direct, indirect, and cumulative effects of the North Project on the northern spotted owl and its continued viability and recovery given: 1) the

---

[3] Indeed, BLM urged FWS to adopt the insufficient protocol for determining take, contrary to the guidance set forth in its own Information Bulletin.

24

removal of 9,073 acres of currently suitable habitat, including the complete removal of 4,864 acres of designated critical habitat for the species; 2) the increased occupancy of barred owls as a result of habitat removal for spotted owls that facilitates spotted owl non-occupancy; 3) the lack of suitable spotted owl habitat and occupied sites on adjacent nonfederal lands; 4) northern spotted owl survival and recovery in the event that the experimental barred owl control program is successful; 5) the value of retaining currently occupied sites as refugia for displaced northern spotted owls; and 6) how the Project may result in a competitive advantage to barred owls. Rather than conduct this analysis in the context of the species' recovery, the REA discloses the mere fact of extensive suitable habitat removal, BLM AR 001092–1102, the high likelihood that barred owls will occupy all habitat within the project area, *id.* at 000092, and the truism that there is no suitable spotted owl habitat on intermingled nonfederal lands, *id.* at 000083.

As then-Judge Breyer admonished in *Sierra Club v. Marsh*, 769 F.2d 868, 874 (1st Cir. 1985), "To announce that these documents—despite their length and complexity—demonstrate no need for an EIS is rather like the mathematics teacher who, after filling three blackboards with equations, announces to the class 'you see, it is obvious.'" But it is not obvious how the North Project will affect the ability of the northern spotted owl to recover given the logging of more than 9,000 acres of suitable habitat, the likelihood that barred owls will occupy all habitat in the project area post-project, and that there is no suitable spotted owl habitat on adjacent nonfederal lands where the species might find refuge from the liquidation of habitat on federal lands, because the North REA does not conduct this analysis.

The North REA also fails to consider the direct, indirect, and cumulative effects of the North Project on northern spotted owl survival and recovery in the event that the experimental barred owl control program is successful. If so, FWS and BLM expect to implement a permanent

25

control program to reduce barred owl populations in an effort to allow northern spotted owls to recolonize suitable habitat. BLM AR 007228–29. The availability of suitable habitat will then be the primary limiting factor for northern spotted owl survival and recovery. FWS AR 016364–65.

However, according to the North REA, barred owls will supplant northern spotted owls in the project area regardless of how fast BLM destroys suitable northern spotted owl habitat through logging, and therefore retention, now, of suitable spotted owl habitat has no value. BLM AR 000089. This assertion ignores the agencies' larger premise, which is that lethal barred owl control may in fact give spotted owls the ability to recover; and if so, then the lack of suitable spotted owl habitat—not competition from barred owls, which will be reduced or eliminated due to lethal control measures—will be the limiting factor for the spotted owl's persistence and recovery. Thus, BLM should have considered how the elimination of more than 9,000 acres of spotted owl habitat will affect the ability of the species to persist, recolonize the project area, and ultimately recover to the point where ESA protections are no longer warranted.

Similarly, the North REA fails to consider the conservation value of retaining currently occupied sites as refugia for displaced northern spotted owls. The North REA contends it is unnecessary to set aside occupied sites because such areas are already "protected" under the Project Design Feature that prohibits removing or downgrading habitat in occupied northern spotted owl sites. *Id*. at 000093. However, under the management approach of the agencies, these areas will be logged as soon as they become unoccupied, which is likely given the lack of sufficient suitable habitat. *Id*. at 014436–37. Thus, protecting such areas from logging would add meaningful long-term protection beyond the Project Design Feature's temporary protection.

As with a successful barred owl control program, the lack of suitable habitat remains a limiting factor for spotted owl persistence and recovery; and BLM should have considered how

protecting additional suitable habitat would affect the conservation and recovery of the species. FWS AR 016284, 016546–47.

Instead of addressing this issue, the North REA states without further explanation that the North Project's reduction in forest cover is likely to have similar effects on barred owls as on northern spotted owls. BLM AR 000091. However, experts have observed that barred owls adapt more readily to inferior habitat conditions, cautioned that the "availability of old forests and associated prey species are likely to be the most strongly limiting factors in the competitive relationships between these species[,]" and highlighted "the importance of maintaining high-quality habitat in late-successional forests." *Id*. at 018425–26. The reduction in forest cover can be expected to disproportionately affect northern spotted owls relative to barred owls, leaving barred owls better adapted to the post-logging landscape than northern spotted owls. This effect of habitat removal and downgrading is likely to compound the barred owl threat to northern spotted owls in the project areas for decades to come, but is not a direct, indirect, and cumulative effect BLM considered in the North REA.

