Michael E. Haglund, OSB No. 772030
e-mail: mhaglund@hk-law.com
Julie A. Weis, OSB No. 974320
e-mail: weis@hk-law.com
Christopher T. Griffith, OSB No. 154664
e-mail: cgriffith@hk-law.com
Haglund Kelley LLP
200 SW Market St., Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorneys for Defendant-Intervenor
Murphy Company

THE HONORABLE MARK D. CLARKE

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## MEDFORD DIVISION

KLAMATH SISKIYOU WILDLANDS
CENTER, OREGON WILD, CASCADIA
WILDLANDS, and SODA MOUNTAIN
WILDERNESS COUNCIL,

        Plaintiffs,

        v.

UNITED STATES BUREAU OF LAND
MANAGEMENT,

        Defendant,

and

MURPHY COMPANY,

        Defendant-Intervenor.

Case No.: 1:19-cv-01810-CL

**DEFENDANT-INTERVENOR'S
MOTION AND MEMORANDUM IN
SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT**

**ORAL ARGUMENT REQUESTED**

**DEFENDANT-INTERVENOR'S SJ MEM.**

# TABLE OF CONTENTS

MOTION ................................................................................................................1

I.    INTRODUCTION ...........................................................................................1

II.   LEGAL STANDARDS GOVERNING JUDICIAL REVIEW ...........................4

      A.    Summary Judgment Standard ................................................................4

      B.    The APA Arbitrary and Capricious Standard of Review .......................5

      C.    Tiering Under NEPA ...........................................................................5

      D.    Deference to Agency Expertise and Management Direction ..................6

III.  THE NORTH LANDSCAPE PROJECT AND ITS POTENTIAL IMPACTS.................6

IV.   ARGUMENT ..................................................................................................12

      A.    KSWild's Challenge to the Biological Opinion is Meritless ................12

            1.    FWS Fully Considered the Northern Spotted Owl's Life Cycle .............12

            2.    FWS's Analysis of Effects to Northern Spotted Owl Critical Habitat
                  and Recovery is Wholly Lawful .............................................15

            3.    FWS Correctly Concluded that North Project Implementation Will Not
                  Incidentally Take Northern Spotted Owls .................................18

      B.    BLM Properly Relied on the Lawful FWS Biological Opinion..........................25

      C.    The Revised EA Fully Satisfies NEPA's "Hard Look" Requirement .................25

      D.    BLM Reasonably Concluded NEPA Did Not Require Preparation of an EIS ......30

            1.    The Effects of North Project Implementation Are Not Highly
                  Controversial, Uncertain or Unique Under NEPA ....................31

            2.    North Project Implementation Does Not Set a NEPA Precedent .............33

            3.    The Effects of North Project Implementation on the Northern Spotted
                  Owl and/or Its Critical Habitat Do Not Require an EIS Under NEPA ......34

V.    CONCLUSION ..............................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akiak Native Cmty. v. U.S. Postal Serv.*,
  213 F.3d 1140 (9th Cir. 2000) ............................................30

*Am. Forest Res. Council v. Hammond*,
  No. CV 16-1599 (RJL), 2019 WL 6311896 (D.D.C. Nov. 22, 2019) ....................14

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
  273 F.3d 1229 (9th Cir. 2001) ............................................21

*Barnes v. F.A.A.*,
  865 F.3d 1266 (9th Cir. 2017) ............................................30

*Barnes v. U.S. Dep't of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) ............................................34

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs*,
  620 F.3d 936 (9th Cir. 2010) ............................................20

*Cascadia Wildlands v. Carlton*,
  2017 WL 1807607 (D. Or. Mar. 20, 2017) ............................................34

*Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) ............................................30

*Deer Creek Valley Natural Resource Conservation Ass'n v. U.S. BLM*,
  No. 1:12-cv-1596-CL, 2014 WL 458288 (D. Or. Feb. 4, 2014)............................6-7

*Durning v. Citibank, N.A.*,
  950 F.2d 1419 (9th Cir. 1991) ............................................34-35

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
  451 F.3d 1005 (9th Cir. 2006) ............................................30, 31

*F.C.C. v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)............................................24

*Friends of the Wild Swan v. U.S. Forest Serv.*,
  875 F. Supp. 2d 1199 (D. Mont. 2012), *aff'd in part*, *vacated in part*,
  *remanded on other grounds*, 650 Fed. Appx. 400 (9th Cir 2016) ............................................34

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004), *superseded on other grounds by* 81 Fed. Reg.
7,214 (Feb. 11, 2016) ........................................................................................15, 16, 17, 33

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds by Am.
Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) .................5, 6, 26

*Marsh v. Oregon Natural Res. Council*,
490 U.S. 360 (1989) ........................................................................................................6, 30

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ...............................................................................................................5

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
23 F.3d 1508 (9th Cir. 1994) ...............................................................................................21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) ...............................................................................................17

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
384 F.3d 1163 (9th Cir. 2004) ....................................................................................... 20-21

*Native Ecosystems Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) ......................................................................................... 6-7

*Native Village of Nuiqsut v. BLM*,
431 F. Supp. 3d 1003 (D. Alaska 2020) ..............................................................................28

*Pacific Rivers v. U.S. Bureau of Land Management*,
Case No. 6:16-cv-01598-JR (D. Or. Oct. 12, 2018), *adopted in full*, 2019 WL
1232835 (D. Or. Mar. 15, 2019), *aff'd*, No. 19-35384, 20 WL 2510759 (9th
Cir. May 15, 2020) ...........................................................................................................3, 15

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation
(PCFFA I)*,
265 F.3d 1028 (9th Cir. 2001) ..............................................................................................15

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation
(PCFFA) II*,
426 F.3d 1082 (9th Cir. 2005) ...........................................................................12, 13, 14, 15

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ..............................................................................................................25

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ..........................................................................................12, 25

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ...................................................................21

*T.W. Elec. Serv. v. Pac. Elec. Contractors*,
    809 F.2d 626 (9th Cir. 1987) .......................................................................4

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    139 S. Ct. 361 (2018) ................................................................................10

*WildEarth Guardians v. Provencio*,
    923 F.3d 655 (9th Cir. 2019) ........................................................30, 31, 35


**Statutes**

5 U.S.C. § 706(2)(A) .......................................................................................5

16 U.S.C. §§ 1531 et seq .................................................................................3

16 U.S.C. § 1532 .....................................................................................18, 32

16 U.S.C. § 1536(a)(1) ..................................................................................16

16 U.S.C. § 1536(b)(3)(A) .............................................................................12

42 U.S.C. §§ 4321 et seq .................................................................................3

42 U.S.C. § 4332(2)(C) .............................................................................25, 30

43 U.S.C. § 2601 et seq ...................................................................................3


**Other Authorities**

40 C.F.R. § 1501.4(b) ....................................................................................30

40 C.F.R. § 1502.20 ........................................................................................6

40 C.F.R. § 1508.27 ....................................................................30, 31, 33, 34

40 C.F.R. § 1508.28 ......................................................................................5-6

43 C.F.R. § 46.140(c) ......................................................................................6

50 C.F.R. § 402.02 ....................................................................................16, 18

77 Fed. Reg. 71,876 (Dec. 4, 2012) ............................................................................10

85 Fed. Reg. 43,304 (July 16, 2020) ...........................................................................30

85 Fed. Reg. 48,487 (Aug. 11, 2020) ..........................................................................10

FED. R. CIV. P. 56 ........................................................................................................1, 4

## MOTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure (FRCP) and this Court's order of July 28, 2020, defendant-intervenor Murphy Company moves the Court for summary judgment against plaintiffs' Endangered Species Act (ESA) claims, brought against the U.S. Fish and Wildlife Service (FWS) and the U.S. Bureau of Land Management (BLM), and against plaintiffs' National Environmental Policy Act (NEPA) claims, regarding BLM's North Landscape Project on the agency's Klamath Falls Resource Area (KFRA) in Southern Oregon. As discussed below, Murphy Company and the federal defendants are entitled to judgment as a matter of law.  In support of this motion, Murphy Company relies on the following Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, the pleadings on file, including the Administrative Record (AR),[1] and the filings of BLM and FWS, all of which support granting summary judgment in favor of Murphy Company and federal defendants, and against plaintiffs.

## MEMORANDUM

## I.     INTRODUCTION.

Before the Court is yet another challenge to BLM's management of the Harvest Land Base in southern Oregon brought by plaintiffs Klamath Siskiyou Wildlands Center et al. (collectively KSWild).  The land management action challenged in this case is the KFRA's North Landscape Project (the Project, or the North Project), under which Murphy Company is the purchaser of the not-yet-awarded Stag Timber Sale (Stag Sale).

Murphy Company purchased the Stag Sale in the summer of 2019 with a goal of operating it no later than the 2020 operating season.  Declaration of John Murphy (Murphy Decl.

---

[1]  There are two agency defendants, so there are two ARs identified as BLM AR and FWS AR.

