BILLY J. WILLIAMS
United States Attorney
District of Oregon

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment and Natural Resources Division

JOHN P. TUSTIN (TX Bar No. 24056453)
Senior Attorney
EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
Natural Resources Section
ROBERT M. NORWAY (DC Bar No. 490715)
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022 (Tustin)
        (202) 305-0479 (Hamilton)
        (202) 532-3202 (Norway)
Fax:    (202) 305-0506
john.tustin@usdoj.gov
emma.hamilton@usdoj.gov
robert.m.norway@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION**

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, *et al.* <br>       Plaintiffs, <br><br>   v. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT, *et al.* <br>       Federal Defendants, <br><br>   and <br><br> MURPHY COMPANY <br>       Intervenor-Defendant. | Case No. 1:19-CV-01810-CL <br><br> FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [ECF No. 36] |

## MOTION FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a) and Rule 56-1 of the Local Rules of Civil Procedure, Federal Defendants hereby move this Court for summary judgment on claims brought by Klamath-Siskiyou Wildlands Center, Oregon Wild, Cascadia Wildlands, and Soda Mountain Wilderness Council ("Plaintiffs") challenging the actions of the U.S Bureau of Land Management ("BLM") and the U.S. Fish and Wildlife Service ("FWS") authorizing the North Landscape Project—a timber harvest project in southwestern Oregon.

The Ninth Circuit has endorsed the use of Rule 56 motions for summary judgment in reviews of agency administrative decisions under the limitations imposed by the Administrative Procedure Act ("APA").  *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994) (discussing the standards of review under both the APA and Fed. R. Civ. P. 56).  Under Rule 56, "[t]he moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute."  *Id.* at 1472.  Because the role of the Court under the APA is not to "find facts" but is limited to reviewing the Administrative Record to determine whether the federal agencies considered the relevant factors and reached conclusions that were not arbitrary and capricious, there can be no genuine issue of material fact, and summary judgment is the appropriate resolution of this case.

Federal Defendants respectfully request that this Court grant summary judgment in their favor and deny Plaintiffs' motion for summary judgment (ECF No. 36) on the following grounds.  First, the Environmental Assessment for the North Landscape Project fully complies with the National Environmental Policy Act.  Plaintiffs have failed to demonstrate that BLM did not adequately consider the direct, indirect, and cumulative impacts of the proposed action on

northern spotted owls and their habitat, *see* ECF 26 ¶¶ 106-116 ("First Claim for Relief"), and

have failed to demonstrate that BLM should have prepared an Environmental Impact Statement,

*see id.* ¶¶ 117-130 ("Second Claim for Relief").  Further, the Biological Opinion ("BiOp") that

FWS prepared for the Project complies with the APA and Endangered Species Act ("ESA"), *see*

*id.* ¶¶ 131-148 ("Third Claim for Relief"), and BLM's reliance on that BiOp is consistent with

the ESA, *see id.* ¶¶ 149-158 ("Fourth Claim for Relief").[1]  The Court should grant judgment in

favor of Federal Defendants on all claims, dismiss this action with prejudice, and enter judgment

in Federal Defendants' favor.

This cross-motion is supported by the following Memorandum of Points and Authorities

and the Administrative Records lodged with the Court.  In accordance with Local Rule 7.1,

counsel have conferred and Plaintiffs indicated that they oppose this motion.


Respectfully submitted on this 16th day of December, 2020.

<div style="margin-left: 40%;">

BILLY J. WILLIAMS
United States Attorney
District of Oregon

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/ Emma L. Hamilton*
EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney

</div>

---

[1] Plaintiffs have abandoned their claim challenging the North Landscape Project under the Federal Land Policy and Management Act, ECF 26 ¶¶ 159-66.  *See* ECF 36 at 1 n.1.  Plaintiffs have also waived their claims related to wildfire risk and the planned Pacific Connector Gas Pipeline (ECF 26 ¶¶ 113-14, 125, 127).  *See United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("[A]rguments not raised by a party in its opening brief are deemed waived." (internal quotation marks and citation omitted)); *Mountain States Legal Found. v. Espy*, 833 F. Supp. 808, 813 n.5 (D. Idaho 1993) (deeming claims not raised in a summary judgment motion to be abandoned and granting judgment for defendant).

JOHN P. TUSTIN (TX Bar No. 24056453)
Senior Attorney
Natural Resources Section
ROBERT M. NORWAY (DC Bar No. 490715)
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022 (Tustin)
        (202) 305-0479 (Hamilton)
        (202) 532-3202 (Norway)
Fax:    (202) 305-0506
john.tustin@usdoj.gov
emma.hamilton@usdoj.gov
robert.m.norway@usdoj.gov

*Attorneys for Federal Defendants*

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF ACRONYMS .............................................................................................. vi

INTRODUCTION ........................................................................................................... 1

STATUTORY BACKGROUND .................................................................................... 2

    I.    The Endangered Species Act ................................................................................ 2

    II.   The National Environmental Policy Act ............................................................. 2

    III.  The Oregon and California Revested Lands Act ................................................ 3

FACTUAL BACKGROUND ......................................................................................... 4

    I.    The 2016 Southwestern Oregon RMP ................................................................ 4

    II.   The Cascade-Siskiyou National Monument ...................................................... 7

    III.  The North Landscape Project ............................................................................. 7

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT ................................................................................................................ 11

    I.    Plaintiffs Improperly Attempt to Relitigate Prior Challenges to the 2016 RMP ............ 11

    II.   FWS's BiOp for the North Project Fully Complies with the ESA. ............................. 13

        A.   FWS Analyzed the Lifecycle of the NSO and the Effects of the North Project ........ 13

        B.   FWS Analyzed the Effects of the Project on Designated Critical Habitat. ............... 18

        C.   FWS's Incidental Take Statement is Reasonable. ..................................................... 20

        D.   BLM's Reliance on FWS's BiOp is Reasonable and Complies with the ESA. ......... 25

    III.  The North Landscape Project Fully Complies with NEPA. ............................................. 26

        A.   The North EA Properly Tiers to the RMP/FEIS's Exhaustive Analysis of NSO Effects and Analyzes Project-Specific Effects. ........................................ 26

        B.   An EIS is Not Required for this Properly Tiered, Site-Specific Project. ................. 32

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

Allen v. McCurry,
  449 U.S. 90 (1980).................................................................................................. 11

Am. Forest Res. Council v. Hammond,
  422 F. Supp. 3d 184 (D.D.C. 2019)........................................................................... 7

Animals v. U.S. Dep't of Interior,
  751 F.3d 1054 (9th Cir. 2014) ................................................................................. 34

Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,
  273 F.3d 1229 (9th Cir. 2001) ................................................................................. 23

Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,
  515 U.S. 687 (1995).................................................................................................. 23

Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,
  462 U.S. 87 (1983)............................................................................................. 10, 26

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,
  419 U.S. 281 (1974).................................................................................................. 10

Cascadia Wildlands v. Bureau of Land Mgmt.,
  410 F. Supp. 3d 1146 (D. Or. 2019) ........................................................................ 34

Cascadia Wildlands v. Thrailkill,
  806 F.3d 1234 (9th Cir. 2015) ........................................................................... 16, 22

City of Sausalito v. O'Neill,
  386 F.3d 1186 (9th Cir. 2004) ................................................................................... 9

Costantini v. Trans World Airlines,
  681 F.2d 1199 (9th Cir. 1982) ................................................................................. 12

Ctr. for Biological Diversity v. Salazar,
  695 F.3d 893 (9th Cir. 2012) ..................................................................................... 3

Ctr. for Biological Diversity v. Salazar,
  706 F.3d 1085 (9th Cir. 2013) ................................................................................... 2

Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,
  746 F. Supp. 2d 1055 (N.D. Cal. 2009).................................................................... 23

Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,
  807 F.3d 1031 (9th Cir. 2015) ................................................................................. 16

Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.,
  (EPIC), 451 F.3d 1005 (9th Cir. 2006)..................................................................... 19

*Friends of the Earth v. Hintz,*
  800 F.2d 822 (9th Cir. 1986) ............................................................................ 10

*Headwaters, Inc. v. U.S. Forest Serv.,*
  399 F.3d 1047 (9th Cir. 2005) .......................................................................... 11

*Howard v. City of Coos Bay,*
  871 F.3d 1032 (9th Cir. 2017) .......................................................................... 12

*In re Gottheiner,*
  703 F.2d 1136 (9th Cir. 1983) .......................................................................... 11

*Kern v. BLM,*
  284 F.3d 1062 (9th Cir. 2002) .......................................................................... 27

*Kremer v. Chem. Constr. Corp.,*
  456 U.S. 461 (1982) .......................................................................................... 12

*KS Wild v. BLM,*
  387 F.3d 989 (9th Cir. 2004) ...................................................................... 33, 34

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ................................................................ 3, 10, 11, 31

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................ 2

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ...................................................................................... 3, 10

*Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................................ 10

*Mountain States Legal Found. v. Espy,*
  833 F. Supp. 808 (D. Idaho 1993) ...................................................................... ii

*Murphy Co. v. Trump,*
  2019 WL 4231217 (D. Or. Sept. 5, 2019) ............................................................ 4

*Murphy Co. v. Trump,*
  No. 1:17-cv-00285-CL, 2019 WL 2070419 (D. Or. April 2, 2019) ...................... 4, 7

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) .......................................................................................... 24

*Native Ecosystems Council v. Dombeck,*
  304 F.3d 886 (9th Cir. 2002) ............................................................................ 10

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,*
  137 F.3d 1372 (9th Cir. 1998) ...................................................................... 3, 28

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) .............................................................................................. 5

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ............................................................................ i

*Or. Nat. Res. Council Fund v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) ......................................................................... 5

*Or. Wild v. U.S. v. Forest Serv.*,
    107 F. Supp. 3d 1102 (D. Or. 2015) ............................................................... 35

*Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marines Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001) ....................................................................... 17

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,
    (PCFFA II)*, 426 F.3d 1082 (9th Cir. 2005) ............................................. 14, 15

*Pac. Rivers v. U.S. Bureau of Land Mgmt.*,
    2019 WL 1232835 (D. Or. March 15, 2019) ................................................... 5

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
    898 F.2d 1410 (9th Cir. 1990) ................................................................... 25, 26

*Rivers v. U.S. Bureau of Land Mgmt.*,
    No. 6:16-cv-01598-JR, 2018 WL 6735090 (D. Or. Oct. 12, 2018) .............. 5, 11, 13

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................................................ 3

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ...................................................................... 9, 24

*Seattle Audubon Soc. v. Lyons*,
    871 F. Supp. 1291 (W.D. Wash. 1994) .......................................................... 4

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
    143 F.3d 515 (9th Cir. 1998) ........................................................................ 10

*Swanson Group Mfg. LLC v. Bernhardt*,
    417 F. Supp. 3d 22 (D.D.C. 2019) ................................................................. 4

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planing Agency*,
    322 F.3d 1064 (9th Cir. 2003) ................................................................. 11, 13

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
    671 F.3d 1113 (9th Cir. 2012) ...................................................................... 10

*Turtle Island Restoration Network v. U.S. Dep't of State*,
    673 F.3d 914 (9th Cir. 2012) ........................................................................ 13

*United States v. Romm*,
    455 F.3d 990 (9th Cir. 2006) ......................................................................... ii

*United States v. Tohono O'Odham Nation*,
    563 U.S. 307 (2011) ...................................................................................... 12

*W. Watersheds Proj. v. Lueders*,
   122 F. Supp. 3d 1039 (D. Nev. 2015) ........................................................ 27

*WildEarth Guardians v. Provencio*,
   923 F.3d 655 (9th Cir. 2019) ................................................................... 34

**Statutes**

16 U.S.C. § 1532(19) ................................................................................... 23

16 U.S.C. § 1533(d) ..................................................................................... 16

16 U.S.C. § 1536(a)(2) ...................................................................... 2, 16, 17

16 U.S.C. §§ 1531-1544 ................................................................................. 2

43 U.S.C. § 2601 ............................................................................................. 4

43 U.S.C. §§ 1701-1785 ................................................................................. 5

5 U.S.C. § 706(2) ........................................................................................... 9

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................... i

**Regulations**

40 C.F.R. § 1502.20 ............................................................................... 27, 28

40 C.F.R. § 1506.4 ................................................................................. 27, 33

40 C.F.R. § 1508.27(b) ................................................................................ 32

40 C.F.R. §§ 1501.4-1508.9 ........................................................................... 3

40 C.F.R. Part 1500 (2018) ............................................................................ 3

43 C.F.R. § 1610.5–3(a) ................................................................................. 5

43 Fed. Reg. 55,978 (Nov. 29, 1978) ............................................................ 3

50 C.F.R. § 17.3 ..................................................................................... 22, 23

50 C.F.R. § 402.01(b) ..................................................................................... 2

50 C.F.R. § 402.02 ................................................................................. 14, 17

50 C.F.R. § 402.13 ........................................................................................ 22

50 C.F.R. § 402.14(g) ..................................................................................... 2

50 C.F.R. § 402.14(i) ...................................................................................... 2

50 C.F.R. § 402.15(a) .................................................................................... 25

51 Fed. Reg. 15,618 (Apr. 25, 1986) ............................................................. 3

## **TABLE OF ACRONYMS**

APA         Administrative Procedure Act
ASQ         Allowable Sale Quantity
BiOp        Biological Opinion
BLM         U.S. Bureau of Land Management
CSNM        Cascade-Siskiyou National Monument
EA          Environmental Assessment
EIS         Environmental Impact Statement
ESA         Endangered Species Act
FEIS        Final Environmental Impact Statement
FONSI       Finding of No Significant Impact
FWS         U.S. Fish & Wildlife Service
ITS         Incidental Take Statement
KFRA        Klamath Falls Resource Area
MMbf        Million Board Feet
NEPA        National Environmental Policy Act
NMFS        National Marine Fisheries Service
NSO         Northern Spotted Owl
NWFP        Northwest Forest Plan
RMP         Resource Management Plan

## INTRODUCTION

Plaintiffs challenge the North Landscape ("North") Project—a site-specific management approach for conducting annual timber sales in BLM's Klamath Falls Resource Area ("KFRA") in accordance with the 2016 Southwestern Oregon Resource Management Plan (the "RMP"). The RMP governs BLM's management of the KFRA and harmonizes the agency's compliance with various statutory mandates, like the Endangered Species Act ("ESA") and the Oregon and California Revested Lands Act ("the O&C Act") of 1937. BLM designed the North Project to implement the management direction in the RMP. As such, BLM's 2020 Environmental Assessment for the North Project ("the EA") and FWS's accompanying Biological Opinion ("BiOp") properly incorporate the agencies' previous, thorough analyses of how the management direction in the RMP may affect the northern spotted owl ("NSO") and NSO habitat.

Plaintiffs challenged BLM's and FWS's environmental analyses of the RMP framework in prior litigation, and were unsuccessful both in this Court and in the Ninth Circuit. Their present challenges to the North Project amount to improper attempts to relitigate the management framework established in the RMP, while disregarding the programmatic actions in the RMP that are designed to benefit NSOs and their habitat. The EA and BiOp explain that the site-specific impacts associated with the North Project are within the range analyzed in the Final Environmental Impact Statement ("FEIS") and BiOp for the 2016 RMP, and Plaintiffs point to no new information rendering that determination unreasonable. Moreover, Plaintiffs' ESA and National Environmental Policy Act ("NEPA") claims fail on their merits in light of the full analyses in the North Project's BiOp and EA, which incorporate the agencies' robust prior evaluations of the RMP's potential effects on NSOs and NSO habitat. The Court should grant Federal Defendants' motion for summary judgment and deny Plaintiffs' motion in its entirety.

## STATUTORY BACKGROUND

### I.    The Endangered Species Act

The ESA, 16 U.S.C. §§ 1531-1544, "seeks to protect species of animals against threats to their continuing existence caused by man." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558 (1992). The Secretary of Interior, through FWS, administers the ESA for the listed species at issue in this case.[2]  Section 7(a)(2) of the ESA directs each agency to insure, in consultation with FWS, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify a species' designated critical habitat.  16 U.S.C. § 1536(a)(2).  At the conclusion of formal consultation, FWS issues a BiOp, which is an expert opinion on whether the action meets Section 7(a)(2)'s standards.  *Id.* § 1536(b)(3)(A).  The BiOp must be based on the "best scientific and commercial data available."  *Id.* § 1536(a)(2); 50 C.F.R. § 402.14(g), (h).  If FWS issues a "no jeopardy" and "no adverse modification" opinion but still concludes that the action may result in incidental take of a listed species, FWS includes an incidental take statement ("ITS") in its BiOp that specifies terms and conditions the action agency must follow regarding such take.  *See* 50 C.F.R. § 402.14(i)(1).

### II.    The National Environmental Policy Act

NEPA is a procedural statute—it does not contain substantive environmental standards or mandate certain results, but merely requires that federal agencies "perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'"  *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)).  "NEPA merely prohibits uninformed—rather than unwise—

---

[2] FWS is responsible for terrestrial and freshwater species, while the National Marine Fisheries Service ("NMFS") is responsible for marine species.  § 50 C.F.R. § 402.01(b).

agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

Indeed, NEPA does not require an agency to choose the most environmentally sound course of

action following its required analysis. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371

(1989). In reviewing NEPA claims, courts are charged only with ensuring that the agency has

presented a "'full and fair discussion of significant environmental impacts' so as to 'inform

decisionmakers and the public of the reasonable alternatives which would avoid or minimize

adverse impacts or enhance the quality of the human environment.'" *Lands Council v. McNair*,

537 F.3d 981, 1001 (9th Cir. 2008) (en banc) (quoting 40 C.F.R. § 1502.1).[3]

 To satisfy NEPA's procedural requirements, an agency may prepare an EA to determine

whether a Finding of No Significant Impact ("FONSI") is warranted or if an EIS that further

analyzes significant environmental impacts is required. 40 C.F.R. §§ 1501.4, 1508.9. An EA is

a "concise public document" that serves to "briefly provide sufficient evidence and analysis for

determining whether to prepare an EIS or [FONSI]." § 1508.9(a)(1). An EA must take a "'hard

look' at the likely effects of the proposed action" by considering all foreseeable direct and

indirect impacts, *Ctr. for Biological Diversity v. Salazar,* 695 F.3d 893, 916-17 (9th Cir. 2012),

but need only include a "reasonably thorough discussion" of probable effects. *Neighbors of*

*Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1376 (9th Cir. 1998).

## III.   The Oregon and California Revested Lands Act

 BLM manages approximately two million acres of federal land in western Oregon under

---

[3] The Council on Environmental Quality promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, the Council published a new rule, effective September 14, 2020, further revising the 1978 regulations. The claims in this case arise under the 1978 regulations, as amended in 1986. All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

the O&C Act of 1937, which provides for those lands to be managed for permanent forest

production. *See* 43 U.S.C. § 2601. To achieve this objective, the O&C Act requires BLM to

determine the "allowable sale quantity," or ASQ[4] for O&C lands, and "timber from said

lands . . . not less than the annual sustained yield capacity when the same has been determined

and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a

normal market." *Id.* This Court has recognized that "the O&C Act is a 'dominant' or 'primary'

use statute for sustained yield timber production." *Murphy Co. v. Trump*, No. 1:17-cv-00285-

CL, 2019 WL 2070419, at *1 (D. Or. April 2, 2019), *adopted,* No. 1:17-CV-00285-CL, 2019

WL 4231217 (D. Or. Sept. 5, 2019) (citations omitted).[5] BLM must also comply with the ESA

and NEPA in addition to declaring the sustained yield capacity for timber volume on O&C lands

and offering that timber for sale. *Seattle Audubon Soc. v. Lyons*, 871 F. Supp. 1291, 1314 (W.D.