Rather than conduct the requisite analysis addressing the forgoing issues, the North REA unlawfully relies on BLM's 2016 RMP and FEIS for the requisite site-specific analysis. BLM AR 000080, 000085, 000089. But the 2016 RMP and FEIS do not contain any site-specific analysis pertaining to the North Project area, so "tiering to the RMP EIS cannot save the EA[]." *KS Wild v. U.S. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004); *Blackwood*, 161 F.3d at 1214 ("It does not support the proposition that any scale of logging project is exempt from a project-specific EIS simply because an EIS for a forest plan contemplates that logging may occur."). As the Ninth Circuit recently explained, "[t]his line of precedent makes sense: a site-specific project demands site-specific analysis. Agencies cannot rely on a general discussion in a

programmatic EIS or other document to satisfy its NEPA obligations for a site-specific action."

*Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019) (*citing W.

Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013), *Friends of Yosemite Valley v.

Norton*, 348 F.3d 789, 800 (9th Cir. 2003), *opinion clarified*, 366 F.3d 731 (9th Cir. 2004), and

*KS Wild*, 387 F.3d at 998); *see also Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 410 F.

Supp. 3d 1146, 1157–58 (D. Or. 2019) (rejecting BLM's argument that site-specific timber sale

effects were considered in BLM's 2016 RMP FEIS). BLM's failure to consider the direct,

indirect, and cumulative effects of the North Project on the northern spotted owl's ability to

recover is arbitrary, capricious, and not in accordance with NEPA. 5 U.S.C. § 706(2)(A).

## D.    BLM's Failure to Prepare an Environmental Impact Statement Violates NEPA.

BLM has failed to prepare an EIS for the North Project, despite the presence of several

factors indicating possible significant environmental consequences of the proposed action.

*Ocean Advocates*, 361 F.3d at 1124–25 ("We have held that one of these factors may be

sufficient to require preparation of an EIS."). These deficiencies—both individual and in

combination—indicate that the EA fails to meet the minimum NEPA requirements, and an

environmental impact statement is therefore required. 40 C.F.R. § 1500.1(b). The agency's

decision to implement and proceed with the proposed action without first preparing an EIS is

arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

### 1.    The degree to which the effects on the quality of the human environment are likely to be highly controversial, highly uncertain, or involve unique or unknown risks (40 C.F.R. §§ 1508.27(b)(4)-(b)(5)).

In evaluating whether a federal agency should have prepared an EIS due to a federal

action's highly controversial or uncertain effects, a court will hold that "[a] project is 'highly

controversial' if there is a substantial dispute about the size, nature, or effect of the major Federal

action rather than the existence of opposition to a use. A substantial dispute exists when evidence

. . . casts serious doubt upon the reasonableness of an agency's conclusions. Mere opposition

alone is insufficient to support a finding of controversy." *Bark v. U.S. Forest Serv.*, 958 F.3d

865, 870 (9th Cir. 2020) (internal citations, alterations, and quotations omitted). Similarly, "an

agency must generally prepare an EIS if the environmental effects of a proposed agency action

are highly uncertain [or involve unique or unknown risks]. Preparation of an EIS is mandated

where uncertainty may be resolved by further collection of data, or where the collection of such

data may prevent speculation on potential effects. An EIS is not required anytime there is some

uncertainty; rather, the effects of the project must be highly uncertain." *W. Watersheds Project v.*

*U.S. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1135–36 (D. Nev. 2008) (internal citations,

alterations, and quotations omitted).

There are a number of effects of the North Project on northern spotted owls that are

highly controversial, highly uncertain, or involve unique or unknown risks, thus compelling the

preparation of an EIS. First, the North REA does not assess how the complete removal of more

than 9,000 acres of suitable spotted owl habitat (the vast majority of which is critical habitat) will

affect the ability of the species to recover: it is highly uncertain whether this population of owls,

which is already experiencing severe downward population pressure and recently produced no

young, will persist, much less recover to the point where the protection of the ESA is no longer

required. It is highly uncertain what will be the fate of the currently extant northern spotted owls

in the North project area once suitable (but unoccupied) habitat is logged: given the absence of

habitat on nonfederal lands, neither BLM nor FWS have disclosed to where these owls will

disperse or whether they will survive at all.

29

Second, the experimental barred owl control program is highly controversial in that neither FWS nor BLM know whether it will be successful. Early results suggest it may be, BLM AR 012576, which then raises the highly uncertain question of whether northern spotted owls in the North project area will have sufficient suitable habitat to recolonize the area once competitive barred owls are removed: there is no information in the record about this possible—indeed, desirable—outcome. If the barred owl control program *is* successful, it is highly uncertain whether there will be any spotted owls remaining to reoccupy the newly-vacant habitat: the administrative record does not address this issue. There are substantial unknown risks to the species of assuming spotted owls will recolonize the North project area if there is no suitable habitat there for up to 120 years because it has been logged.