**PAGE 1 --     DEFENDANT-INTERVENOR'S SJ MEM.**

(Docket No. 7) ¶¶ 5-6.  The Stag Sale is important to Murphy Company operations because it is comprised largely of white fir.  White fir logs from the Stag Sale will be peeled at Murphy Company's White City veneer plant, with the resulting white fir veneer being used as high grade veneer in both the softwood plywood manufactured at Murphy Company's Rogue River plant and the hardwood plywood made at its Eugene manufacturing facility.  *Id.* ¶¶ 2-3, 6.

Murphy Company's Stag Sale is modest, even more so after BLM dropped a 103-acre unit to avoid incidental take of a newly-discovered northern spotted owl (an ESA threatened species) in accordance with protective Project Design Features (PDFs).  *See generally* BLM AR 41-42 (Decision Record #3, Stag Timber Sale (Modified) at 1-2).  BLM's PDFs ensure that authorized timber harvest avoids incidental take of northern spotted owls, as required by the governing 2016 Southwestern Oregon Resource Management Plan (2016 RMP).  BLM AR 57 (2020 Revised Environmental Assessment (Revised EA) at 8) (discussing both the North Project's avoidance of incidental take and the 2016 RMP's prohibition against same).  As modified, the Stag Sale involves only 336 acres of thinning harvest that will generate about 4.5 million board feet of timber from lands within the Harvest Land Base's Uneven-Aged Timber Area land use allocation.  *Id.*  The Harvest Land Base is designated under the governing 2016 RMP for continual timber production and, accordingly, is to be managed to achieve continual, sustained-yield timber harvest.  BLM AR 33 (2020 Finding of No Significant Impact (FONSI)) ("HLB is the land use allocation for which timber production activities were designated in the RMP.").  The Harvest Land Base is *not* "'being relied upon for supporting reproducing populations of spotted owls . . . .'"  FWS AR 283 (FWS Biological Opinion for the North Project (Biological Opinion) at 86) (quoting FWS Biological Opinion for the 2016 RMP).

The North Project also is of great importance to Murphy Company because it authorizes timber harvest over about a ten-year period from the Harvest Land Base within the KFRA. BLM AR 33 (FONSI at 2). Notably, in addition to being comprised solely of Harvest Land Base acres dedicated to timber harvest under the 2016 RMP, the Project area also is comprised almost entirely of O&C Act lands, BLM AR 57 (Revised EA at 8), which per congressional mandate are to be managed for the dominant use of permanent forest production under the principles of sustained-yield timber management.[2] *See, e.g.*, *Pacific Rivers v. U.S. Bureau of Land Management*, Case No. 6:16-cv-01598-JR (D. Or. Oct. 12, 2018) ("[C]ourts have repeatedly held the O&C Act is a 'primary' or 'dominant' use statute for sustained-yield timber production."), *adopted in full*, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, No. 19-35384, 2020 WL 2510759 (9th Cir. May 15, 2020). KSWild's lawsuit thus seeks to cut off the timber supply from BLM lands dedicated to the very purpose of timber production for the foreseeable future, to the detriment of companies like Murphy Company. KSWild does so despite the fact that the 2016 RMP dedicates far more acres to protective reserves for the benefit of species like the northern spotted owl than it dedicates to the Harvest Land Base for timber production.[3]

In moving for summary judgment, KSWild presses meritless claims under the ESA, 16 U.S.C. §§ 1531 et seq., and NEPA, 42 U.S.C. §§ 4321 et seq. Regarding the ESA, KSWild unsuccessfully attempts to paint a picture of a flawed FWS Biological Opinion on which BLM erroneously relied. Not so. Regarding NEPA, KSWild fruitlessly characterizes the Revised EA

---

[2] The O&C Act is the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937, 43 U.S.C. § 2601 et seq.

[3] Under the 2016 RMP, 31% of the acreage in the planning area is allocated to late-successional reserves, and 15% is allocated to riparian reserves (not to mention the 18% of the acreage that is allocated to District-Designated Reserves), whereas only 20% of the acreage is allocated to the Harvest Land Base. BLM AR 14449 (2016 RMP at 43).

PAGE 3 --    DEFENDANT-INTERVENOR'S SJ MEM.

as having failed to take a NEPA "hard look" at North Project impacts on the northern spotted owl and owl critical habitat, and similarly asks the Court to conclude that BLM ignored NEPA regulatory significance factors which, according to KSWild, supported preparation of an environmental impact statement (EIS) rather than a Revised EA. Again, not so. Rather, this case once again illustrates KSWild's refusal to acknowledge that Harvest Land Base and O&C Act lands are dedicated to sustained-yield timber production. KSWild may wish it were otherwise, but that is the reality of the Harvest Land Base and O&C Act acreage in the North Project area – they are dedicated to timber harvest. And contrary to KSWild's mischaracterization of the record, the Biological Opinion and the Revised EA are sound environmental documents that satisfy the ESA and NEPA. The Court thus should grant summary judgment in favor of Murphy Company and federal defendants and in favor of Project implementation.

## II.    LEGAL STANDARDS GOVERNING JUDICIAL REVIEW.

### A.    Summary Judgment Standard.

Summary judgment is proper when the evidence and reasonable inferences show there are no genuine issues of fact such that the moving party is entitled to judgment as a matter of law. FRCP 56(c); *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 630 (9th Cir. 1987). Where review is based on an administrative record, the Court's task is not to judge whether there are disputed issues of material fact but rather to ensure the record supports the agency action. Here, the record supports FWS's decision to issue the Biological Opinion for the North Project, and BLM's decision to authorize the North Project after preparation of a thorough Revised EA and pursuant to a FONSI, followed by decision records for subsequent approximately-annual timber sales. As a result, the Project should be upheld.

**B.**     **The APA Arbitrary and Capricious Standard of Review**.

The NEPA and ESA challenges to agency actions in this case are reviewed under the Administrative Procedure Act's (APA) arbitrary and capricious standard of review.  5 U.S.C. § 706(2)(A) (providing that an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  The APA's arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment for that of the agency.  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009).  Under this standard, an agency's decision should be upheld unless the agency "relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' . . . offered an explanation 'that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *McNair*, 537 F.3d at 987 (citation omitted).  Applying this legal standard, the North Project should be upheld by the Court in all respects.

**C.**     **Tiering Under NEPA**.

For the North Project, BLM properly tiered its environmental analysis to that for the 2016 RMP.  *See, e.g.*, BLM AR 80 (Revised EA at 31) (tiering regarding effects on northern spotted owl critical habitat); BLM AR 85, 89 (Revised EA at 36, 40) (tiering regarding impacts on the northern spotted owl).  Tiering under NEPA is a process whereby an agency evaluates the potential environmental impacts of a proposed action based on prior NEPA environmental analysis.  *See* 40 C.F.R. § 1508.28 ("Tiering refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental

analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement [or environmental assessment] subsequently prepared").

The Council on Environmental Quality, the agency that promulgates NEPA regulations, encourages agencies to employ tiering "to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28)." *Id.* § 1502.20. Thus, when a broad, programmatic EIS like that for the 2016 RMP already has been prepared and the agency is preparing a subsequent EA (or a Revised EA) for an action "included within the entire program . . . (such as a site specific action) the subsequent [EA] need only summarize the issues discussed in the broader statement and incorporate discussion from the broader statement by reference . . . ." *Id.* Department of Interior regulations similarly encourage tiering. 43 C.F.R. § 46.140(c) (explaining that "[a]n environmental assessment prepared in support of an individual proposed action can be tiered to a programmatic or other broader-scope environmental impact statement").

### D.   <u>Deference to Agency Expertise and Management Direction</u>.

Federal agencies are owed substantial deference by bodies reviewing agency action, particularly agency action involving scientific matters. *McNair*, 537 F.3d at 988. *See also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989) (deference to an agency's decision is particularly appropriate where questions of scientific methodology or technical expertise are involved). Review should be at its *most* deferential where an agency is addressing difficult issues within its area of special expertise. *McNair*, 537 F.3d at 993. An "agency's interpretation and application of its own management direction" also is entitled to "'substantial deference.'" *Deer Creek Valley Natural Resource Conservation Ass'n v. U.S. BLM*, No. 1:12-cv-1596-CL, 2014 WL 458288 (D. Or. Feb. 4, 2014) (unpublished opinion) (quoting *Native*

*Ecosystems Council v. Weldon*, 697 F.3d 1043, 1055-56 (9th Cir. 2012)).  The expert agencies' scientific decision-making in this case is entitled to substantial deference.

## III.   THE NORTH LANDSCAPE PROJECT AND ITS POTENTIAL IMPACTS.

The North Project, which "was designed to meet timber harvest requirements" of the KFRA under the 2016 RMP, encompasses about 11,789 acres of BLM lands.  BLM AR 50 (Revised EA at 1).  These BLM lands are comprised largely of O&C Act acres and entirely of Harvest Land Base acres, all dedicated to sustained-yield timber production, *not* to the conservation of northern spotted owls.  Over a period of ten or so years, the North Project contemplates active management on about 9,000 of these acres,[4] BLM AR 32 (FONSI at 1), almost all in the Uneven-Aged Timber Area land use allocation.  BLM AR 33 (FONSI at 2).