Wash. 1994), *affirmed*, 80 F.3d 1401 (9th Cir. 1996).

## FACTUAL BACKGROUND

## I.    The 2016 Southwestern Oregon RMP

The listing of the NSO as a threatened species in 1990 required BLM to harmonize the

mandate of the O&C Act, that permanent forest production be the dominant use of O&C lands,

with the conservation mandate of the later-enacted ESA. *See* BLM AR 000546. To that end,

---

[4] ASQ is synonymous with "annual productive capacity," "annual sustained yield capacity," and "sustained yield capacity." BLM AR 014705, 014721.

[5] In *Swanson Group Mfg. LLC v. Bernhardt*, 417 F. Supp. 3d 22 (D.D.C. 2019), one district court recently went a step further, issuing an order that concluded BLM has a non-discretionary, judicially enforceable duty under the Administrative Procedure Act requiring the agency to sell or offer for sale the declared ASQ each year. *Id.* at 28. The parties are awaiting a remedy order in *Swanson*, but the case illustrates that the O&C Act's requirement that BLM declare the ASQ and offer that timber for sale each year is far from an "arbitrary timber target for private commercial gain[,]" as Plaintiffs misleadingly characterize it. *See* ECF 36 at 10.

BLM worked with the Forest Service to adopt resource management plans[6] for western Oregon as part of the 1995 Northwest Forest Plan ("NWFP"). BLM AR 014408. The NWFP gave effect to both the ESA and the O&C Act by restricting timber harvest on portions of the O&C lands to conserve NSO habitat, while permitting timber harvest on other portions of those lands. *See Pac. Rivers v. U.S. Bureau of Land Mgmt.*, No. 6:16-cv-01598-JR, 2018 WL 6735090, at \*2 (D. Or. Oct. 12, 2018), *adopted*, 2019 WL 1232835, at \*1 (D. Or. March 15, 2019).

The two decades following adoption of the NWFP saw numerous changed circumstances and new information regarding NSOs, including a new recovery plan, new information about the effects of barred owls on NSO survival and recovery, and changes to critical habitat designations. *See, e.g.*, BLM AR 000318-19, 000333-36. BLM undertook an extensive process to revise the NWFP-based RMPs, which generated two revised RMPs including the 2016 Southwestern Oregon RMP at the center of this case.[7] BLM AR 014768-70. The 2016 RMPs reflected the input of dozens of formal cooperators including federal and state agencies, tribes, and local governments, and were supported by a comprehensive FEIS spanning four volumes and over 2,000 pages. BLM AR 014726-016827. BLM also formally consulted with FWS and NMFS to comply with Section 7 of the ESA. FWS authored a final BiOp for the 2016 RMPs, in which the agency formally issued "no jeopardy" and "no adverse-modification" findings for

---

[6] The Federal Land Policy and Management Act of 1976 ("FLPMA") establishes requirements for land use planning on public lands. *See* 43 U.S.C. §§ 1701-1785. Under FLPMA, BLM is required to "develop, maintain, and when appropriate, revise land use plans to ensure that land management be conducted on the basis of multiple use and sustained yield." *Or. Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (citations and internal quotations omitted). Once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a). BLM has "a great deal of discretion in deciding how to achieve" compliance with an applicable land use plan. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004).

[7] The second RMP, not relevant here, is BLM's 2016 Northwestern and Coastal Oregon RMP.

several listed species, including the NSO.  FWS 018033-38.

The 2016 RMP allocates varying amounts of land to six different land use categories, including late-successional reserves, riparian reserves, and the "Harvest Land Base."  BLM AR 014449.  BLM committed approximately eighty percent of the entire RMP planning area to reserves, including late-successional reserves that are managed to develop, maintain, and promote NSO nesting/roosting and foraging habitat.  BLM AR 014844-47; BLM AR 006762-63.  BLM allocated the remaining twenty percent of land in the RMP planning area to the Harvest Land Base, which is managed primarily to "achieve continual timber production that can be sustained through a balance of growth and harvest," and to offer the ASQ of timber volume for sale under the O&C Act.  BLM AR 014844-47.

Through these land use allocations, the RMP ensures BLM can comply with the ESA *and* the O&C Act by reserving most NSO habitat for conservation in late-successional and other reserves, while allocating land to the Harvest Land Base to be managed to meet the annual ASQ volume.  The RMP also directs the BLM Districts to refrain from offering timber sales that would result in incidental take of NSO for a period of time.  BLM AR 014527, 014533-34. BLM performed extensive modeling to develop the ASQ declared in the 2016 RMP.  *See* BLM AR 015964-16028.  This modeling utilized data from tree stands in the KFRA, which encompasses the North Project Area, to determine the appropriate level of harvest that will maintain sustained yield.  BLM AR 015970.  The RMP declared the ASQ for the KFRA to be 6 million board feet ("MMbf") annually.[8]  BLM AR 014411.  FWS concluded in the BiOp on the RMP that, notwithstanding some adverse effects to NSOs associated with habitat removal in the Harvest

---

[8] This represents only a 1.5% increase from the ASQ declared for the KFRA under the 1995 RMP, which was 5.91 MMbf.  BLM AR 024005.

Land Base, the RMP provides a net benefit to the species and its designated critical habitat, contributing to species recovery.  BLM AR 006748, 006750, 006753, 006759-63.

## II.    The Cascade-Siskiyou National Monument

The Cascade-Siskiyou National Monument ("CSNM") was established by presidential proclamation in 2000, and commercial timber harvest is generally prohibited within the monument.  BLM AR 000055.  On January 12, 2017, the CSNM was expanded by a subsequent presidential proclamation, nearly doubling the size of the monument and adding approximately 11,792 acres within Klamath County and the KFRA.[9]  *Id.*  Complicating BLM management, 99% of lands in the KFRA that were added to the monument in 2017 are O&C lands (11,716 out of 11,792 acres).  BLM AR 000056.  Of those 11,716 O&C acres, 8,682 are in the Harvest Land Base that the RMP allocated to meet the KFRA's ASQ.  Further, the areas in the Harvest Land Base that were added to the monument in 2017 represent a large portion of the most suitable lands for harvest—areas that have high site quality *and* are economically viable for commercial harvest to meet the KFRA's annual ASQ volume.  BLM AR 000056.

## III.    The North Landscape Project

BLM developed the North Project in 2018 to comply with its timber harvest obligations under the O&C Act and the RMP while abiding by the prohibitions on commercial harvest in the CSNM and fulfilling its ESA obligation to protect and conserve the NSO and its critical habitat.

---

[9] In 2019 this Court upheld the legality of the monument expansion.  *Murphy Co.*, 2019 WL 2070419, at *1, *appeal docketed*, No. 19-35921 (9th Cir. Nov. 4, 2019).  Not soon after, a district court in the District of Columbia held that the CSNM expansion unacceptably conflicts with the O&C Act and interferes with Congress's intent that those lands be managed exclusively for sustained yield timber production.  *Am. Forest Res. Council v. Hammond*, 422 F. Supp. 3d 184, 193 (D.D.C. 2019), *appeal docketed*, No. 20-5009 (D.C. Cir. Jan. 24, 2020).  Both appeals are currently stayed pending a final remedy order in *Swanson*, discussed *supra* in note 4.  The North EA notes, however, that "[a]ll actions are proposed outside the CSNM boundary and would not be affected by any court rulings on the validity of the expansion."  BLM AR 000056.

BLM AR 000057.  The Project Area consists of 11,879 acres of BLM land in the KFRA, and 9,073 of those acres are analyzed for harvest.  BLM AR 000060, 000099.  More than 90% of the Project Area falls within the Harvest Land Base designated in the 2016 RMP, and no treatments are proposed outside the Harvest Land Base.  BLM AR 000033.  BLM selected the Project Area specifically: (1) to include forest stands in the KFRA "with relative densities that support viable timber sales" that can meet annual ASQ volume, (2) to cover only lands outside the recently expanded CSNM, and (3) to avoid incidental take by including a large enough area that harvest can shift in response to changes in NSO occupancy.  BLM AR 000053-57.  In fact, given the constraints of BLM's timber harvest and species protection obligations, the "Project Area consists of the *only current feasibly grouped collection of forest stands*" that is outside the monument, large enough to allow for adaptive management in siting annual timber sales to avoid incidental take of NSOs, and "can immediately meet the KFRA's ASQ in a sustained manner[.]" BLM AR 000057-58 (emphasis added).

In the EA for the North Project, BLM analyzed the effects of annual timber harvest within the Project Area to implement the management direction in the RMP.  BLM AR 000076. But the EA and FONSI do not *authorize* any timber sales.  BLM AR 000033.  Rather, the North EA analyzes a management approach under which BLM can offer 6 MMbf of timber (plus or minus forty percent variance) per year through subsequent, annual timber sales, each accompanied by its own sale-specific decision record.  *Id*.  Thus, over the course of ten years, BLM will offer for sale through subsequent decisions approximately 60 to 78 MMbf from the North Project (not 111 MMbf, as Plaintiffs misleadingly claim).[10]  Annual timber sales under the

---

[10] The KFRA's ASQ is 6 MMbf/year with a forty percent annual variance and a thirty percent variance over the decade.  *See* BLM AR 014411-12.  Thus, the maximum BLM could offer for sale over a ten-year period under the North Project EA would be 78 MMbf.  This is not a

EA must comply with the RMP's direction to avoid incidental take of NSOs, so the Project

Design Features incorporate a flexible approach that pairs rigorous NSO survey protocols with a

large pool of potential harvest acres so that BLM can easily modify or shift annual sales to

alternative units when necessary to avoid take.  BLM AR 000057, 000077; 000550, 000558-62,

000575-79.  BLM initiated formal Section 7 consultation with FWS by preparing a Biological

Assessment, BLM AR 000538-92, and FWS issued the BiOp for the North Project in July 2018,

BLM AR 000298-443.  FWS determined in its BiOp that the Project would not jeopardize the

NSO, nor adversely modify the species' critical habitat.  *Id.*

BLM has issued four timber sale decision records under the North Project EA and

FONSI.  BLM awarded the contract for the Sweet Vidalia Sale in 2018, and harvest of 4.5 MMbf

was completed in October 2019.  BLM AR 000240.  BLM offered the Stag Sale for 5.8 MMbf in

2019, but modified the sale to 4.5 MMbf following a determination of NSO occupancy in one of

its proposed harvest units, consistent with the project design features described above.  BLM AR

000190; 000042.  In 2020, BLM offered the Terminus Sale for 2.8 MMbf.  BLM AR 000010.