Third, BLM's premise that it is futile to retain unoccupied suitable habitat for future spotted owl colonization should the barred owl control program be effective is highly controversial and uncertain, and involves unique and unknown risks to the spotted owl. Not only is this premise not based on any sort of biological evidence in the record, but it also "writes off" the ability of a listed species to persist, even though FWS has repeatedly stated that retention of suitable habitat is essential to the species' conservation and recovery. FWS AR 016284, 016546–47. BLM, therefore, is gambling with a species' survival based on a premise—that habitat does not matter—that has been repeatedly rejected by FWS. Rather than hew to the best available science, BLM has proposed—and FWS has blessed—a decadal timber sale that will liquidate the limited suitable owl habitat that remains anywhere in this portion of southwest Oregon. Given the owl's continued precarious survival status, eliminating all suitable habitat in the Project area involves unique and unknown risks to the species.

30

Fourth, FWS has dramatically shifted its position in terms of how it determines incidental take for spotted owls, choosing to rely on occupancy surveys alone rather than to utilize surveys in conjunction with biological habitat thresholds. BLM has encouraged and accepted this shift in approach. FWS AR 000245; BLM AR 005883–84. In the past, FWS would find incidental take if habitat for the owl was reduced below threshold levels, FWS AR 000167–68, 000250, 000319, 000324; but now, the agency will only look to whether surveys result in affirmative detections over a two-year period. *Id*. at 001604. As discussed *infra*, this methodology is flawed, as demonstrated first by the fact that spotted owl surveys are regularly confounded by barred owl presence, and second by the fact that FWS and BLM determined that the East Miner's Creek site was unoccupied based on a lack of detections from the mid-1990s to 2011, thus releasing these acres for logging; but surveys in 2020 revealed a single owl occupying the site. BLM AR 004983, 005001. While a positive outcome that spot surveys located this bird, clearly (as FWS acknowledges but disregarded here) more than just surveys dictate whether spotted owls are present and using extant suitable habitat. FWS and BLM's new approach to determining owl occupancy is highly controversial and uncertain, and its long-term effect on spotted owl persistence and recovery involves unknown risks to the species.

Finally, FWS and BLM rely heavily on the Late-Successional Reserve land use allocation to provide for the habitat needs of the spotted owl. Not only has this approach been rejected by the Ninth Circuit, *see Gifford Pinchot*, 378 F.3d at 1076, but also there is no evidence in the record that this approach will be successful. Instead, it is the *hypothesis* of BLM and FWS that the reserves will be sufficient to carry the agencies' ESA obligations; but there is no administrative record data to support this hypothesis and given the precarious status of the

species, relying on an untested hypothesis is highly controversial and uncertain, and involves unknown risks to the species' survival and recovery.

KS Wild has raised substantial questions regarding the degree to which the effects of the Project are likely to be highly controversial, highly uncertain, or involve unique or unknown risks, requiring the preparation of an EIS. *Blackwood*, 161 F.3d at 1212; *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998), *overruled on other grounds*, *Lands Council*, 537 F.3d at 997. Preparation of an EIS would bring to light information that could resolve some of these highly controversial and uncertain effects of the North Project. The Ninth Circuit has held that an EIS is appropriate under 40 C.F.R. §§ 1508.27(b)(4)–(b)(5) when the lack of data about a project's effects could be cured by a more through EIS that would develop or obtain that missing information. *Blackwood*, 161 F.3d at 1213–14; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731–36 (9th Cir. 2001), *abrogated on other grounds*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010); *W. Watersheds Project*, 552 F. Supp. 2d at 1135–36. "The purpose of an EIS is to obviate the need for such speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (citing *Found. for N. American Wild Sheep v. USDA*, 681 F.2d 1172, 1179 (9th Cir. 1982)).

> **2.    The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration (40 C.F.R. § 1508.27(b)(6)).**

The North Project represents the first—and only—example of the Klamath Falls Resource Area's timber sale offerings under BLM's 2016 RMPs. BLM AR 000080; 000058 ("The North Project Area consists of the only current feasibly grouped collection of forest stands that meets the design criteria and can immediately meet the [Klamath Falls Resource Area's Allowable Sale Quantity or timber target] in a sustained manner."). The North Project will also

be the only environmental analysis for logging that the Klamath Falls Resource Area plans to conduct for the foreseeable future, given that the Resource Area is depauperate in merchantable timber due to past logging. *Id.* at 008062. Therefore, the North Project is an action that establishes a precedent for future action, as it is the *only* action authorizing logging in the Resource Area, and therefore represents the first, last, and only "decision in principle about a future consideration," i.e. the decision to offer timber for sale from the Resource Area. In the past, BLM would have put forward several timber offerings from the Resource Area over the life of the Resource Management Plan: the decision to offer all of the Resource Area's timber target in a single environmental analysis is precedential because this type of decision has never been made in the past, and it will be the only decision to offer timber here that BLM makes.