Uneven-Aged Timber Area treatments are an "Ecological Forestry" approach aimed at increasing "fire resilience in the dry forest."  BLM AR 14429 (2016 RMP at 23).  The thinning treatment involves harvesting trees of different ages, retaining at least 10% of each harvest unit, retaining "Pine and Douglas fir trees 36 inches dbh and larger that were established before 1850" and ensuring adequate snag retention post-treatment.  BLM AR 305 (Biological Opinion at 8). *See also* BLM AR 60 (Revised EA at 11) (Uneven-Aged Timber Area treatment "result[s] in post-harvest relative densities between 20 percent and 45 percent.").  Based on its silvicultural expertise, BLM estimates that 30% of Uneven-Aged Timber Areas will retain "sufficient canopy closure" to function as northern spotted owl dispersal habitat after treatment.  BLM AR 75 (Revised EA at 26).  *See also* BLM AR 368 (Biological Opinion at 71) (acknowledging BLM's

---

[4]  The Biological Opinion more conservatively evaluated the effects of potentially treating 9,654 acres.  *See, e.g.*, BLM AR 303 (Biological Opinion at 6).  Although BLM reasonably assumed it will retain additional acres over the life of the Project, FWS instead assumed all potential treatment acres would be removed.  BLM AR 366 (Biological Opinion at 69).

estimate "that any stands that retain dispersal habitat function will become foraging habitat in approximately 50 years"). But because the exact location of the retained habitat will not be known until after harvest, FWS conservatively assumed no retention of habitat post-treatment in its analysis. BLM AR 366 (Biological Opinion at 69).

The habitat needs of the northern spotted owl include nesting, roosting, foraging and dispersal habitat. *See, e.g.*, BLM AR 387 (Biological Opinion at 90). The acres proposed for treatment include 386 acres of nesting/roosting habitat, 2,188 acres of foraging habitat and 5,579 acres of dispersal habitat. BLM AR 369 (Biological Opinion at 72). These acres represent "the majority of nesting/roosting, foraging, and dispersal habitat" in the action area, about 31% in the aggregate of nesting/roosting and foraging habitat and 65% of dispersal habitat. BLM AR 370 (Biological Opinion at 73). *But see* BLM AR 397 (Biological Opinion at 100) (acknowledgement by FWS that BLM anticipates retaining "580 acres of foraging habitat and 30 percent of dispersal habitat," none of which was considered in FWS's conservative analysis).

Again, the 2016 RMP dedicates the Harvest Land Base acres to sustained-yield timber production, not to the conservation of northern spotted owls. The conservation strategy for the owl instead includes placing 63% of lands governed by the 2016 RMPs (there are two, one for Southwestern Oregon, the other for Northwestern & Coastal Oregon) into protective Late-Successional Reserves and Riparian Reserves. BLM AR 332 (Biological Opinion at 35). *See also* BLM AR 353 (Biological Opinion at 56) (explaining that the "conservation needs of the . . . owl are focused on the existence of large blocks of habitat, spatially distributed across a variety of ecological conditions"). The 2016 RMPs' system of reserves, which has withstood the scrutiny of litigation, satisfies the owl's conservation needs, whereas the Harvest Land Base "'is the portion of the landscape that is not being relied upon for supporting reproducing populations

of spotted owls . . . .'"  BLM AR 383 (Biological Opinion at 86) (quoting FWS Biological Opinion for the 2016 RMP).  Further, the Biological Opinion's analysis of impacts on the owl focuses not on the Project area in a vacuum but rather "on using the range-wide survival and recovery needs of the northern spotted owl and the role of the action area in meeting those needs . . . ."  BLM AR 306 (Biological Opinion at 9).

The northern spotted owl has an expansive range that is divided into 12 physiographic provinces, BLM AR 308 (Biological Opinion at 11), with the Eastern Oregon Cascades Physiographic Province being the relevant geographical area for the Project.  BLM AR 353 (Biological Opinion at 56).  *See also* BLM AR 352 (Biological Opinion at 55) (reporting that this Province "covers approximately 2.3 million acres").  The owl conservation strategy treats physiographic provinces as recovery units, BLM AR 351 (Biological Opinion at 54), with the Eastern Oregon Cascades Physiographic Province and Recovery Unit including more than 330,000 acres of nesting/roosting and foraging habitat for the owl.  BLM AR 384 (Biological Opinion at 87).  Full implementation of the North Project may affect up to 2,574 acres of such habitat, so about "1 percent available . . . within the Province and recovery unit."  *Id.*  Project implementation is not expected to change the owl's "population trends and distribution" at this scale.  BLM AR 385 (Biological Opinion at 88).  Range-wide, the "nesting/roosting and foraging habitat treated within the Project area represents less than 0.1 percent of" available habitat.  *Id.*

Regarding critical habitat, the conservation role of northern spotted owl critical habitat "is to 'adequately support the life-history needs of the species to the extent that well-distributed and inter-connected northern spotted owl nesting populations are likely to persist within properly

functioning ecosystems at the critical habitat unit and range-wide scales.'"[5]  BLM AR 387 (Biological Opinion at 90) (quoting the final Critical Habitat Rule).  For the Project, East Cascades South (ECS) Subunit 1 of critical habitat unit 8 "is the only subunit to overlap the action area."  BLM AR 397 (Biological Opinion at 100).

Project impacts on critical habitat subunit ECS 1, which is comprised of 127,801 acres and serves to provide demographic and connectivity support for the owl, *id.*, are minor and include removal of about 3% of nesting/roosting/foraging habitat and 6% of dispersal habitat.  BLM AR 402 (Biological Opinion at 105).  *But see* BLM AR 397 (Biological Opinion at 100) (acknowledgement by FWS that BLM anticipates retaining "580 acres of foraging habitat and 30 percent of dispersal habitat," some of which will "occur within critical habitat," but none of which FWS is taking into account out of an abundance of caution).  Project impacts at the scale of critical habitat unit 8 as a whole, which includes 368,380 acres, 77 Fed. Reg. 71,876, 71,918 (Dec. 4, 2012), are estimated to affect only 1% of nesting/roosting/foraging habitat and less than 1% of dispersal habitat.  BLM AR 402 (Biological Opinion at 105).  Based on this evidence, FWS reasonably concluded that Project impacts at the critical habitat subunit and unit levels will not compromise the ability of the northern spotted owl critical habitat to fulfill its purpose of providing demographic and connectivity support for the owl.  BLM AR 403-04 (Biological Opinion at 106-07).

---

[5]  KSWild criticizes FWS for proposing to revise the owl's critical habitat designation downward by about 200,000 acres, Opening Br. at 9, action taken in response to "new information that has become available" since 2012.  85 Fed. Reg. 48,487, 48,487 (Aug. 11, 2020).  An impetus for excluding certain acres is the Supreme Court's recent holding in *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018), "that 'critical habitat' is the subset of 'habitat' that is 'critical' to the conservation of an endangered species."  In so holding, the Supreme Court rejected an agency practice of designating as critical habitat areas not currently providing habitat for a listed species where the agency believed such areas nonetheless were essential for species conservation.  Apparently KSWild would have FWS ignore Supreme Court teachings.

KSWild takes issue with BLM authorizing timber harvest on a portion of the KFRA's recently-truncated Harvest Land Base, despite BLM doing so in a manner that complies with the governing 2016 RMP, carefully avoids incidental take of spotted owls and prioritizes "harvest units away from currently and recently occupied territories," among other things.  BLM AR 57 (Revised EA at 8).  *See also* BLM AR 142-48 (Revised EA Appendix C at C-1 to C-7) (describing protective PDFs for the owl).  The 2016 RMPs dramatically shrunk the available land base for timber harvest from about 692,000 acres to only about 498,000 acres, split approximately equally between the Southwestern Oregon and Northwestern & Coastal RMPs. *See generally* BLM AR 14449 (2016 RMP at 43) (Harvest Land Base under the 2016 RMP is 251,552 acres).  After the 2016 RMP's adoption, the KFRA's Harvest Land Base was further diminished through the expansion of the Cascade-Siskiyou National Monument, which put off-limits to timber harvest nearly 9,000 Harvest Land Base acres, all O&C Act lands, previously designated for the very purpose of continual timber production.  BLM AR 56 (Revised EA at 7).