## STANDARD OF REVIEW

The Court's assessment of Plaintiffs' claims is governed by the APA, 5 U.S.C. § 706(2).

*City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004); *San Luis & Delta-Mendota*

---

"dramatic[] increase[]," *see* ECF 36 at 10—this ASQ is substantially similar to the KFRA's ASQ
under the 1995 NWFP.  *See* BLM AR 014413.  While the EA projects that 111 MMbf would be
the total timber volume *available* in the Project Area's Harvest Land Base acres under the
proposed action, this number is higher than the actual volume that BLM may authorize through
future decisions over a ten-year period.  Each annual timber sale will likely average less than 500
acres but will be offered from a pool of approximately 9,300 Harvest Land Base acres.  BLM AR
000001; 000041.  BLM analyzed a larger project area to preserve flexibility in harvest locations
to avoid incidental take.  BLM AR 000057.  Thus, the EA does not "offer for sale" 111 MMbf
of timber, or any timber for that matter, and the RMP limits BLM to authorizing a maximum of 78
MMbf over a ten-year period.

*Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, final agency decisions must be upheld unless they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). As such, the Court's task "is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.").

The scope of review under the APA is narrow and judicial review of federal agency actions is "exceedingly deferential"—the Court may not substitute its judgment for that of the agency. *See McNair*, 537 F.3d at 992-94; *Motor Vehicle Mfrs. Ass'n., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). Under this deferential standard, "[a]n agency will have acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency] made a clear error in judgment.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (quoting *McNair*, 537 F.3d at 994). "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (citation omitted).

Agencies are accorded particular deference with respect to scientific questions within their expertise. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378. Indeed, as

the Ninth Circuit explained, courts "are to be most deferential when the agency is making predictions, within its area of special expertise, at the frontiers of science[,]" and should "conduct a particularly deferential review of an agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable." *McNair*, 537 F.3d at 993 (quotation marks and citations omitted).

## ARGUMENT

### I.     Plaintiffs Improperly Attempt to Relitigate Prior Challenges to the 2016 RMP.

As a threshold matter, Plaintiffs' claims attack the RMP framework underlying the North Project and are barred by the doctrine of claim preclusion, or *res judicata*, which prohibits "further claims by parties or their privies based on the same cause of action[.]" *Headwaters, Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051-52 (9th Cir. 2005); *see also Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been* raised in that action." (emphasis added)).   Claim preclusion applies "whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planing Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (citations omitted).

Plaintiffs' claims meet each of the required elements for claim preclusion based on this Court's and the Ninth Circuit's final judgments on the merits upholding the 2016 RMP.  *See Pac. Rivers*, 2018 WL 6735090, at *1; *Pac. Rivers*, 815 Fed. Appx. at 110.  First, "there is 'substantial identity'" and "sufficient commonality of interest" between the parties.  *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983) (citation omitted).  Plaintiffs here were nearly all represented in *Pacific Rivers* with the exception of Soda Mountain Wilderness Council, which represents substantially the same environmental interests as the other Plaintiffs.  ECF 26 ¶¶ 13, 16.

Most importantly, the cases share "factual overlap," and involve "claims arising from the same transaction." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011) (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 482, n.22 (1982)); *accord Howard v. City of Coos Bay*, 871 F.3d 1032, 1039 (9th Cir. 2017) (explaining that the most important factor courts consider in analyzing identity of claims is "whether the two suits arise out of the same transactional nucleus of facts." (quotation omitted)).  Claim preclusion "bars all grounds for recovery which *could* have been asserted, whether they were or not, in a prior suit between the same parties on the same cause of action." *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201 (9th Cir. 1982) (emphasis added; citation omitted).

Plaintiffs' challenges to how the agencies analyzed NSO impacts stemming from timber harvest in the Harvest Land Base are actually attacks on the overarching analysis and programmatic land use directions set forth in the RMP and analyzed in the 2016 FEIS and BiOp.  They are thus part of the same transactional nucleus of facts as Plaintiffs' 2017 challenge to the RMP.  *Compare* ECF 26 ¶ 112, *with Pac. Rivers*, 6:16-cv-01598-TC, ECF 32 ¶¶ 126, 137 (allegations that Federal Defendants violated NEPA by failing to analyze the RMP's potential direct, indirect, and cumulative impacts on terrestrial species including the NSO).  Indeed, while Plaintiffs purport to challenge only the North Project EA, FONSI, and BiOp, each of their arguments is rooted in their dissatisfaction with BLM's decision at the programmatic level to allocate some lands encompassing NSO habitat to the Harvest Land Base—a decision the North Project is merely implementing in accordance with the RMP's management direction.

Plaintiffs focused their prior challenges to the RMP on aquatic species and elected not to pursue claims challenging the RMP based on its potential NSO impacts, but "[n]ewly articulated claims based on the same nucleus of facts may still be subject to a [claim preclusion] finding if

the claims could have been brought in the earlier action." *See Tahoe-Sierra*, 322 F.3d at 1078.

Plaintiffs could have raised their NEPA and ESA challenges to the Harvest Land Base allocation

and its effects on NSOs in their previous suit, and they have not challenged any elements of the

North Project that were not already analyzed in the 2016 FEIS and BiOp.  "[W]here claims arise

from the same factual circumstances, a plaintiff must bring all related claims together or forfeit

the opportunity to bring any omitted claim in a subsequent proceeding." *Turtle Island*

*Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012).

This Court has already determined that "the reasonably foreseeable effects of the [2016

RMPs] were fully analyzed within the FEIS[,]" *Pac. Rivers*, 2018 WL 6735090, at *8, and the

Ninth Circuit agreed.  *See Pac. Rivers*, 815 Fed. Appx. at 108.  The Court held also that "the

record establishes FWS . . . considered the relevant facts, available data, and scientific

information, and supplied a reasoned analysis in determining the 2016 RMPs would avoid

jeopardy and adverse modification.  Under these circumstances, the Court must defer to the

[agencies'] decisions." *Pac. Rivers*, 2018 WL 6735090, at *14 (citation omitted).  Plaintiffs

already challenged the land use allocation framework and analysis of the RMP, claim preclusion

has attached, and Plaintiffs cannot challenge the RMP again under the same nucleus of facts.

## II.    FWS's BiOp for the North Project Fully Complies with the ESA.

### A.  FWS Analyzed the Lifecycle of the NSO and the Effects of the North Project.

Plaintiffs argue that FWS's BiOp is arbitrary and capricious because the analysis did not

adequately consider the life cycle of the NSO.  ECF 36 at 19.[11]  This argument lacks merit.

There can be no credible dispute that FWS considered the life cycle of the NSO.  *See generally,*

FWS AR 001503-13 (Section 5.2.2 entitled "Life History").  In fact, and with particular

---

[11] All citations to ECF documents in this brief refer to ECF/PDF (rather than internal) pagination.

relevance to Plaintiffs' argument, there is a specific section within the larger discussion of the life cycle that focuses exclusively on NSO reproductive biology. FWS AR 001510-11 (discussing lifespan, sexual maturity, and ability to reproduce over time). As a factual matter, Plaintiffs' contention that FWS failed to consider the NSO life cycle is simply incorrect.

Perhaps in light of FWS's thorough consideration of the NSO lifecycle, Plaintiffs shift their argument and contend that when a species has a "short" life cycle, FWS must analyze the near-term effects of the agency action under consultation. ECF 36 at 19 ("FWS 'must consider near-term habitat loss to populations with short life cycles.'" (citing *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation (PCFFA II)*, 426 F.3d 1082, 1094 (9th Cir. 2005))). While it could be endlessly debated whether a species has a "short" life cycle, which is a relative comparison, the BiOp expressly found that NSOs do not have "short" life cycles. FWS AR 1510 ("The spotted owl is relatively *long-lived*, has a *long reproductive life span*, invests significantly in parental care, and exhibits *high adult survivorship* relative to other North American owls (Forsman et al. 1984; Gutiérrez et al. 1995, p. 5)." (emphasis added)).[12]

Nevertheless, and putting aside Plaintiffs' factual misstep, FWS agrees that a BiOp must discuss and fully evaluate the near-term effects of the agency action under consultation, regardless of the length of the species' lifecycle. 50 C.F.R. § 402.02 ("Effects of the action refers to direct and indirect effects of an action . . . ."). But like the BiOp's discussion of the NSO's life cycle, here again there can be no credible dispute that FWS analyzed the near-term effects to habitat. There is a lengthy section in the BiOp that discusses all of the effects of the action on the species and critical habitat. FWS AR 001560-81. The contention that FWS failed

---

[12] This is particularly true when compared to salmonid lifecycles at issue in the *PCFFA* cases, and on which Plaintiffs rely. *See* 426 F.3d at 1086 ("The SONCC coho has a three-year life cycle, spending half its life in fresh water and half in salt water.").

to candidly consider near-term, direct habitat effects is incorrect.  *See e.g.,* FWS AR 001565.