"[P]reparation of an EA is usually highly specific to the project and the locale, thus creating no binding precedent[,]" *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011), and "[c]ourts have therefore been reluctant to conclude that 40 C.F.R. § 1508.27(b)(6) provides an independent basis for preparing an EIS." *Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F. Supp. 2d 1199, 1218 (D. Mont. 2012), *aff'd in part, vacated in part, remanded sub nom. Friends of the Wild Swan v. Garcia*, 650 F. App'x 400 (9th Cir. 2016). However, the Ninth Circuit has explained that the purpose of 40 C.F.R. § 1508.27(b)(6) "is to avoid the thoughtless setting in motion of a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162–63 (9th Cir. 1998) (internal quotations omitted, citing *Sierra Club*, 769 F.2d at 879). In the present case, there will be no further environmental analysis addressing logging in the Resource Area: the decision to log has been made in the North Project REA, and the bureaucratic commitment to that decision means that the decision will be progressively harder – indeed, impossible – to undo

because it is the only decision BLM will ever make affecting the timber resource in the Resource

Area. Consequently, the facts of the decision in this case set this situation apart from other cases

where the courts have declined to find that this significance factor lends weight to KS Wild's

claim that an EIS should have been prepared.

> **3.      The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973 (40 C.F.R. § 1508.27(b)(9)).**

The North Project "may affect and is likely to adversely affect" the Threatened northern

spotted owl, and will result in the elimination of 4,864 acres of designated spotted owl critical

habitat. FWS AR 001498. As a result of the Project, BLM expects that 5 currently occupied

spotted owl sites will be lost, and that there will be no suitable habitat for the species in the

project area for 120 years. *Id*. at 001566; BLM AR 000557 ("the expected life of this EA is long

enough that currently occupied [northern spotted owl] territories may become unoccupied within

the life of the EA which would potentially 'free up' currently . . . encumbered proposed sale

acres"). The lack of suitable spotted owl habitat is expected to create a competitive advantage for

the barred owl, which, in conjunction with the lack of suitable habitat, will create a situation

where it is unlikely that the spotted owl will recolonize the North Project area in the foreseeable

future. BLM AR 012576–77; FWS AR 001579.

This court has held that the removal of less than 190 acres of spotted owl critical habitat,

and the removal of 82 acres of suitable habitat, requires the preparation of an EIS under this

significance factor, acreages that are much lower than that which will be eliminated as a result of

the North Project. *Cascadia Wildlands v. Carlton*, 2017 WL 1807607 *8–9 (D. Or. Mar. 20,

2017) (citing *Or. Wild v. U.S. Bureau of Land Mgmt.*, 2015 WL 1190131 *9–10 (D. Or. Mar. 14,

2015) (proposed action removing less than 190 acres of critical NSO habitat (including 153 acres

of NRF habitat) within three overlapping spotted owl home ranges, even with "no nests or projected taking of spotted owls," was significant under 40 C.F.R. § 1508.27(b)(9) and supported the need for an EIS); *KS Wild*, 373 F. Supp. 2d at 1080–81 (FWS' "likely to adversely affect" finding "is an important factor supporting the need for an EIS"). The Ninth Circuit similarly has held that the lack of information about a project's effect on listed species, *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 828–29 (9th Cir. 2008), *appeal dismissed as moot*, 571 F.3d 859 (9th Cir. 2009), or information that itself indicates there will be a significant effect on a listed species, also compels the preparation of an EIS. *Nat. Res. Def. Council, Inc. v. Winter*, 518 F.3d 658, 692–93 (9th Cir. 2008), *rev'd on other grounds*, 555 U.S. 7 (2008). Given that the North Project is likely to significantly adversely affect the northern spotted owl, in conjunction with other significance factors, BLM should have prepared an EIS for the Project.

## VI.    CONCLUSION.

For the forgoing reasons, the court should GRANT Plaintiffs' motion for summary judgment.

Date:   November 4, 2020.                  Respectfully submitted,

/s/  Susan Jane Brown
Susan Jane Brown (OSB #054607)
4107 NE Couch Street
Portland, Oregon 97232
(503) 914-1323 | Phone
brown@westernlaw.org

*Counsel for Plaintiffs*