BLM fully disclosed that over a period of about 10 years, Project implementation will harvest the majority of the Project area, including about 5,532 acres within designated critical habitat for the owl.  *See, e.g.*, BLM AR 77 (Revised EA at 28).  FWS carefully assessed the impacts of full Project implementation on owls and their critical habitat and concluded Project implementation "is not likely to jeopardize the continued existence of the northern spotted owl or result in the destruction or adverse modification of critical habitat."  BLM AR 405 (Biological Opinion at 108).  KSWild, in contrast, asks this Court to substitute KSWild's blanket opposition to timber harvest for the opinion of the expert agencies.  Murphy Company urges the Court to review the record carefully and, after having done so, acknowledge that the facts support the lawfulness of this carefully designed Project.

IV.   **ARGUMENT**.

A.   **KSWild's Challenge to the Biological Opinion is Meritless**.

Contrary to KSWild's assertions, Opening Br. at 11-23, FWS's Biological Opinion for the North Project is wholly lawful under the ESA. To comply with the ESA, a consulting agency like FWS prepares a biological opinion that analyzes the proposed action and explains any effects on listed species and their designated critical habitats. 16 U.S.C. § 1536(b)(3)(A). The biological opinion includes the consulting agency's conclusion regarding whether the proposed action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of designated critical habitat. *Id.* FWS did just that in this case and reasonably concluded that "the survival and recovery of the northern spotted owl are not in jeopardy as a result of implementation of the Project," and that "critical habitat for the northern spotted owl will not be destroyed or adversely modified as a result of implementation of the Project." BLM AR 302 (Biological Opinion at 5). In reaching that conclusion, FWS did not err. The Court thus should uphold the Biological Opinion, which is entitled to substantial deference. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601-02 (9th Cir. 2014) (agency scientific decision-making under the ESA is afforded highly deferential review).

1.   **FWS Fully Considered the Northern Spotted Owl's Life Cycle**.

KSWild first asserts that FWS failed to consider the life-history needs of the northern spotted owl, Opening Br. at 11-14, an assertion belied by the record. In making this argument, KSWild relies heavily on *PCFFA II*, *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082 (9th Cir. 2005), a case that is factually distinguishable. In essence, KSWild would have this Court equate the life-history needs of the northern spotted owl with those of an anadromous salmon population (the Southern Oregon/Northern California Coast

coho salmon, or SONCC coho) that must return to their natal stream to spawn within a discrete

time period before dying, all in an effort to progenate the next generation. But the northern

spotted owl is not an anadromous fish whose life cycle is tied inextricably to a natal stream for a

once-in-a-lifetime shot at procreation.

In *PCFFA II*, the court struck down a National Marine Fisheries Service (NMFS)

biological opinion for a federal irrigation project on the Klamath River. The court particularly

took issue with the biological opinion's blessing of the project's first two phases, during which

the SONCC coho would see at most 57% of their needed stream flows over an eight-year period.

426 F.3d at 1088-89. The court observed that the SONCC coho "has a three-year life cycle,"

with adults "return[ing] to the same streams in which they were born to spawn . . . between

November and January." *Id.* at 1086. Any resulting juveniles (fry that develop into smolts) then

live in their natal stream for about 15 months, after which they migrate down river to mature in

the ocean before (hopefully) returning to their place of birth to start the life cycle anew. *Id.* at

1086-87. Despite the unforgiving constraints on the population's continued existence, the

biological opinion omitted meaningful discussion about the impacts of eight years of insufficient

flows in the Klamath River on a species having a three-year life span. During those eight years:

> Five full generations of coho will complete their three-year life cycles . . . . Or, if
> there is insufficient water to sustain the coho during this period, they will not
> complete . . . with the consequence that there will be no coho at the end of the
> eight years. If that happens, all the water in the world [in the third, full-flow,
> phase of the project] will not protect the coho, for there will be none to protect.

*Id.* at 1094. On those facts, the biological opinion was held arbitrary and capricious.

The northern spotted owl is not an anadromous fish whose life cycle is tied inextricably

to a natal stream for a once-in-a-lifetime spawning opportunity. The owl's life history is

described in the Biological Opinion at pages 10-20. BLM AR 307-17. Unlike salmon, the owl

"is relatively long-lived, has a long reproductive life span, invests significantly in parental care, and exhibits high adult survivorship . . . ."  BLM AR 314 (Biological Opinion at 17).  The owl generally does not nest every year, and in years when young are produced, the juveniles "depend on their parents until they are able to fly and hunt on their own."  *Id.*  At the time of dispersal, owls are estimated to travel about 10-15.5 miles.  BLM AR 315 (Biological Opinion at 18).

Also unlike the SONCC coho, the northern spotted owl has an extensive range.  Its current range "extends from southwest British Columbia through the Cascade Mountains, coastal ranges, and intervening forested lands in Washington, Oregon, and California . . . ."  BLM AR 308 (Biological Opinion at 11).  Again, the expansive range is divided into 12 physiographic provinces, *id.*, with the Project located in the 2.3 million-acre Eastern Oregon Cascades Physiographic Province.  BLM AR 353 (Biological Opinion at 56).

In further contrast with *PCFFA II*, unlike the Klamath River, which was the SONCC coho's sole spawning ground, the Project acres proposed for treatment are *not* dedicated to the conservation of the owl – they are Harvest Land Base and O&C Act acres dedicated to sustained-yield timber production, an undeniable fact KSWild would have this Court ignore.  The owl's conservation needs are provided for by non-Harvest Land Base acres in accordance with the 2016 RMP, which has withstood all legal challenges brought by three of the plaintiffs in this case (Klamath Siskiyou Wildlands Center, Oregon Wild and Cascadia Wildlands).[6]  Those plaintiffs (joined by others) challenged the 2016 RMP under NEPA, the ESA and the O&C Act but saw

---

[6]  In two cases challenging the 2016 RMP on different grounds (D.C. District Court Case Nos. 16-1599 and 16-1602), the D.C. District Court in late 2019 ruled that the 2016 RMP violates the O&C Act by excluding certain O&C Act timberlands from timber harvest.  *See Am. Forest Res. Council v. Hammond*, No. CV 16-1599 (RJL), 2019 WL 6311896, at *3 (D.D.C. Nov. 22, 2019). The parties' remedy briefing in the D.C District Court is complete, and no party has asked for wholesale invalidation of the 2016 RMP, which continues to govern the lands at issue here.

**PAGE 14 --    DEFENDANT-INTERVENOR'S SJ MEM.**

their claims rejected resoundingly first by Magistrate Russo and then by Judge McShane in a

decision affirmed by the Ninth Circuit.  *See generally Pacific Rivers*, *supra*, 2018 WL 6735090

(D. Or. Oct. 12, 2018), *adopted in full*, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, 2020

WL 2510759 (9th Cir. May 15, 2020).  Regardless of whether Project implementation will

render the treated Harvest Land Base and O&C acres largely devoid of owl nesting, roosting and

foraging habitat for the foreseeable future – and BLM candidly disclosed that condition could

persist for approximately 100 years, BLM AR 77 (Revised EA at 28) – these acres never were

intended to support the conservation needs of the owl.

  For all of the above reasons, *PCFFA II* is inapposite.  Similarly inapposite is *PCFFA I*,

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 265 F.3d 1028 (9th Cir.

2001), see Opening Br. at 12-13, which invalidated NMFS biological opinions to the extent they

authorized 20 timber sales in the Umpqua River Basin without considering "the life cycle and

migration cycle of anadromous fish" dependent on natal streams in the system, *id.* at 1037,

despite NMFS's knowledge "that the next few generations [would] be critical to Umpqua River

anadromous species."  *Id.* at 1038.  Fact patterns matter, and *PCFFA I* joins *PCFFA II* in being

factually-distinguishable from this case based on "the actual behavior of the species" at issue. *Id.*

### 2. FWS's Analysis of Effects to Northern Spotted Owl Critical Habitat and Recovery is Wholly Lawful.

  KSWild's next challenge to the Biological Opinion accuses FWS of improperly relying

on protective land use allocations in the 2016 RMP when evaluating potential Project impacts to

the survival and recovery of the owl.  Opening Br. at 14-17.  At the heart of this flawed argument

is KSWild's assertion that *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d

1059 (9th Cir. 2004), *superseded on other grounds by* 81 Fed. Reg. 7,214 (Feb. 11, 2016),

prohibits FWS from considering the 2016 RMP land use allocations when assessing "jeopardy

and recovery." Opening Br. at 15. Actually, *Gifford Pinchot* holds that land use allocations like Late-Successional Reserves cannot serve as a surrogate for critical habitat when a consulting agency makes an *adverse modification of critical habitat* determination. 378 F.3d at 1076 (declining to "allow the survival and recovery benefits derived from a parallel habitat conservation project (the NFP and its LSRs) that is not designated critical habitat to stand in for the loss of designated critical habitat in the adverse modification analysis"). KSWild mischaracterizes that holding by conflating the definitions of jeopardy and adverse modification under the ESA. Opening Br. at 14 (quoting the definition for "Jeopardize the continued existence of" in 50 C.F.R. § 402.02 before discussing *Gifford Pinchot*'s adverse modification of critical habitat holding and then importing that holding into its jeopardy argument).