Faced with a BiOp that both thoroughly discusses the NSO life cycle and near-term, direct effects of the Project, Plaintiffs again shift their argument and suggest that there is some unlawful legal inconsistency when a species has a purportedly "short" lifecycle and the proposed action has long-term adverse effects.  ECF 36 at 20 ("FWS unlawfully failed to analyze how these dire effects enduring for many decades is consistent with the far shorter life cycle of the northern spotted owl . . . ."); *id.* at 21 ("This century-long timeline is inconsistent with the life-span of the species . . . .").  While novel, this argument presents a false standard effectively precluding FWS from *ever* reaching any reasonable no-jeopardy determination.

Plaintiffs' first mistake is the misapplication of *PCFFA II.*  In that case, the Ninth Circuit faulted NMFS for focusing exclusively on long-term beneficial effects while ignoring the near-term adverse effects of the proposed agency action (on a species that truly has a short life cycle, the coho salmon).  426 F.3d at 1089, 1091 (describing how water flow sufficient to meet the needs of the coho would not occur during the *first eight years* of the proposed operation).  For those listed salmon, whose entire life cycle is generally three years, the failure to analyze the first eight years of the proposed action was problematic because multiple generations could be extirpated before any long-term beneficial effects came to fruition.  *Id.* at 1091.  Thus, the focus on long-term mitigation, excluding consideration of short-term adverse effects, failed to ensure the proposed action was not likely to jeopardize the species.  Under those circumstances, the BiOp was found to be arbitrary and capricious.  426 F.3d at 1094  ("Five full generations of coho will complete their three-year life cycles—hatch, rear, and spawn—during those eight years. Or, if there is insufficient water to sustain the coho during this period, they will *not* complete their life cycle, with the consequence that there will be no coho at the end of the eight years.").

Here, by contrast, FWS did not fail to consider the near-term, direct effects and rely on long-term mitigation to justify its no-jeopardy determination.  Instead, FWS fully analyzed the effects throughout the duration of the Project and thoroughly considered what those effects mean for the NSO as a species and its habitat.  FWS AR 001602 ("Within the action area, there are approximately 8,307 acres of nesting/roosting and foraging habitat. Approximately 2,574 acres (31 percent) of the nesting/roosting and foraging habitat in the action area will be treated and removed as part of the proposed action. An additional 12 acres of nesting/roosting habitat (0.2 percent) will be degraded, but will maintain pre-harvest habitat function."); *id.* ("The affected habitats in the action area represent less than 1 percent of the nesting/roosting and foraging habitat available for the species across its range. Because timber harvest will not be implemented in occupied [NSO] territories, adverse effects to individual [NSOs] are not expected.").

Plaintiffs' attempted analogy with *PCFFA I* is similarly inapt.  Here, there was no failure to analyze near-term adverse effects (as discussed above), nor was there reliance on long-term mitigation to reach a no-jeopardy conclusion.[13]  FWS never relied on the re-generation of the

---

[13] Plaintiffs argue that "FWS failed in the Biological Opinion to rationally explain why the Project's purported long-term benefits outweigh its dire short-term risks for northern spotted owl."  ECF 36 at 22.  This is a strawman.  BLM and FWS neither suggested that there would be long-term benefits to the species from this Project, nor did FWS purport to rely on long-term mitigation to reach a no-jeopardy conclusion.  Rather, FWS found that the direct and indirect effects of the Project do not reduce appreciably the likelihood of survival and recovery of the species, just as the statute and regulations require.  16 U.S.C. § 1536(a)(2).  Plaintiffs mistakenly confuse a recovery plan, which is issued under ESA Section 4, 16 U.S.C. § 1533(d), with the consultation requirements under ESA Section 7(a)(2).  An agency's action (which has adverse effects, otherwise it would not require consultation) does not itself need to recover the relevant species under ESA Section 7(a)(2).  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1051–52 (9th Cir. 2015) (plaintiffs' "objections to the Biop . . . in this case can appropriately be characterized as claiming that the [action] does not do enough to ensure the survival . . . Adopting this position, however, would impermissibly broaden FWS's obligations, both as the action agency and as the consulting agency."); *Cascadia Wildlands v. Thrailkill,* 806 F.3d 1234, 1244 (9th Cir. 2015) ("The purpose of the Recovery Plan is evident—promote recovery of the spotted owl. Although they are not necessarily mutually exclusive, recovery and

timber stands to justify its no-jeopardy conclusion, as the Ninth Circuit found fault with in *PCFFA I.* 265 F.3d 1028, 1037 (9th Cir. 2001) ("The NMFS predicts that more trees will grow within the watershed during the ensuing decade than are cut in the proposed project and, therefore, concludes that the 'short-term' and 'localized' effects of the logging will be naturally mitigated by regrowth."). FWS is not waiting for 100 years for timber regeneration to offset near term adverse effects, but instead concluded that although there may be adverse effects from the North Project, these effects do not rise to the level of jeopardy or adverse modification, as those terms are used in the ESA. FWS AR 001602 ("The harvest of these unoccupied forests in the Harvest Land Base is consistent with [Recovery Action] RA10 and RA32 of the spotted owl recovery plan, and exceeds the expectations of the recovery plan by avoiding the take of spotted owls through timber harvest…we do not expect these specific harvests to influence the numbers or reproduction of spotted owls at the local, action area or range-wide scales in the long-term because this harvest of unoccupied forest stands during the interim period will not impact territorial or reproducing spotted owls and will avoid impacts to territories that are expected to provide for future populations of spotted owls."). While it may be anathema to Plaintiffs' organizational goals, ESA Section 7(a)(2) does not require the maintenance of an ecological *status quo*, but rather requires agencies, like BLM here, to ensure that its actions are "not likely to jeopardize the *continued existence*" of listed species, like the NSO. 16 U.S.C. § 1536(a)(2) (emphasis added). As FWS found, the North Project does not "reduce appreciably" the likelihood of survival and recovery of the NSO. 50 C.F.R. § 402.02 (definition of jeopardy).

FWS candidly evaluated the effects of the North Project. It looked at the near-term effects and evaluated the long-term effects within the context of the NSO life cycle. It did not

---

jeopardy are two distinct concepts.").

rely on speculative, future mitigation to reach its determination that the North Project is not likely to jeopardize the NSO or adversely modify designated critical habitat.  Nothing in the ESA or regulations precludes a project from moving forward just because there are long-term effects, especially when FWS has thoroughly analyzed those effects and set forth a well-explained, reasonable explanation in the BiOp.  FWS AR 001601-04.  FWS's analysis is sound.

**B.  FWS Analyzed the Effects of the Project on Designated Critical Habitat.**

Plaintiffs simultaneously contend that FWS (1) "failed" to analyze recovery, and (2) impermissibly relied on late-successional reserves in analyzing recovery.  ECF 36 at 22-23.  Even if these arguments were not mutually exclusively (which they are), Plaintiffs are incorrect.

FWS analyzed the effects of the Project on designated critical habitat.  FWS AR 001582-1601.  It found that the Project would not destroy or adversely modify critical habitat.  FWS AR 001603-04.  FWS also analyzed whether the Project is consistent with the NSO Recovery Plan, FWS AR 001579-80, as well as the Eastern Oregon Cascades Physiographic Unit.  FWS AR 1580-81.  On both, it found that the Project was consistent with the recovery guidance.  *Id.*  And, most relevant here, FWS ultimately found that the effects of the Project would not preclude designated critical habitat from fulfilling its conservation (recovery) role.  FWS AR 001603 ("In all, the proposed action will not change the ability of ECS 1 to provide demographic support and connectivity, the stated conservation function of the subunit, or the overall conservation role of critical habitat for the northern spotted owl.").  Indeed, despite passing allegations to the contrary, Plaintiffs ultimately concede that FWS did in fact analyze the impacts to recovery in the BiOp.  ECF 36 at 23 ("discussion of recovery impacts *is found* in the section of the Biological Opinion addressing effects to northern spotted owl . . . ." (emphasis added)).

Nevertheless, and relying on *Gifford Pinchot*, Plaintiffs contend that the analysis is

flawed because FWS allegedly treated late-successional reserves as a substitute for critical habitat. ECF 36 at 24. This is not a faithful reading of FWS's BiOp, and ignores controlling Ninth Circuit case law (noticeably absent in Plaintiffs' brief). It is true that the Ninth Circuit in *Gifford Pinchot* stated that FWS cannot substitute late-successional reserves for designated critical habitat. But that is not what FWS did in this BiOp and it certainly does not mean FWS must ignore late-successional reserves altogether in its critical habitat analysis.

The Ninth Circuit has definitively clarified this point. *Envtl. Prot. Ctr. v. U.S. Forest Serv.* (*EPIC*), 451 F.3d 1005, 1012 (9th Cir. 2006).[14] FWS may lawfully acknowledge late-successional reserves in its critical habitat analysis, but it cannot simply substitute one for another. *Id.* ("In the BiOps challenged in *Gifford Pinchot*, FWS appears to have essentially treated the LSRs as a substitute for critical habitat. In contrast, although the FWS BiOp in this case does contain some discussion of LSRs, it contains a significant analysis of the Project's effect on critical habitat that is independent of the LSR discussion."). As the panel noted, it would be odd for FWS not to recognize the recovery benefits of late-successional reserves. *Id.* at 1012 n.4 ("Importantly, *Gifford Pinchot* does not mandate that agencies ignore LSRs altogether, and expressly approved reliance on compliance with the [NWFP], especially the LSRs, when analyzing jeopardy to the species (as opposed to its critical habitat) under the ESA.").