FWS did not improperly rely on the 2016 RMP's protective land use allocations in assessing Project impacts on owl critical habitat. As a general matter, the ESA requires a consulting agency to ensure that any action it authorizes "is not likely to . . . result in the destruction or adverse modification" of designated critical habitat for a listed species. 16 U.S.C. § 1536(a)(1). Under the operative ESA regulation, "destruction or adverse modification" means:

> a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species. Such alterations may include, but are not limited to, those that alter the physical or biological features essential to the conservation of a species or that preclude or significantly delay development of such features.

50 C.F.R. § 402.02 (2016).[7] FWS properly applied this framework in its analysis, BLM AR 386-87 (Biological Opinion at 89-90), with a goal of determining:

---

[7] The regulation was amended in 2019, though not substantively. See 50 C.F.R. § 402.02 (2019) ("Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species.").

> If the value of the critical habitat range wide for the conservation/recovery of the listed species would remain functional or would retain the current ability for the key components of the critical habitat that provide for the conservation of the listed species to be functionally re-established in areas of currently unsuitable but capable habitat.

BLM AR 386 (Biological Opinion at 89).  In doing so, FWS did not rely on protective land use allocations in the 2016 RMP as a surrogate for critical habitat.

For example, in discussing Project impacts on the ability of northern spotted owl critical habitat in ECS 1 (the sole recovery subunit overlapping the action area) to fulfill its purpose in providing demographic support for the owl, FWS rightly observed that "the Harvest Land Base is not intended to provide demographic support under the [2016 RMP] . . . . Rather demographic support is provided by the *reserved land use allocations in other portions of the critical habitat network . . . .*"  BLM AR 1434 (Biological Opinion at 106) (emphasis added).  Similarly, in discussing the adverse effects to northern spotted owl PBFs [physical or biological features] from Project implementation,[8] FWS noted that such adverse effects "are expected to be balanced by the improved function of *critical habitat in reserve land use allocation in other portions of the critical habitat network*" over the life of the Project.  BLM AR 1438 (Biological Opinion at 110) (emphasis added).  Put simply, FWS's adverse modification analysis did not rely on reserve land use allocations in the 2016 RMP as a surrogate for critical habitat.

Nor is it true as KSWild alleges that FWS ignored the owl's recovery in assessing Project impacts on owl critical habitat (or on the owl itself).  Opening Br. at 15.  *See generally Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008) (concluding that consulting agencies must consider "both recovery and survival impacts" in the context of assessing jeopardy, just as (per *Gifford Pinchot*) recovery and survival impacts are relevant in the

---

[8]  The Biological Opinion at pages 90-91 describes the four PBFs for owls.  BLM AR 387-88.

**PAGE 17 --    DEFENDANT-INTERVENOR'S SJ MEM.**

context of assessing adverse modification of critical habitat).  FWS fully considered recovery in assessing Project impacts on the owl.  *See, e.g.*, BLM AR 302 (Biological Opinion at 5) (concluding that "the survival and recovery of the northern spotted owl are not in jeopardy as a result of" Project implementation); BLM 306 (Biological Opinion at 9) (setting forth the "survival and recovery" framework for the jeopardy determination); BLM AR 351 (Biological Opinion at 54-55) (setting forth the four recovery criteria for recovery units like unit 8 and subunit ECS 1 at issue in this case); BLM AR 383-85 (Biological Opinion at 86-88) (discussing potential impacts to owl recovery from the Project).  Likewise, FWS fully considered recovery is assessing Project impacts on owl critical habitat.  BLM AR 386 (Biological Opinion at 89) (describing the four components of the agency's adverse modification analysis, each of which is assessed in relation to the interplay between the owl's critical habitat and its recovery); BLM AR 387-89, 399-402 (Biological Opinion at 90-92, 105) (discussing the PBFs for the owl's recovery and then discussing potential Project impacts on the owl's PBFs ); BLM AR 100-01, 05-08 (Biological Opinion at 397-98, 402-05) (discussing the baseline role of subunit ECS 1 in owl recovery followed by the Project's potential impacts on the role of ECS 1 in owl recovery).[9]

Put simply, KSWild's misguided attack on the Biological Opinion is belied by the record.

### 3.    FWS Correctly Concluded that North Project Implementation Will Not Incidentally Take Northern Spotted Owls.

Equally without merit is KSWild's challenge to the Biological Opinion's determination of no incidental take.  Opening Br. at 17-23.  KSWild's multi-pronged attack ranges from the

---

[9]  This discussion falls under the heading "Effects on Critical Habitat Relative to Conservation Function and Role."  To the extent KSWild complains the word "recovery" is not included in that heading, the term "conservation" under the ESA means bringing a listed species to the point that listing is no longer necessary, i.e. recovery.  16 U.S.C. § 1532(3).  *See also* 50 C.F.R. § 402.02 ("Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate . . . .").

assertion that acknowledged adverse impacts on owl habitat from Project implementation *must* equate to incidental take (not so), to the erroneous notion that FWS's fully-disclosed initial concerns "regarding how incidental take would be avoided," BLM AR 302 (Biological Opinion at 5), invalidates FWS's no incidental take determination.  See BLM AR 408-09 (Biological Opinion at 111-12) (Incidental Take Statement).  KSWild's arguments gain no legal traction.

First, KSWild cannot rest its case for invalidating the Biological Opinion on the fact that during the initial informal consultation process between BLM and FWS, a representative of FWS expressed concern about BLM's take avoidance approach.  Opening Br. at 21-22.  Developing the North Project under the new 2016 RMP was no small task, and the back-and-forth between BLM and FWS allowed for the early and free sharing of information and opinions to ensure that both the action agency and the consulting agency fully understood the conservation needs of the northern spotted owl and its designated critical habitat, along with the ways in which Project implementation might or might not impact same.  That back-and-forth is detailed in the Biological Opinion, beginning with FWS's November 2017 expression of concern regarding how incidental take would be avoided (as required by the 2016 RMP); the exchange of initial Project documents and meetings to discuss the issue; the elevation of the issue within each agency; further exchanges and discussions of Project and other agency documents informing the incidental take approach; and BLM's mid-2018 transmittal to FWS of a final biological assessment detailing potential Project impacts on the owl and its critical habitat.  BLM AR 302 (Biological Opinion at 5).  *See also* BLM AR 538-92 (Biological Assessment).  All of this culminated in the Biological Opinion and its incidental take statement.

KSWild cites to various record documents in an effort to portray FWS as being opposed to BLM's approach to avoiding incidental take.  But in reality, it was the job of all participants in

the process to do their best to resolve scientific concerns that were the natural result of the cooperative working arrangement between agency experts – the record simply illustrates that professional back-and-forth dialogue. *See, e.g.*, FWS AR 9 (Notes from November 2017 Level 1 Meeting) (documenting BLM's planned approach and the agencies' agreement that "there would likely be multiple drafts [of environmental documents] back and forth as the project develops"); FWS AR 245 (Notes from February 2018 Level 1 Meeting) (documenting the parties' mutual efforts to clarify "what constitutes incidental take" and to confirm the adequacy of FWS's 2012 survey protocol for owls); BLM AR 5883 (Notes from April 2018 Level 1 Meeting) (confirming that FWS's 2012 survey protocol for owls "is indeed sufficient for making determinations of occupancy and inferences of non-occupancy for take determination purposes, but that it is the minimum survey effort that is sufficient to do so," and further confirming that while FWS may "try to negotiate a higher [survey] standard . . . BLM is not obligated to do anything more than the survey protocol calls for in order to infer non-occupancy").

Regardless of the normalcy of the interagency consultation dialogue described above, from a legal perspective expressions of disagreement during ESA consultation do not represent a final agency position on judicial review.  "Agencies are entitled to change their minds[.]" *Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 946 (9th Cir. 2010).  *See also id.* ("'[T]he fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.'") (quoting Supreme Court case law).  Ultimately, it is the final Biological Opinion that must be the focus of the Court's review.[10]

---

[10]  Agencies consist of numerous employees who not surprisingly sometimes espouse diverging views on various topics.  That does not mean the views of each employee equate to an official agency position on a particular matter.  *See, e.g.*, *Nat'l Wildlife Fed'n v. U.S. Army Corps of*

Second, it is not true as KSWild suggests that FWS ignored potential indirect harm to the owl from habitat modification in reaching its no incidental take conclusion, or that adverse effects to habitat equate to per se incidental take.  Opening Br. at 17-18.  FWS's incidental take statement acknowledged that take (in the form of harm) includes "significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering."  BLM AR 408 (Biological Opinion at 111).  This is consistent with the discussion in *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001), regarding "when habitat modification will constitute harm."  *Id.* at 1238 (noting that the action must actually kill or injure the listed species).