FWS never equated compliance with the RMP with no adverse modification of critical habitat. Nor did FWS simply substitute late-successional reserves for critical habitat. Rather, it recognized the value of late-successional reserves for NSO recovery, but independently evaluated the Project's effect on critical habitat. FWS AR 001581-82. And FWS fully

---

[14] Plaintiffs rely on a number of unpublished district court opinions, ECF 36 at 25, which pre-date the Ninth Circuit's clarification in *EPIC*.

addressed recovery within the context of its critical habitat analysis. FWS AR 001604 ("The proposed action is not expected to compromise the capability of ECS 1 or critical habitat unit 8 to fulfill the intended conservation functions of demographic support and connectivity . . . [or] result in an appreciable reduction of the conservation role of the range-wide designation of [NSO] critical habitat. Therefore, it is our determination that . . . the Project will not result in the destruction or adverse modification of critical habitat designated for the [NSO]."). This is a far cry from the deficient analyses, relying on a now-vacated regulation, in *Gifford Pinchot*.

### C. FWS's Incidental Take Statement is Reasonable.

Plaintiffs challenge a specific determination within FWS's Incidental Take Statement ("ITS"). Plaintiffs contend that FWS's determination, that incidental take from the Project "is not anticipated as a result of the proposed action," is arbitrary and capricious and challenge the survey protocol that is employed to determine "site occupancy." ECF 36 at 25. The survey protocol to determine site occupancy is sound and therefore FWS's determination that incidental take is not anticipated is reasonable.

The ITS references the discussion in Section 5.4 of the BiOp that details the survey protocol for site occupancy:

> Per Project Design Features, 'no acres of NRF habitat within the North EA project area will be approved for harvest or have harvests implemented unless they have been surveyed to protocol standards for at least 2 seasons with no detections of territorial NSOs prior to their inclusion in a decision record' (USDI BLM 2018, p. 36). If KFRA determines, via protocol surveys, a site is 'occupied' by northern spotted owls, harvest will be deferred to avoid incidental take; however, if KFRA determines a site is 'not occupied' by northern spotted owls, timber harvest may be implemented (UDSI BLM 2018, pp. 36-41).

FWS AR 001567. The survey protocol that is referenced in the BiOp was developed in the late 1980s, and early 1990s and has been used effectively for decades. BLM AR 025682; FWS AR 016220. FWS has updated the protocol occasionally to reflect knowledge advances in NSO

ecology.  The most recent update was in 2012, largely to account for the increasing presence of barred owls and their effect on NSO responsiveness (detectability).  FWS AR 016220.  Although the protocol is extensive, in short, a complete survey requires two years of six visits per year, with subsequent spot-checks in future years.  FWS AR 016238.  Plaintiffs' challenge to the protocol and FWS's determination lacks merit for a number of reasons.

From the outset, Plaintiffs seem to misinterpret the survey protocol.  They contend that "two consecutive surveys without northern spotted owl detections" equates to non-occupancy.  ECF 36 at 26.  This ignores a significant temporal component, and understates the nature of the surveys.  Under the BiOp, there must be a complete survey of the area for "at least [two] seasons with no detections of territorial NSOs . . . ."  FWS AR 001567.  A complete survey consists of two consecutive years with six visits per year, plus any spot checks during years three and four.  FWS AR 016230, 016233-37.  This means that in order to move forward with a harvest project, there will have been a minimum of *12 different field visits* conducted over a period of at least *two consecutive years*, plus further spot checks during the next two years if harvest does not occur immediately.  *Id.*  In addition, the survey protocol not only directs the survey methodology and intensity required to reach conclusions regarding occupancy, it also provides criteria for interpreting the results of surveys—namely, what constitutes a territorial owl(s) and thus occupancy.  FWS AR 016240-41.  And, if at any time during those field visits an owl is located and occupancy is established, harvest may not move forward in that unit, or in other units within 1.2 miles of the center of the occupied territory, and BLM must redesign or modify the sale to avoid incidental take.  *Id.*  Thus, from the start, Plaintiffs' argument is built on a false premise.[15]

---

[15] Plaintiffs also claim that re-occupancy occurred with the Terminus timber sale.  ECF 36 at 27. This is incorrect.  Under the BiOp, BLM is required to conduct a "spot-check" in accordance with the survey protocol prior to ground disturbing activity to ensure there is no re-occupation.

Second, when distilled to its essence, Plaintiffs' criticism is that FWS did not use the best available science by relying on the survey protocol to determine site occupancy. ECF 36 at 26. But Plaintiffs neglect to mention that the protocol has been in place since 2012 and has withstood legal challenges before. Indeed, this very Court previously examined the survey protocol, found FWS's utilization reasonable, and was affirmed by the Ninth Circuit. *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1241 (9th Cir. 2015) (upholding FWS's survey protocol that addressed the presence of barred owls). Plaintiffs even attempt the same argument here—that the presence of barred owls somehow renders the survey protocol deficient. ECF 36 at 27. But this Court and the Ninth Circuit have already rejected that argument. *Id.* ("The record reflects that the Service indeed relied upon the data of several surveys from an array of surveyors regarding the effect that barred owls have on the spotted owl."). The survey protocol has been in place for years, is based on the best available science, and notably Plaintiffs fail to point to *any* study or report that undermines the protocol.

Third, Plaintiffs confuse "adverse effects" with incidental "take," two separate terms of art under the ESA. 50 C.F.R. § 17.3 (defining take in the form of "harm" as including "significant habitat modification or degradation where it *actually kills or injures* wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering") (emphasis added); 50 C.F.R. § 402.13 (describing the consultation pathway for "adverse effects"); ECF 36 at 26. They argue that timber harvest, which FWS candidly acknowledges has an adverse effect on habitat, automatically and necessarily results in incidental take—regardless

---

FWS AR 001499, 001634; 016233-37. In the course of conducting these spot-checks, NSO occupancy was determined in a harvest unit within the planned location for the 2019 Stag sale. BLM AR 003127. As required, BLM redesigned the Stag sale so the NSO-occupied unit would not be harvested and there would be no incidental take. BLM AR 000041-42. The Terminus sale was planned in the vicinity of that unit, so it was redesigned as well. BLM AR 003133.

of whether NSOs occupy that particular area—because it is possible that NSOs may return to that area at some point in time.  *See id.* (premising "take" on the possibility of re-occupation). This pushes the bounds of incidental take too far.  Just because a specific parcel of habitat is suitable for a listed species, does not mean that any modification to that habitat results in "take" of *that species*.  *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1121 (N.D. Cal. 2009) (rejecting similar, unsubstantiated arguments that actions with adverse effects cause "take" that must be addressed in an ITS).

    To be clear, habitat degradation may, in certain circumstances, rise to the level of take for a species.  But, the specific characteristics of that species and its presence within a certain temporal window is critical to establishing the proximate cause element required by the Supreme Court.  *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 712 (1995) (J. O'Connor concurring) ("private parties should be held liable under § 1540(a)(1) only if their habitat-modifying actions proximately cause death or injury to protected animals.").  Based on its scientific expertise, FWS determined that non-occupancy of habitat for at least two consecutive years meant that habitat modification to that particular area would not result in incidental take of NSOs.  That is, the temporal link between the habitat modification and the species' presence (or lack thereof) was too lengthy to establish proximate cause for incidental take.  The possibility of re-occupation, without detection, was too attenuated to rise to the level of take under the definition.  50 C.F.R. § 17.3; 16 U.S.C. § 1532(19); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1244-47 (9th Cir. 2001) (holding that "the mere potential for harm [] is insufficient" to establish incidental take where evidence did not establish that various listed species were recently present on the land in question).  This is a highly technical judgment, based on decades of expertise and experience, and is eminently

reasonable.  This Court should defer to FWS's scientific judgment.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 626 (9th Cir. 2014) (affording FWS "substantial deference" in the context of an ITS determination.).

Fourth, Plaintiffs highlight the fact that a FWS biologist advocated for a more protective standard during the course of the consultation.  ECF 36 at 29.  This is not surprising or even unusual.  FWS's biologists are charged by Congress to administer the ESA, and strive to safeguard the species protected by that statute.  But advocacy on behalf of the species does not render the ultimate decision arbitrary.  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) ("the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious.").  More importantly, BLM and FWS agreed upon the additional safeguard of performing spot-checks prior to any timber sale to ensure that the possibility of re-occupation would not result in unexpected incidental take.  FWS AR 001634; FWS AR 016233-37 (spot-check protocol).  BLM ultimately made this commitment as part of the proposed action in the BiOp.  FWS AR 001499 (incorporating Appendix B protocol as part of the proposed action).  Nor was this a significantly different approach to consultations warranting further explanation from the FWS.  The survey protocol, including spot-checks, has been in place for nearly eight years now.  FWS AR 016217-44.

Finally, it is worth noting that the requirement of allowing no incidental take over the course of the Project is a heightened protective standard.  Most proposed actions and ITSs allow some level of incidental take, or actual death of a species, to occur.  FWS AR 000167 (recognizing that before the 2016 RMP, FWS would have just exempted take if an owl was present and timber harvest would proceed).  But that is not what BLM set forth as management

direction in the 2016 RMP and carried through into the Project here. BLM AR 014527. Instead, if an owl occupies a particular parcel of land during the surveys, BLM will re-design the timber sale to avoid that area so no incidental take will occur. BLM AR 000142-43. This allows BLM to harmonize the O&C Act and the ESA, just as Congress and this Court envisioned. Plaintiffs have simply confused adverse effects to habitat with incidental take of a species based on a flawed reading of the BiOp and ITS. Their ESA arguments should be rejected.