Although KSWild cites *Ariz. Cattle* for the proposition that acknowledged adverse habitat impacts can be equated with harm that constitutes per se take, Opening Br. at 18, *Ariz. Cattle* does not so hold.  Rather, *Ariz. Cattle* acknowledged that "habitat degradation is not always sufficient to equal harm."  *Id.*  Indeed, to "regulate habitat degradation that merely retards recovery of a depleted species, '[plaintiff] would have to show significant impairment of the species' breeding or feeding habits and prove that the habitat degradation prevents, or possibly, retards, recovery of the species.'"  *Id.* (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994)) (alteration in original).

KSWild has made no such showing.  FWS, in contrast, reasonably concluded that Project implementation in the Harvest Land Base will *not* prevent or retard the owl's recovery:

---

*Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004) (finding unpersuasive certain communications found in the administrative record that did not constitute "the official view of any agency"); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) ("*Chevron* deference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee.").

> "The Harvest Land Base is the portion of the landscape that is not being relied upon for supporting reproducing populations of spotted owls . . . . The harvest of unoccupied spotted owl habitat . . . will not affect any currently nesting or territorial spotted owls, but does have the potential to preclude the occupancy of these areas by spotted owls in the future.  The Harvest Land Base, however, is not where the recovery of the spotted owl will be focused. . . . we do not expect these specific harvests to influence the numbers or reproduction of spotted owls at the local, action area or range-wide scales in the long-term . . . ."

BLM AR 384 (Biological Opinion at 87) (quoting FWS Biological Opinion for the 2016 RMP).

FWS acknowledged the North Project's harvest of owl habitat "is expected to result in impacts for 50 to 120 years."  BLM AR 385 (Biological Opinion at 88).  But "the Harvest Land Base is not expected to support reproductive populations of northern spotted owls," which are "expected to continue to be distributed across the Province and the recovery unit after implementation of the proposed action."  *Id.  See also id.* (at the scale of the Province, recovery unit and range, "occupancy and productivity of northern spotted owls are not expected to diminish").

Third, KSWild's criticism of FWS's northern spotted owl survey protocol, and the North Project's reliance on the survey protocol to avoid incidental take of owls, misses the mark. Opening Br. at 18-20.  The survey protocol, found at FWS AR 16217-58, has two purposes:

> (1) provide a methodology that results in adequate coverage and assessment of an area for the presence of spotted owls, and (2) ensure a high probability of locating resident spotted owls and identifying owl territories that may be affected by a proposed management activity, thereby minimizing the potential for unauthorized incidental take.

FWS AR 16220-21.  The survey protocol states that a complete survey takes two years.  FWS AR 16238.  The Biological Opinion confirmed that BLM was committed to at least two years of

**PAGE 22 --    DEFENDANT-INTERVENOR'S SJ MEM.**

surveys.[11]  BLM AR 358 (Biological Opinion at 61) ("Harvest . . . may begin as soon as two consecutive years of no detections are documented per protocol surveys . . . .").

    As discussed above, KSWild points to meeting documents reporting on the interagency dialogue during the consultation process whereby FWS was seeking to determine whether BLM would consider exceeding the requirements of the survey protocol.  *See, e.g.*, BLM AR 5883 (Notes from April 2018 Level 1 Meeting) (confirming that FWS's 2012 survey protocol for owls "is indeed sufficient for making determinations of occupancy and inferences of non-occupancy for take determination purposes, but that it is the minimum survey effort that is sufficient to do so").  FWS acknowledged that although it could "try to negotiate a higher [survey] standard . . . BLM is not obligated to do anything more than the survey protocol calls for in order to infer non-occupancy."  *Id.*  BLM declined the invitation to commit to exceeding the minimum survey standard but noted "that in actual application the protocol almost always requires additional survey effort beyond 2 years . . . ."  *Id.*  BLM further noted its commitment "to continue to do 6 visits annually in NRF [nesting roosting foraging] habitat across the whole North project area and nearby potentially affected territories . . . ."  *Id.*  Notably, the FWS representative "expressed confidence in the ability of the protocol compliant surveys to detect NSO, and recognized that

---

[11]  KSWild also criticizes BLM's use of the FWS owl survey protocol on the grounds that northern spotted owls might be harder to detect in the presence of barred owls.  Opening Br. at 19.  But the FWS survey protocol has been updated to account for that possibility:

> The recent changes to the northern spotted owl survey protocol were based on the probability of detecting northern spotted owls when barred owls are present (See USDI USFWS Memorandum dated February 7, 2011, "2011 Northern Spotted Owl Survey Protocol" and attached "Protocol for Surveying Proposed Management Activities That May Impact Northern Spotted Owls" for guidance and methodology).

BLM AR 323 (Biological Opinion at 26).

**PAGE 23 --    DEFENDANT-INTERVENOR'S SJ MEM.**

the KFRA has a great record of surveying and tracking the status of [owl] sites … the best . . .

she is aware of." *Id.* (second ellipsis added).  In fact, BLM's KFRA has extensive data on

northern spotted owl occupancy – "owl surveys have been conducted on portions of the KFRA

annually since 1990," BLM AR 357 (Biological Opinion at 60), so for about three decades.

      During the same April 2018 meeting, the agencies discussed BLM's desire to incorporate

an additional protective PDF into the North Project "that would allow the KFRA to change the

harvest priority category of an unoccupied site with regard to other unoccupied sites" based on

such environmental data as "habitat amount in the territory, estimated likelihood of re-

occupancy, and nature of last occupancy (pair or reproductive pair VS territorial single)."  BLM

AR 5885.  FWS "was in favor of such a PDF." *Id.*  BLM incorporated this PDF into the

Project's biological assessment, BLM AR 579 (Biological Assessment at 40), which itself was

incorporated into the Revised EA.  BLM AR 72 (Biological Assessment at 23).  *See generally*

BLM AR 575-80 (Biological Assessment Appendix B – Relevant Project Design Features).

BLM's PDFs also were incorporated in their entirety into the Biological Opinion.  BLM AR 438-

43 (Biological Opinion at 141-46).

      Finally, KSWild would have the Court believe that FWS acted arbitrarily and

capriciously by "depart[ing] from its established method for determining occupancy and take"

without satisfying the so-called *Fox* factor requirements for a lawful change in agency policy.

Opening Br. at 22-23.  *See generally F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515

(2009) (holding that an agency may lawfully change course so long as the agency is aware of its

policy change, which is itself statutorily permissible, coupled with the agency believing the

policy change is better and offering "good reasons for the new policy").  That is not so.  The

foregoing discussion confirms that BLM is following FWS's survey protocol for the North

Project, and that the Biological Opinion incorporates that requirement.  The fact that FWS has successfully persuaded other BLM Districts to do "more than the survey effort described in the protocol, at some territories, on a case by case basis," does not mean that FWS's inability to "negotiate a higher standard" for the North Project effected an agency policy change.  BLM AR 5883 (Notes from April 2018 Level 1 Meeting).  FWS plainly acknowledged that "BLM is not obligated to do anything more than the survey protocol calls for . . . ."  *Id.*

In sum, the Biological Opinion does not suffer from the flaws alleged by KSWild.  Rather, it is legally sound and should be upheld by this Court.  *Jewell*, 747 F.3d at 601-02.

### B.    BLM Properly Relied on the Lawful FWS Biological Opinion.

The foregoing demonstrates the Biological Opinion's compliance with the ESA.  This dispenses with KSWild's erroneous argument that BLM violated the law by relying on an infirm Biological Opinion.  Opening Br. at 23-24.

### C.    The Revised EA Fully Satisfies NEPA's "Hard Look" Requirement.

NEPA requires a federal agency to examine the potential environmental effects of a proposed federal action and inform the public about those effects.  42 U.S.C. § 4332(2)(C).  The statute is purely procedural and mandates process without dictating any substantive environmental result.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  The record in this case shows that BLM fully complied with NEPA's procedural requirements.

As an initial matter, KSWild's allegations of a NEPA violation seek to impose a non-NEPA obligation on BLM, namely an obligation to frame its disclosures of potential Project impacts in terms of impacts on northern spotted owl recovery.  Opening Brief at 25 (stating that BLM must conduct its analysis "in the context of the species' recovery," and complaining that Project impacts on the owl's ability to recover are "not obvious").  Governing case law is clear

that it is impermissible under NEPA to impose an obligation on an agency where such obligation

is not found in NEPA.  For example, in the Ninth Circuit's seminal *McNair* opinion, an en banc

panel held that a requirement – affirmatively addressing uncertainties in a project's EIS – could

not be engrafted onto NEPA's purely procedural "hard look" requirement where neither the

statute nor its implementing regulations imposed such an obligation.  *McNair*, 537 F.3d at 1001.

KSWild's "recovery context" demand is similarly improper under NEPA.  Regardless, BLM's

robust disclosures of potential impacts on the owl, including its survival and recovery, satisfy the

statute.