### D. BLM's Reliance on FWS's BiOp is Reasonable and Complies with the ESA.

Following consultation, action agencies, like BLM here, must determine "whether and in what manner to proceed with the action in light of its section 7 obligations and [FWS's] biological opinion." 50 C.F.R. § 402.15(a). Where a BiOp concludes that the proposed action is not likely to jeopardize a listed species or adversely modify its designated critical habitat, the action agency may reasonably rely on that BiOp and proceed with the action in compliance with the ESA. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990). However, the action agency's duty is independent from FWS' BiOp, and plaintiffs alleging a substantive violation of Section 7(a)(2) must demonstrate that the action agency's proposed course of action is arbitrary. *Id.*

In *Pyramid Lake*, the Ninth Circuit held that it was incumbent on the plaintiff to produce new information demonstrating that the action agency's reliance on the BiOp is unreasonable. 898 F.2d at 1415 ("even when the FWS's opinion is based on 'admittedly weak' information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no 'new' information—*i.e.,* information the Service did not take into account—which challenges the opinion's conclusions" (citation omitted)). Here, Plaintiffs have presented no new information that would call into question BLM's reliance on FWS's

BiOp.  While Plaintiffs vigorously argue that FWS's BiOp is arbitrary, that does not automatically mean BLM's reliance on the BiOp or proposed action is similarly arbitrary. Indeed, that is the precise holding in *Pyramid Lake*.  898 F.2d 1410 (dismissing secondary challenges to FWS' BiOp).  Here, Plaintiffs have presented nothing more.  BLM has fully complied with ESA Section 7(a)(2).

**III.  The North Landscape Project Fully Complies with NEPA.**

   **A.  The North EA Properly Tiers to the RMP/FEIS's Exhaustive Analysis of NSO Effects and Analyzes Project-Specific Effects.**

   Plaintiffs attack the sufficiency of the North EA's analysis of direct, indirect, and cumulative impacts to NSOs.  ECF 36 at 32.  This claim lacks merit because the EA includes an extensive analysis discussing those very effects—more than fulfilling BLM's obligation to produce a "concise public document" that briefly explains its decision to prepare a FONSI and not a second EIS.  *See* § 1508.9(a)(1);  BLM AR 000072-93.  Plaintiffs list six issues that purport to call BLM's effects analysis into doubt, ECF 36 at 32-33, but each argument is contradicted by the thorough analysis in the EA and completely negated by the highly detailed analysis in the 2016 RMP/FEIS to which the EA tiers.  Plaintiffs disagree with BLM's substantive conclusions regarding the effects of including NSO habitat in the Harvest Land Base and the trajectory of barred owl/NSO competition in the Project Area and surrounding lands.  *Id.*  But disagreements with BLM's expert determinations are not enough to set aside an agency action under NEPA where, as here, the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *See Balt. Gas & Elec. Co.*, 462 U.S. at 105.

   As a threshold matter, the North EA properly tiers to the in-depth NSO effects analysis in the 2016 FEIS/RMP.  NEPA regulations "encourage[]" agencies to "tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the

actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20. "Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork." 40 C.F.R. § 1506.4. NEPA regulations also provide that, when a broad EIS has been prepared (like one prepared for an RMP) and a subsequent EA is then prepared for an action included in the broader program (like a timber harvest), "the subsequent [EA] need only summarize the issues discussed in the broader [EIS,]" "incorporate discussions from the broader statement by reference[,]" and "concentrate on the issues specific to the subsequent action." 40 C.F.R. § 1502.20. Tiering is "expressly permitted and encouraged under NEPA, so long as the tiered-to document has been subject to NEPA review." *W. Watersheds Proj. v. Lueders*, 122 F. Supp. 3d 1039, 1047 (D. Nev. 2015) (citing *Kern v. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002), *aff'd*, 701 F. App'x 651 (9th Cir. 2017)).

The 2016 FEIS thoroughly analyzes the RMP's direct, indirect, and cumulative impacts to NSOs at the programmatic level. BLM AR 015714-84. In preparing the FEIS, BLM marshalled its subject-matter expertise, numerous scientific studies, and highly technical habitat and population response modelling to inform its NSO analysis and predict population and recovery trends across the NSO's range under different management alternatives. BLM AR 015734-52, 015759-63. In line with NEPA regulations encouraging tiering when a thorough programmatic analysis forms the basis of a proposed action, the North EA explicitly tiers to the RMP/FEIS, and incorporates by reference specific portions of its NSO analysis when relevant. *See, e.g.*, BLM AR 000080-81 (incorporating analysis of the effects of removing or downgrading NSO habitat); BLM AR 000085 (incorporating the FEIS's population analysis); BLM AR 000089 (assessing the FEIS's population and habitat modelling in light of new survey data).

The North EA does not merely tier to the FEIS, however. It also includes its own

discussion of NSO effects that "concentrate[s] on the issues specific" to the North Project. *See*

40 C.F.R. § 1502.20; BLM AR 000072-93.  For example, the North EA discloses new

information (including new survey and Project-level harvest data) relevant to the potential effects

of NSO habitat removal due to harvest.  BLM AR 000085-93.  And after summarizing the

FEIS's underlying NSO population and effects analysis, likely effects to NSOs at the North

Project level, and all relevant new information, BLM concluded that there are no Project-specific

negative impacts to NSOs or their habitat that exceed the impacts analyzed in the FEIS.  BLM

AR 000081, 000085.  Plaintiffs may disagree with BLM's substantive conclusions regarding the

effects of NSO habitat removal, but their claim that BLM did not fully consider the issue in its

analysis of the North Project is misleading at best.  The EA provides a "reasonably thorough

discussion" of the North Project's likely direct, indirect, and cumulative effects on NSOs, *Cuddy

Mountain*, 137 F.3d at 1376, "summarize[s] the issues discussed in the broader statement[,] and

incorporate[s] discussions from the broader statement by reference . . . ."  40 C.F.R. § 1502.20.

Together, the Project-specific analysis in the EA and the detailed FEIS to which it tiers fully

address the Project's potential effects on NSOs, and address each of the concerns Plaintiffs raise.

      **i.  BLM Thoroughly Analyzed the Potential Effects of Harvesting Timber in
NSO Habitat Within the Project Area.**

      Plaintiffs' first, third, and fifth objections to the EA allege that BLM did not sufficiently

consider the effects of NSO habitat removal resulting from the harvest treatments analyzed in the

EA.  *See* ECF 36 at 32-33 (arguing the EA is inadequate given: the removal of NSO habitat in

the Project Area through harvest, a "lack of suitable spotted owl habitat" on nearby non-federal

lands, and the alleged "value of retaining currently occupied sites as refugia for displaced"

NSOs).  To start, each of these claims is rebutted by the EA's explanation of how the North

Project will affect the amount of available NSO habitat in the project area, BLM AR 000073-79,

its analysis of whether altered NSO habitat levels in the Project Area will affect future NSO occupancy and recovery, BLM AR 000079-80, and its discussion of how the Project may affect population support and connectivity between large habitat blocks, BLM AR 000080-81.

Moreover, the 2016 RMP is the programmatic framework that allocated the North Project Area, and the NSO habitat within it, to the Harvest Land Base and directed each BLM District to offer the declared annual ASQ timber volume from that Harvest Land Base. BLM AR 014413, 014532 ("BLM will conduct timber harvest on all lands within the Harvest Land Base over time, consistent with the [RMP's] management direction."). BLM contemplated that there were some NSO-occupied sites, broader core use areas, and provincial home ranges within the proposed Harvest Land Base when it analyzed and approved the RMP's current land use allocations, BLM AR 014535-37, which included maintaining nearly eighty percent of BLM land where NSOs exist in reserves. BLM AR 014844-45, 014847; 006762-63. The NSO analysis in the FEIS thus provides the proper context for the reduction in NSO habitat in the Project Area that Plaintiffs hyperbolically describe as "the liquidation of habitat on federal lands[.]" ECF No. 36 at 33.

The North EA explains that BLM explicitly analyzed the utility of creating additional NSO "refugia" in the RMP/FEIS, and determined that "there were minimal differences in expected NSO population responses between the No Timber Harvest reference analysis and the Preferred Alternative" that became the 2016 RMP. BLM AR 000092-93 (citing the RMP/FEIS at BLM AR 015724, 015726, 015745). In other words, the extensive population modelling and analysis in the FEIS revealed that even a scenario allowing *no* harvest whatsoever in the Harvest Land Base (essentially converting the entire Harvest Land Base into refugia), did not appreciably improve projected population outcomes for NSOs throughout their range because the large land blocks *already* allocated to reserves contribute most effectively to NSO conservation. *See* BLM

AR 000081 ("[O]nce the BLM lands necessary to support the large habitat blocks are reserved, reserving additional BLM lands provides little effective added support to the NSO population . . . [, and n]one of the proposed treatment units under the North Project's action alternatives are within reserved land allocations intended or assumed to contribute to the large block reserves.").

The North EA incorporates the FEIS's lengthy NSO population and refugia analyses and further explains that, while reductions in potential habitat in the Project Area "could reduce dispersal capability for NSO on a local (project area, or KFRA wide) scale, it is unlikely to prevent NSO dispersal and movement between large block reserves." BLM AR 000078. The North Project Area "is not located directly between any large block reserves, and 82% of the dispersal capable habitat currently provided by the KFRA land base is expected to continue to be in a condition that supports the dispersal life function for at least the next decade as the North Project is implemented." *Id.* BLM thus sufficiently analyzed the effect of removing NSO habitat at both the Project and programmatic levels, and NEPA does not require the EA to duplicate the FEIS's analysis of the negligible effect that reserving additional NSO habitat in the Harvest Land Base would have on this listed species.

### ii. BLM Thoroughly Analyzed How Timber Harvest in the Project Area Might Affect Barred Owl Impacts to NSOs.

In Plaintiffs' second and sixth challenges to the EA, they claim that BLM failed to adequately analyze new barred owl impacts that might be catalyzed by the North Project. ECF 36 at 33 (claiming the EA's analysis is flawed given: alleged "increased occupancy of barred owls as a result of habitat removal for spotted owls that facilitates spotted owl non-occupancy" and "how the Project may result in a competitive advantage to barred owls."). To the contrary, the EA discusses the issue of barred owl/NSO habitat competition at length, and BLM rationally concluded that timber harvest in the Harvest Land Base will not significantly increase the degree

to which NSOs are already threatened by competition with barred owls.  *See, e.g.*, BLM AR 000089 (summarizing how scientific modelling in the FEIS reveals that "forest cover amount on BLM-managed lands did not substantially influence projected NSO population trends due to the effects of the barred owl"); BLM AR 000090 (highlighting new information regarding effects to NSOs resulting from barred owl presence in the Project Area).