First, BLM took the requisite NEPA "hard look" at potential Project impacts on the

northern spotted owl, KSWild's contrary assertion notwithstanding.  Opening Br. at 24-25.  This

topic was discussed above – *see supra* part III – where Murphy Company explained based on

Project disclosures that the North Project:  involves active management on about 9,000 BLM

acres, about 5,500 of which are designated critical habitat for the owl; anticipates treating about

386 acres of nesting/roosting habitat, 2,188 acres of foraging habitat and 5,579 acres of dispersal

habitat, which is the majority of such habitat in the action area; affects only Harvest Land Base

and O&C Act lands that are not being relied upon to support reproducing populations of owls;

may remove about 3% of the owl's nesting, roosting and foraging habitat, and 6% of dispersal

habitat, in the 127,801-acre critical habitat subunit ECS 1 overlapping the Project area; and may

affect up to 2,574 acres of owl nesting/roosting and foraging habitat out of the more than

300,000 acres of such habitat in the owl's Eastern Oregon Cascades Physiographic Province and

Recovery Unit where the Project is located.  Respectfully, to avoid further repetition, the Court is

referred to this brief's prior discussion of BLM's disclosures regarding Project implementation

and the reasonable conclusion that the Project is not expected to change the owl's survival and

recovery within the recovery unit, the province or range-wide, and regarding critical habitat continuing to fulfill its purpose at the critical habit subunit and units levels. *See supra* part III.

Second, it is untrue that BLM overlooked the Project's potential impacts on "the increased occupancy of barred owls." Opening Br. at 25. In fact, BLM disclosed the concern that Project implementation could result in barred owls "invad[ing] occupied northern spotted owl territories inside or outside the project area." BLM AR 90 (Revised EA at 41). BLM explained that "the likelihood of that occurring is small" and further pointed out the speculative nature of the concern. BLM AR 91 (Revised EA at 42) ("[I]t is contingent on the behavior of barred owls and NSO . . . ."). BLM further discussed the unlikelihood of Project-induced increased barred owl occupancy due to such factors as displaced barred owls being more likely "to search for new territories where competing for resources with NSOs is unnecessary because . . . competition is energetically demanding (Yackulic et al. 2014)." *Id.* Additional disclosures on this topic are found at pages 42-43 of the Revised EA. BLM AR 91-92.

Third, BLM plainly acknowledged "the lack of suitable spotted owl habitat and occupied sites on adjacent nonfederal lands." Opening Br. at 25. *See, e.g.*, BLM AR 75 (Revised EA at 26) ("Private industrial forest lands adjacent to the KFRA . . . provide minimal to no habitat for spotted owls. That situation is expected to continue into the future indefinitely . . . ."); BLM AR 83 (Revised EA at 34) (disclosing in the Project's cumulative effects analysis that "[p]rivate and state lands . . . provide little to no suitable habitat for the spotted owl. . . . It is reasonable to assume that this situation will continue")

Fourth, there is no merit to KSWild's assertion that BLM ignored the potential habitat impacts of Project implementation in the event the "barred owl control program is successful." Opening Br. at 25. The Project's guiding star is the avoidance of incidental take – during the

ESA consultation process, BLM "made clear" that it "is no longer in the business of planning and approving projects that incidentally take NSO's." FWS AR 8 (Notes from November 2017 Level 1 Meeting). BLM repeatedly disclosed the 2016 RMP's bedrock prohibition against timber harvest that results in incidental take of owls prior to "'implementation of a barred owl management program.'" BLM AR 90 (Revised EA at 41). And BLM further disclosed that the protective PDFs applicable to all Project timber harvest were "intended to buy some time for the NSO population by minimizing direct effects of habitat loss . . . to high priority NSO territories until implementation of a barred owl management program . . . ." BLM AR 550 (Biological Assessment at 11). *See also* BLM AR 24 (explaining that the Project prioritizes harvest "**away** from occupied NSO sites and **away from recently occupied** NSO sites) (emphasis in original).

Fifth, BLM fully disclosed the effects of not retaining additional habitat as "refugia for displaced northern spotted owls." Opening Br. at 25, 26. BLM properly tiered the Project's analysis to that for the 2016 RMP, which concluded after exhaustive analysis that "once the BLM lands necessary to support the large habitat blocks are reserved [under the 2016 RMP to conserve the owl and other species], reserving additional BLM lands provides little effective added support to the NSO population (FEIS, pp. 940-41)." BLM AR 81 (Revised EA at 32). Tiering in this instance was wholly proper – in *Native Village of Nuiqsut v. BLM*, 431 F. Supp. 3d 1003 (D. Alaska 2020), the court explained that "when a programmatic EIS *doe*s adequately consider the impacts of subsequent site-specific projects, a subsequent NEPA document need not repeat that analysis 'unless new and significant environmental impacts arise that were not previously considered.'" *Id.* at 1025 (emphasis in original, citation to Ninth Circuit case law omitted). BLM further explained the futility of "providing additional refugia at the scale of the North project area (thousands of acres) . . . when [the EIS for the 2016 RMP] demonstrated that

providing refugia at the scale of the entire western Oregon BLM forest land base (approx. 2.5 million acres)" was incapable of "positively influenc[ing the owl] population range-wide . . . ." BLM AR 93 (Revised EA at 44). Further, based on the extensive expertise of BLM scientists, potential spotted owl refugia in the Project either were already occupied by the owl and hence protected, or already occupied by barred owls and hence not refugia. *Id.*

Sixth, similar to the refugia issue discussed above, there is no merit to KSWild's allegation that BLM failed to disclose potential impacts of Project implementation on "a competitive advantage to barred owls." Opening Br. at 25. BLM disclosed that the EIS for the 2016 RMP "addressed barred owls . . . and concluded that there was no evidence that BLM could affect changes in the spotted owl/barred owl dynamics . . . through management of individual forest stands." BLM AR 73 (Revised EA at 24). BLM plainly acknowledged the adverse effect on the spotted owl from competitive interactions with the barred owl but further disclosed there was no new information "that suggests preserving more, or even all" spotted owl habitat would change the owl's "population trends." BLM AR 89 (Revised EA at 40). *See also* BLM AR 90 (Revised EA at 41) (disclosing that barred owl impacts on the northern spotted owl cannot be "ameliorated by greater forest retention than provided for under the" 2016 RMP). BLM's biological assessment also discussed the competitive interactions between the owls and pointed out that barred owl impacts on the spotted owl would continue in the Project area regardless of Project implementation. *See generally* BLM AR 547-50 (Biological Assessment at 8-11). BLM's disclosures regarding competitive interactions between the two species satisfied NEPA.

For all of the above reasons, the Revised EA took the requisite NEPA "hard look" at potential Project impacts on the northern spotted owl. Nothing more was required.

**D.      BLM Reasonably Concluded NEPA Did Not Require Preparation of an EIS.**

Under NEPA, federal agencies must prepare an EIS for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C).  To determine whether an action requires an EIS, an agency may prepare an EA.  40 C.F.R. § 1501.4(b).[12]  The determination whether an EIS is required hinges on the term "significantly," 40 C.F.R. § 1508.27, and "depends on the project's 'context' and its 'intensity.'"  *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006).  Context refers to the scope and setting of the action.  40 C.F.R. § 1508.27(a).  Intensity refers to the "severity" of the impact and is based on evaluation of ten regulatory factors.  40 C.F.R. § 1508.27(b).

An agency's determination that a project requires no EIS will be upheld unless it is arbitrary or capricious.  *Barnes v. F.A.A.*, 865 F.3d 1266, 1269-70 (9th Cir. 2017).  Only "[i]f there is a *substantial question* whether an action 'may have a significant effect' on the environment" must an agency prepare an EIS.  *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)).  The Court's standard of review on this issue "is quite narrow."  *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000) (upholding an EA while "[m]indful of the limited scope of our review").  An agency's determination that a particular effect is insignificant will generally be "'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'"  *WildEarth Guardians v. Provencio*, 923 F.3d 655, 672 (9th Cir. 2019) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989)).

---

[12]  The NEPA regulations recently were updated, effective September 14, 2020.  *See generally* 85 Fed. Reg. 43,304 (July 16, 2020).  The operative regulations for the Project were those in effect prior to September 2020 – all citations to NEPA regulations herein are to the prior rules.

**PAGE 30 --    DEFENDANT-INTERVENOR'S SJ MEM.**

BLM examined each of the regulatory factors and appropriately found the Project will

not have "significant" impacts on the environment.  BLM AR 32-40 (FONSI).  KSWild asks the

Court to second guess BLM's determination of no significant impact for three reasons, all

without merit.  As discussed below, BLM properly concluded no EIS was required.

### 1.    The Effects of North Project Implementation Are Not Highly Controversial, Uncertain or Unique Under NEPA.

An EIS is not required under 40 C.F.R. §§ 1508.27(b)(4) or (5).  *Cf.* Opening Br. at 28-

32.  These factors, which speak to whether Project effects are likely to be highly controversial,

*id.* § 1508.27(b)(4), or highly uncertain, *id.* § 1508.27(b)(5), must be evaluated in the context of

NEPA significance with deference afforded the agency's exercise of substantial expertise.