The EA notes that barred owls represent the greatest threat to NSO survival and recovery range-wide, and acknowledges Plaintiffs' "concern that any breeding barred owls displaced by the North Project could invade occupied [NSO] territories inside or outside the project area." BLM AR 000090.  But upon analysis of that very issue, BLM concluded that further displacement is unlikely for five reasons, each supported by scientific studies to which agency staff applied their expertise.  BLM AR 000091-92.  The EA explains that "[t]he harvest-caused reduction in forest cover associated with use by [NSOs] is likely to have similar effects on barred owls, primarily reduced survival and reproduction on occupied territories," BLM AR 000091, that "it is likely that most, or all, NSO sites in and around the North Project Area will be occupied by barred owls during the life of the North Project regardless of timber harvest," BLM AR 000092, and that "any indirect effects of forest harvest in the [Harvest Land Base] (such as potential displacement of NSOs by harvest-displaced barred owls) - including the North Project are not expected to alter current NSO population trajectories."  *Id.*  In reviewing these conclusions, the Court must "conduct a particularly deferential review of [BLM's] predictive judgments about areas that are within the agency's field of discretion and expertise[,]" *McNair*, 537 F.3d at 993.  Plaintiffs' unsupported assertion that "reduction in forest cover can be expected to disproportionately affect northern spotted owls relative to barred owls[,]"  ECF 36 at 35, does not render BLM's expert and reasoned conclusion to the contrary arbitrary or capricious.

Plaintiffs' final attack on the EA's effects analysis—that BLM failed to consider future limiting factors on NSO "survival and recovery in the event that the experimental barred owl control program is successful[,]" ECF 36 at 33—is speculative and meritless. Plaintiffs have provided no information suggesting that the barred owl control program may be so successful that barred owls will no longer limit NSOs' ability to disperse to new habitat. And in contrast to Plaintiffs' mere conjecture about the potential future effects of a barred owl control program, the RMP/FEIS demonstrates, through scientific analysis, that implementing the RMP along with a barred owl management plan would result in a positive NSO population response, even with removal of potential NSO habitat at a rate and intensity consistent with harvest levels adopted in the RMP and implemented in the North Project. BLM AR 015745. Plaintiffs cannot point to any evidence that the barred owl control program would be so much *more* successful than predicted in BLM's modelling analysis that BLM should have considered reserving Harvest Land Base acres in the Project area for non-harvest.

### B. An EIS is Not Required for this Properly Tiered, Site-Specific Project.

Finally, BLM's FONSI for the North Project addressed each of the ten "intensity factors" that guide agencies in assessing whether a proposed action will have any unexamined "significant" effects on the quality of the human environment, and properly determined that an EIS was not required. *See* 40 C.F.R. § 1508.27(b); BLM AR 000037-40. Plaintiffs claim that three of these intensity factors mandate preparation of an EIS for the North Project rather than an EA, but Plaintiffs' arguments actually serve to illustrate why tiering to the 2016 RMP/FEIS is an appropriate and useful approach in this case.[16]

---

[16] At the outset, Plaintiffs' flawed ESA arguments, repackaged in the context of their NEPA claims, fail to show that unexamined impacts to NSOs necessitate preparation of an EIS for the North Landscape Project. *See supra* pages 13-26.

Plaintiffs argue that the effects of the North Project are "highly controversial" and uncertain, and thus BLM should have prepared an EIS.  ECF 36 at 37.  But all the aspects of the Project Plaintiffs claim are controversial or uncertain have already been analyzed in an EIS—the 2016 RMP/FEIS.  *See* ECF 36 at 37-40 (alleging uncertainty as to: how the removal of NSO habitat will affect the species' ability to recover, *id.* at 37; how the barred owl control program might affect NSOs, *id.* at 38; BLM's conclusion that retaining additional suitable NSO habitat is unnecessary in light of intense competition with barred owls, *id.*; FWS's incidental take methodology, *id.* 39; and BLM's reliance on late-successional reserve land use allocations established in the RMP to contribute to NSO conservation, *id.* at 39-40).

This brief has already addressed each of these issues and explained why Plaintiffs' arguments fail to discredit BLM's and FWS's expert analyses and conclusions regarding the North Project.  *See supra* pages 13-32.  But to the extent any of these issues *do* rise to the level of controversy or uncertainty that would require preparation of an EIS, BLM has already analyzed them in the 2016 FEIS.  Permitting BLM to conserve its resources by not duplicating technical and time-intensive analyses in a second EIS—when it has already determined that any Project-specific effects are within the previously analyzed range—is precisely the reason NEPA regulations allow and encourage tiering.  40 C.F.R. § 1506.4.

The cases Plaintiffs cite in an attempt to undermine BLM's tiering approach are not to the contrary, *see* ECF 36 at 35-36, and merely illustrate examples of inadequate tiering attempts and NEPA analyses that are easily distinguishable from this case.  For example, in *KS Wild v. BLM*, 387 F.3d 989 (9th Cir. 2004), the Ninth Circuit found an EA for a timber harvest project was inadequate because the RMP to which it purported to tier contained only "general statements about the cumulative effects of logging," *id.* at 997, the EA only discussed cumulative effects "in

the form of generalized conclusory statements[,]" and the EA attempted to tier to a non-NEPA

document. *Id.* at 998. In contrast, the effects of timber harvest on NSOs are considered at length

in the North EA and the RMP/FEIS. Indeed, the RMP was developed primarily to harmonize

BLM's O&C Act harvest requirements with its statutory conservation mandates, so the FEIS

centers on the direct, indirect, and cumulative effects of timber harvest.

Likewise, this Court's determination in *Cascadia Wildlands v. Bureau of Land*

*Management* that BLM could not rely solely on an analysis contained in the 2016 RMP for a

timber project EA is easily distinguishable from BLM's tiering approach here. *See* 410 F. Supp.

3d 1146, 1157 (D. Or. 2019). In that case, the Court reasoned that the site-specific effects of fire

hazard patterns were highly relevant to communities near the project area, but that BLM had

"diluted the proposed action's effects by analyzing it as part of the 1.3 million-acre planning

area." *Id.* Here, by contrast, the EA outlines the site-specific impacts to NSOs that may result

from the North Project, applies and incorporates by reference the detailed and broader

population-scale analysis in the FEIS, and reasonably determines that the Project would not have

any site-specific impacts on NSOs beyond those analyzed in the FEIS. BLM AR 000072-93.

Nor does the North Project require an EIS because it is "precedential." ECF 36 at 40-41.

Plaintiffs highlight the threshold weakness of their own argument—the Ninth Circuit has

consistently held that "EAs are usually highly specific to the project and the locale, thus creating

no binding precedent." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1071 (9th

Cir. 2014). And, even when this factor weighs in favor of an EIS, "the precedential factor alone

is not dispositive." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 674 (9th Cir. 2019). The

North Project is no exception to this prevailing rule. The EA analyzes the effects of offering a

specific annual volume of timber harvest annually, in a limited project area. BLM AR 000038

("This analysis would be used *only* for the implementation of the treatments described in the North Landscape Project EA within the 11,879-acre project area." (emphasis added)).

Plaintiffs also ignore the fact that site-specific decision records, not the Project EA or FONSI, will actually authorize the annual timber sales.  While the EA provides the analysis upon which annual sales may rely if those sales and their effects are of the type and magnitude analyzed in the EA, the EA does not authorize any logging or commit any timber to sale.  Rather, it analyzes the effects of offering for sale approximately 6 MMbf of timber each year, subject to project design features that give BLM flexibility to amend or scale back sales when necessary to comply with the RMP's management direction.  BLM AR 000142.  Plaintiffs have tried to convince this Court before that a timber sale implemented under a programmatic land use allocation was "precedential" because it represented the first time the agency authorized harvest in a certain land use area.  *See Or. Wild v. U.S. Forest Serv.*, 107 F. Supp. 3d 1102, 1114 (D. Or. 2015).  But like the harvest units in that case that had been "designated for timber harvest under the [programmatic] Forest Plan[,]" there is nothing precedential about the KFRA crafting the North Project to meet its ASQ volume "consistent with the [RMP's] established designation of the land."  *Id.*  Here too BLM "rationally determined that no EIS was required."  *Id.*

## CONCLUSION

The North Project exemplifies a successful application of BLM's multiple-use mandate—BLM designed a site-specific timber project that complies with the O&C Act, the ESA, NEPA, and the CSNM.  BLM and FWS fully analyzed the Project's effects on NSOs and their habitat.  For the foregoing reasons, Federal Defendants request the Court deny Plaintiffs' motion for summary judgment and grant Federal Defendants' cross-motion for summary judgment.

Respectfully submitted on this 16th day of December, 2020.

BILLY J. WILLIAMS
United States Attorney
District of Oregon

PAUL E. SALAMANCA
Deputy Assistant Attorney General
Environment and Natural Resources Division

*/s/ Emma L. Hamilton*
EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
JOHN P. TUSTIN (TX Bar No. 24056453)
Senior Attorney
Natural Resources Section
ROBERT M. NORWAY (DC Bar No. 490715)
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-3022 (Tustin)
        (202) 305-0479 (Hamilton)
        (202) 532-3202 (Norway)
Fax:    (202) 305-0506
john.tustin@usdoj.gov
emma.hamilton@usdoj.gov
robert.m.norway@usdoj.gov

*Attorneys for Federal Defendants*