*WildEarth Guardians*, 923 F.3d at 672.  Under that lens, KSWild's argument fails.

KSWild properly acknowledges that a finding of NEPA "controversy" requires more than

opposition to the action.  Opening Br. at 29.  Thus, for example, KSWild's blanket opposition to

timber harvest on Harvest Land Base (and O&C Act) acres does not make the Project highly

controversial under NEPA.  Rather, the Ninth Circuit has explained that:

> A project is highly controversial if there is a *substantial dispute* [about] the size, nature or effect of the major Federal action *rather than the existence of opposition to a use.* . . . . A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI casts serious doubt upon the reasonableness of the agency's conclusion.

*Wildearth Guardians*, 923 F.3d at 673 (internal quotation marks and citations omitted, emphasis

in original).  As for uncertainty, "NEPA regulations 'do not anticipate the need for an EIS

anytime there is some uncertainty, but only if the effects of the project are 'highly' uncertain.'"

*Id.* (quoting *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1011 (9th Cir. 2006)).

KSWild first alleges that Project impacts on spotted owl recovery are "highly uncertain,"

Opening Br. 29, an assertion unsupported by the record.  The Project's potential impacts on owl

recovery have been discussed at length in this brief.  For example, Murphy Company explained above that FWS reasonably concluded "the survival and recovery of the northern spotted owl are not in jeopardy as a result of implementation of the Project," BLM AR 302 (Biological Opinion at 5), and that Project implementation in the Harvest Land Base will not prevent or retard the owl's recovery.  BLM AR 384 (Biological Opinion at 87).  BLM also disclosed that its environmental analysis for the Project "concluded that the proposed harvest . . . was consistent with the conservation and recovery of the NSO," and that no subsequent information "changes those conclusions."  BLM AR 90 (Revised EA at 41).  To the extent KSWild is focusing on individual owls in the Project area, Opening Br. at 29 (referring to "these owls"), such focus is improper.  Recovery is not evaluated at the level of individual owls – individual owls do not "recover," rather recovery is a species or population level inquiry.  *See, e.g.*, 16 U.S.C. § 1532 (conservation means bringing an ESA-listed "species" to the point of delisting).

Nor is there merit to KSWild's second contention regarding the barred owl control program.  BLM explained that retaining all Harvest Land Base acres in the Project area would not ameliorate the impacts to spotted owls from barred owl interactions.  BLM AR 89-90 (Revised EA at 40-41).  BLM further disclosed that the protective PDFs applicable to Project timber harvest were "intended to buy some time for the NSO population by minimizing direct effects of habitat loss . . . to high priority NSO territories until implementation of a barred owl management program . . . ."  BLM AR 550 (Biological Assessment at 11).  In other words, it is certain that retaining Harvest Land Base acres will not make a difference to the spotted owl versus barred owl relationship, but BLM is prioritizing harvest "away from currently and recently occupied territories" nonetheless.  BLM AR 57 (Revised EA at 8).

**PAGE 32 --    DEFENDANT-INTERVENOR'S SJ MEM.**

KSWild's third attempt to create controversy and uncertainty also fails. Opening Br. at 30. Here, KSWild asks the Court to ignore the 2016 RMP's conservation strategy, whereby the "conservation needs of the . . . owl are focused on the existence of large blocks of habitat, spatially distributed across a variety of ecological conditions," BLM AR 353 (Biological Opinion at 56), with the Harvest Land Base in contrast being "'the portion of the landscape that is not being relied upon for supporting reproducing populations of spotted owls . . . .'" BLM AR 383 (Biological Opinion at 86) (quoting FWS Biological Opinion for the 2016 RMP). BLM is not "gambling with a species' conservation and recovery" by authorizing timber harvest in the KFRA Harvest Land Base. Opening Br. at 30. Rather, BLM is managing the Harvest Land Base in conformance with the governing 2016 RMP, which has withstood the litmus test of litigation.

KSWild's fourth "highly controversial and uncertain" argument, Opening Br. at 31, already has been rebutted. FWS has not changed its incidental take policy. FWS may have persuaded other BLM Districts to do "more than the survey effort described in the protocol" at times, but FWS's inability to "negotiate a higher standard" for the North Project did not effect an agency policy change. BLM AR 5883 (Notes from April 2018 Level 1 Meeting).

Finally, KSWild's fifth argument repeats assertions rebutted previously, Opening Br. at 31, specifically KSWild's mischaracterization of the holding in *Gifford Pinchot* in the context of the Sjeopardy versus adverse modification of critical habitat inquiries. *See supra* part IV.A.2.

In short, 40 C.F.R. §§ 1508.27(b)(4), (5) do not require preparation of an EIS, as BLM determined. BLM AR 37-38 (FONSI at 6-7). BLM's decision should be afforded deference.

## 2.    North Project Implementation Does Not Set a NEPA Precedent.

Nor is an EIS required under 40 C.F.R. § 1508.27(b)(6) because the Project allegedly sets a "precedent for future action." Opening Br. at 33. KSWild's assertion that the Project sets a

precedent because it is "the only environmental analysis for logging that the Klamath Falls Resource Area plans to conduct for the foreseeable future" misconstrues the regulatory meaning of precedent in the context of NEPA significance. *Id.* "EAs are usually highly specific to the project and the locale, thus creating no binding precedent" for future projects. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011). Consistent with *Barnes*, the North Project's "analysis would be used only for the implementation of the treatments described in the North Landscape Project EA within the 11,879-acre project area." BLM AR 38 (FONSI at 7). Over an approximately ten-year period, individual timber sales authorized under the Revised EA "would be selected, from the pool of proposed treatment acreage." BLM AR 60 (Revised EA at 11). But that does not mean the North Project sets a precedent for its individual timber sales – the Project is the action, and the timber sales are part and parcel of the Project.

"Courts have . . . been reluctant to conclude that [the precedent factor] provides an independent basis for preparing an EIS." *Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F. Supp. 2d 1199, 1218 (D. Mont. 2012), *aff'd in part*, *vacated in part*, *remanded on other grounds*, 650 Fed. Appx. 400 (9th Cir 2016). On the facts of this case, the Court should defer to the agency's reasonable determination of no precedent. BLM AR 38 (FONSI at 7).

### 3.    The Effects of North Project Implementation on the Northern Spotted Owl and/or Its Critical Habit Do Not Require an EIS Under NEPA.

Finally, KSWild offers a conclusory argument that an EIS was required because of the "degree to which the action may adversely affect" an ESA-listed species or its critical habitat. Opening Br. at 34-35 (citing 40 C.F.R. § 1508.27(b)(9)). KSWild is mistaken. For support, KSWild refers the Court to a *vacated* Findings and Recommendation (*Cascadia Wildlands v. Carlton*, 2017 WL 1807607 (D. Or. Mar. 20, 2017)), without bringing the decision's vacatur to the Court's attention, despite the fact that the decision is without precedential authority. *During*

*v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("[A] decision that has been *vacated*

has no precedential authority whatsoever.") (emphasis in original).

The Project's potential impacts on the owl and its critical habitat, and the fact that Project

implementation is not expected to change the owl's survival and recovery or impair the critical

habitat's function, have been discussed extensively throughout this brief, to which discussion the

Court is referred. *See supra* parts III and IV.C. The FONSI further noted that a "may affect,

likely to adversely affect" determination does not equate to a per se "significant effect," as

supported by FWS's determination that Project implementation will not jeopardize the owls'

continued existence nor adversely modify owl critical habitat. BLM AR 39 (FONSI at 8). On

the facts of this case, the North Project's timber harvest on Harvest Land Base and O&C Act

acres designated for the specific purpose of timber harvest, and not for the purpose of supporting

reproducing owl populations, does not support a finding of significance, particularly under the

deferential standard governing the Court's review. *WildEarth Guardians*, 923 F.3d at 672.

## V.    <u>CONCLUSION</u>.

For the foregoing reasons, and for the reasons set forth in the summary judgment filings

of federal defendants, the North Project environmental documents fully satisfy the requirements

of the ESA and NEPA. Because there is no merit to KSWild's ESA and NEPA claims, the Court

should grant summary judgment in favor of Murphy Company and federal defendants and deny

KSWild's motion for summary judgment.

Dated this 16th day of December, 2020.

HAGLUND KELLEY LLP

By: /s/ Julie A. Weis
    Julie A. Weis, OSB No. 974320
    Michael E. Haglund, OSB No. 770230
    Christopher T. Griffith, OSB No. 154664
    Attorneys for Defendant-Intervenor Murphy Company

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the page limitation under LR 7-2(b) because it does not exceed 35 pages in length, excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.


/s/ Julie A. Weis
Julie A. Weis, OSB No. 974320

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of December 2020, I served a true and accurate copy of the foregoing **DEFENDANT-INTERVENOR'S MOTION AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

/s/ Julie A. Weis
Julie A. Weis

**PAGE 37 --    DEFENDANT-INTERVENOR'S SJ MEM.**