SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

SANGYE INCE-JOHANNSEN (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
MEDFORD DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, OREGON WILD, CASCADIA WILDLANDS, and SODA MOUNTAIN WILDERNESS COUNCIL,<br>　　　　*Plaintiffs,*<br><br>　　　　　v.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, and UNITED STATES FISH AND WILDLIFE SERVICE,<br>　　　　*Federal-Defendants*,<br><br>　　　　and<br><br>MURPHY COMPANY,<br>　　　　*Defendant-Intervenor.* | Civ. Case No. 1:19-cv-01810-CL<br><br>**PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

TABLE OF ACRONYMS ........................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................... iii

ARGUMENT ..........................................................................................................................1

I.     INTRODUCTION ....................................................................................................1

II.    STANDARD OF REVIEW ......................................................................................2

III.   KS WILD IS NOT PRECLUDED FROM CHALLENGING
THE NORTH PROJECT ........................................................................................4

IV.   THE NORTH BIOLOGICAL OPINION AND INCIDENTAL TAKE
STATEMENT VIOLATES THE ESA. ...................................................................5

    A.  The BiOp Fails to Adequately Consider Recovery in its
Critical Habitat Analysis. ...........................................................................5

    B.  The BiOp Wrongly Relies on LSRs in its Critical Habitat Analysis. .....................7

    C.  The BiOp Fails to Consider the Lifespan of the Northern Spotted Owl. ................9

    D.  FWS's Determination of Zero Incidental Take is Unlawful. ................................10

V.    THE NORTH REVISED ENVIRONMENTAL ASSESSMENT
VIOLATES NEPA. ................................................................................................15

    A.  The North REA Unlawfully Tiers to the BLM's 2016 RMP EIS .........................15

    B.  The North REA Fails to Consider the Direct, Indirect, and Cumulative Effects
of the Project ..........................................................................................19

VI.   THE FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT
VIOLATES NEPA. ................................................................................................25

    A.  The degree to which the effects on the quality of the human environment are
likely to be highly controversial, highly uncertain, or involve unique or unknown
risks (40 C.F.R. §§ 1508.27(b)(4)–(b)(5)). .............................................27

    B.  The degree to which the action may establish a precedent for future actions with
significant effects or represents a decision in principle about a future
consideration (40 C.F.R. § 1508.27(b)(6)). .............................................32

C.  The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973 (40 C.F.R. § 1508.27(b)(9))..................................................33

VII.    CONCLUSION...........................................................................................................34

## TABLE OF ACRONYMS

APA.............................Administrative Procedure Act
AR ..........................................Administrative Record
BiOp.............................................Biological Opinion
BLM .................. U.S. Bureau of Land Management
CHU ...........................................Critical Habitat Unit
ECS ........................................... East Cascades South
ESA .................................... Endangered Species Act
F&R........................Findings and Recommendation
FWS ........................ U.S. Fish and Wildlife Service
HLB.............................................. Harvest Land Base
ITS...................................Incidental Take Statement
LSR ................................Late-Successional Reserve
NEPA ...............National Environmental Policy Act
NRF...................... Nesting, Roosting, and Foraging
NSO.......................................Northern Spotted Owl
REA.................Revised Environmental Assessment
RMP .............................Resource Management Plan

# TABLE OF AUTHORITIES

**CASES**

### United States Supreme Court

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) .........................................3, 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) ...15

*Nat. Res. Def. Council v. Winter*, 518 F.3d 658 (9th Cir. 2008)..........................................34

*Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998) ...........................................16

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ...................................26

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ...............................................................15

### United States Courts of Appeals

*Alaska Wilderness League v. Kempthorne*, 548 F.3d 815 (9th Cir. 2008) ......................................34

*Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845 (9th Cir. 1997) .......................................3

*Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229 (9th Cir. 2001) ...........................................3, 11

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) ............................................27

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124 (9th Cir. 2011)...........................................32

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ............ *passim*

*Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452 (9th Cir. 1983) ....................................3

*California v. Block*, 690 F.2d 753 (9th Cir. 1982).........................................................27

*Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234 (9th Cir. 2015) ..........................................12

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ..............................................2

*Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339 (4th Cir. 2019) ................................13

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005 (9th Cir. 2006)................................8, 9

*Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) ........................................26

*Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059 (9th Cir. 2004)..............................5, 6, 7, 8, 30

*Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ...............................................3

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146 (9th Cir. 1998) ................................................31

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083 (9th Cir. 2006).....................................15, 16, 17

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012)........................................2

*Kern v. BLM*, 284 F.3d 1062 (9th Cir. 2002).......................................................................18, 27

*KS Wild v. BLM*, 387 F.3d 989 (9th Cir. 2004) ........................................................19, 26, 27, 30

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)..............................................................3

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
    549 F.3d 1211 (9th Cir. 2008) ...........................................................................................27

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999).............................26

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)...............................31

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) ...................27

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) .........................25

*Or. Nat. Res. Council v. BLM*, 470 F.3d 818 (9th Cir. 2006)......................................................27

*Or. Nat. Res. Council v. Lowe*, 109 F.3d 521 (9th Cir. 1997) ......................................................3

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015)...........................13

*Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708 (9th Cir. 2001) ....................................4

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001) .............................................................................................9

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) .............................................................................................9

*Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768 (9th Cir. 2006) .............................................15

*Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153 (9th Cir. 1998) ......................................33

*Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029 (9th Cir. 2019) ....................17, 26

*Resources Ltd. v. Robertson*, 35 F.3d 1300 (9th Cir. 1993) ...................................15

*Rock Creek Alliance v. FWS*, 390 F. Supp. 2d 993 (D. Mont. 2005) ......................13, 14

*Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190 (9th Cir. 1988) ...........................31, 32

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064 (9th Cir. 2003) ......4

*W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189 (9th Cir. 1997) ...........................4

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ..............................26

### United States District Courts

*Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146 (D. Or. 2019) ..........................17, 26

*Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271 (D. Or. 2013) ...........................26

*Conservation Cong. v. Heywood*, No. 2:11-CV-02250-MCE-CMK,
       2015 WL 5255346 (E.D. Cal. Sept. 9, 2015) .......................................12, 13

*Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-cv-02800-TLN-CKD,
       2014 WL 2092385 (E.D. Cal. May 19, 2014) ............................................12, 13

*Friends of the Wild Swan v. U.S. Forest Serv.*, 875 F. Supp. 2d 1199 (D. Mont. 2012) .........32, 33

*KS Wild v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069 (E.D. Cal. 2004) ...........................34

*Or. Wild v. BLM*, No. 6:14-cv-0110-AA, 2015 WL 1190131 (D. Or. Mar. 14, 2015).................34

*Pac. Rivers Council v. BLM*, No. 6:16-cv-01598-TC,
       2019 WL 1232835 (D. Or. Mar. 15, 2019).....................................................4

*W. Watersheds Project v. BLM*, 552 F. Supp. 2d 1113 (D. Nev. 2008) ...........................27, 28, 31


## FEDERAL STATUTES

5 U.S.C. § 706.............................................................................................2

5 U.S.C. § 706(2)(A).............................................................................2, 19, 25

16 U.S.C. § 1536(a)(1).....................................................................................24

16 U.S.C. § 1536(a)(2).................................................................................8, 15

28 U.S.C. § 636(b)(1)(C) ...................................................................................3


**FEDERAL REGULATIONS**

40 C.F.R. § 1500.1(b) ........................................................................................25

40 C.F.R. § 1502.21 ...........................................................................................16

40 C.F.R. § 1508.7 ........................................................................................15, 22

40 C.F.R. § 1508.27(b)(4) ..................................................................................27

40 C.F.R. § 1508.27(b)(5) ..................................................................................27

40 C.F.R. § 1508.27(b)(6) ........................................................................27, 32, 33

40 C.F.R. § 1508.27(b)(9) .....................................................................8, 27, 33, 34

40 C.F.R. § 1508.28 ...........................................................................................16

50 C.F.R. § 402.02 .........................................................................................8, 11


**MISCELLANEOUS**

FED. R. CIV. P. 56(a) ............................................................................................2

FED. R. CIV. P. 72(b)(3) ........................................................................................3

**ARGUMENT**

## I.    INTRODUCTION.

Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, Cascadia Wildlands, and Soda Mountain Wilderness Council ("KS Wild") seek to hold the Bureau of Land Management (BLM) and United States Fish and Wildlife Service ("FWS") accountable to the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"), two of our nation's bedrock environmental laws, at a time when the northern spotted owl ("NSO") spirals toward extinction. The ESA requires BLM and FWS to ensure that federal timber harvest such as that proposed in the North Landscape Project ("North Project") is not likely to result in jeopardy to the spotted owl or the destruction or adverse modification of the owl's critical habitat, and NEPA requires the BLM to disclose and discuss the environmental consequences of the North Project on NSO and to prepare an environmental impact statement if those consequences may be significant.

However, the Biological Opinion ("BiOp") for the North Project fails to address how the elimination of 4,864 acres of northern spotted owl critical habitat by logging will affect the ability of the species to recover to the point where the protection of the ESA is no longer required, instead relying on a land use allocation—Late-Successional Reserves ("LSRs")—that does not exist in the Project planning area to meet the ESA's conservation obligations. The BiOp neither candidly discloses how a species that lives for only a few years will be able to recover if all suitable habitat is eliminated from the North Project area for the next century or more, nor accurately accounts for the incidental take of the species that FWS and BLM acknowledge will be locally extirpated from the North planning area for the foreseeable future.

Similarly, the North Project's revised environmental assessment ("REA") does not account for the effects on the species of eliminating 9,073 acres of suitable spotted owl habitat:

*Plaintiffs' Objections to Findings & Recommendation*                                                    1

rather than conduct the requisite site-specific analysis, BLM unlawfully tiered its analysis to its 2016 Resource Management Plan ("RMP") that addressed the consequences of all land management actions across 2.6 million acres of Oregon and California lands and specifically requires project-level effects analysis. With the North Project, BLM has offered its entire decadal allowable sale quantity of timber for sale, a decision that is highly controversial and involves highly uncertain effects and unique risks for the spotted owl. Because BLM does not intend to offer for sale other timber volume, the North Project is also a precedential decision that may have significant effects, including on northern spotted owls and their critical habitat. Taken together, these factors indicate that BLM should have prepared a comprehensive environmental impact statement to analyze the effects of the North Project.

Magistrate Judge Clarke's Findings and Recommendation ("F&R") overlook these serious legal flaws and should be rejected by this Court.

## II.      STANDARD OF REVIEW.

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judicial review of agency actions under the Endangered Species Act (ESA) and National Environmental Policy Act (NEPA) and their implementing regulations is governed by the Administrative Procedure Act (APA). 5 U.S.C. § 706; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004). Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, 'entirely failed

to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (internal citation omitted).

The arbitrary and capricious standard is deferential, but it does not shield agency decisions from a "thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). FWS must articulate "a rational connection between the facts found and the conclusions made." *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). It is not entitled to deference where its conclusions "do not have a basis in fact." *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001). An agency's decision can be upheld only on the basis of the reasoning found in that decision; the reviewing court cannot substitute reasons for agency action that are not in the record. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). Rationales for agency decision-making appearing for the first time in litigation are post hoc explanations that cannot be used to justify agency action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010) (internal citation omitted).

This Court reviews de novo the portions of a magistrate judge's findings and recommendation to which objection is made. 28 U.S.C. § 636(b)(1)(C). When a party does not file objections to portions of an F&R, the district judge need not undertake de novo review of those portions. *Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th Cir. 1983). In resolving objections, the Court "may accept, reject, or modify, in whole or part the findings and recommendations made by the magistrate judge," and "may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3).

*Plaintiffs' Objections to Findings & Recommendation*                    3

### III.    KS WILD IS NOT PRECLUDED FROM CHALLENGING THE NORTH PROJECT.

As a threshold matter, Magistrate Clarke correctly concluded that "the case at hand is not barred by claim preclusion because this suit and the prior suit do not arise out of the same transactional nucleus of facts." F&R, 7. "Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997). Res judicata only applies when there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between the parties." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (internal citations omitted). "The central criterion in determining whether there is an identity of claims between the first and second adjudications is whether the two suits arise out of the same transactional nucleus of facts." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001) (internal citations omitted).

Here, Magistrate Clark correctly held that there is no identity of claims between a 2017 challenge to the BLM's 2016 RMPs brought by some of the plaintiffs in the present case, and the present challenge to the North Project because there are two separate and distinct "transactional nucleus of facts" involved. The nucleus of facts in the 2017 challenge was BLM's 2016 decision to revise its RMPs, memorialized in a Record of Decision, and biological opinions prepared by FWS and National Marine Fisheries Service pertaining to the 2016 RMP. *Pac. Rivers Council v. BLM*, 6:16-cv-01598-TC, ECF 32 (First Amended Complaint). In the present litigation, KS Wild challenges BLM's decision record and finding of no significant impact and FWS' biological opinion for the North Project, a site-specific project. ECF 26, ¶1, Prayer for Relief. The two lawsuits do not share a common set of facts, a common "transaction," or even a common final

agency action. In short, KS Wild could not have brought these claims in the earlier litigation

challenging the 2016 RMP. This lawsuit is therefore not barred by principles of res judicata.

## IV.    THE NORTH BIOLOGICAL OPINION AND INCIDENTAL TAKE STATEMENT VIOLATES THE ESA.

### A.    The BiOp Fails to Adequately Consider Recovery in its Critical Habitat Analysis.

The ESA requires FWS, as the consulting agency, to consider how an action will affect

the value of critical habitat for both the survival *and* recovery of listed species. *Gifford Pinchot*

*Task Force v. FWS*, 378 F.3d 1059, 1069 (9th Cir. 2004), *superseded by reg. on other grounds*,

*All. for the Wild Rockies v. Savage*, 783 Fed. Appx. 756 (9th Cir. 2019). When it designated

critical habitat, FWS determined that all acres of the sub-unit in question (ECS-1), whether

occupied or unoccupied, are "are essential for the conservation of the species to meet the

recovery criterion that calls for the continued maintenance and recruitment of northern spotted

owl habitat." FWS AR 016598. The BiOp concludes that the North Project is not expected to

compromise the ability of critical habitat units to fulfill their conservation functions, which do

include recovery of the species, FWS AR 001604; but the BiOp contains no discussion of

impacts to northern spotted owl recovery in analyzing the North Project's effects on spotted owl

critical habitat, FWS AR 001594–1601, of which the North Project will remove 4,864 acres.

FWS AR 001598.

Magistrate Clarke's Findings and Recommendation states, without further analysis, that

KS Wild's "arguments regarding recovery of the NSO expand the government's obligations

beyond those required by the ESA." F&R, 11. While it is true that as Magistrate Clarke stated

"[t]he obligation of the government is not to restore or recover the NSO," *id*., that is not what KS

Wild argued. Rather, KS Wild challenges FWS's failure to consider recovery as part of its

critical habitat analysis. *See Gifford Pinchot*, 378 F.3d 1070, 1072–73 (FWS must consider effects to recovery in its critical habitat analysis).

In *Gifford Pinchot*, recovery was mentioned twice in the critical habitat analysis of one challenged BiOp, and the Ninth Circuit found no discussion of recovery in several others. *Id*. at 1072–73. On that record, the Ninth Circuit found there was "no discussion of the specific impact on recovery" of the underlying agency actions, and declined to "substitute our analysis as the work of the agency, nor . . . infer any overarching concern for recovery from the silence of this text." *Id*. at 1074 (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam), *Morgan v. United States*, 304 U.S. 1, 18 (1938)). The few times recovery was mentioned "does not indicate analysis of recovery in the context of critical habitat, the sense in which recovery evaluation is required by the ESA, but only talks of recovery as it is promoted" by the Late-Successional Reserve land use allocation. *Id*.

So too, here. The section of the North BiOp concerning "Direct and Indirect Effects of the Action on Critical Habitat" does not mention the word "recovery" once, let alone analyze any specific impacts on recovery of the northern spotted owl from the loss of 4,864 acres of critical habitat. FWS AR 001594–1601. While the North BiOp discloses impacts to the Physical and Biological Features (PBFs) of northern spotted owl critical habitat, FWS AR 001598, it does not analyze how those impacts will specifically affect the ability of the species to recover. Nor is there any other indication in the North BiOp's analysis of effects to critical habitat that FWS considered the effects of logging this critical habitat on the species' recovery. As the Ninth Circuit recognized in *Gifford Pinchot*, ensuring federal actions are not likely to impede or preclude recovery is a core obligation under the ESA. Fulfilling that obligation requires actual

analysis of projects like this timber sale that removes thousands of acres of habitat deemed critical to the species—an analysis that the BiOp failed to undertake.

     **B.**     **The BiOp Wrongly Relies on LSRs in its Critical Habitat Analysis.**

In *Gifford Pinchot*, the Ninth Circuit also held biological opinions are unlawful when they rely improperly on the Late-Successional Reserve land use allocation to carry the conservation obligation of the ESA in their critical habitat analyses. *Gifford Pinchot*, 378 F.3d at 1076. Here, as in *Gifford Pinchot*, "reliance on the LSR pervades" the BiOp's analysis of effects to critical habitat, to the extent that they have become a "substitute for designated critical habitat." *Id.* at 1076 & n.12.

Discussing impacts to demographic support of critical habitat, the BiOp dismisses the loss of PBFs in critical habitat by pointing to the existence of LSRs. FWS AR 001599 ("The proposed action is not expected to alter the ability of critical habitat to provide demographic support at the scale of the subunit because the [harvest land base] is not intended to provide demographic support under the 2016 BLM RMP . . . . Rather demographic support is provided by [LSRs] in other portions of the critical habitat network. Therefore, the reduction in the potential contribution of PBFs 1, 2, and 3 to demographic support from the proposed action are expected to be balanced by the improved function of critical habitat in [LSRs] in other portions of the critical habitat network"). And in its conclusion that the North Project will not destroy or adversely modify critical habitat, the BiOp again relies on the LSRs. FWS AR 01603 ("The reduction in the potential contribution of PBFs 1, 2, and 3 to demographic support from the proposed action are expected to be balanced by the improved function of critical habitat in reserve land use allocations in other portions of the critical habitat network"). But the Critical Habitat rule determined that all critical habitat in the subunit (ECS-1) was essential for the

survival and recovery of the species, not just critical habitat that was later included by BLM in its LSRs. FWS AR 016598.

The ESA requires FWS to analyze the effects of an action on critical habitat, specifically how the action will affect the ability of critical habitat to contribute to recovery. *Gifford Pinchot*, 378 F.3d at 1076. Here, FWS failed to conduct this analysis, instead relying on the LSR land use allocation to provide all of the recovery function that previously, and correctly, was provided by designated critical habitat. While the LSRs may provide some conservation benefit to the species, this is not where FWS must look when assessing how removal of habitat deemed to be critical by the agency may affect the recovery of a listed species: instead, it must look to the critical habitat units themselves, regardless of what land use allocation overlays the critical habitat designation.

Magistrate Clarke found that "[j]ust like in *EPIC*, the FWS BiOp in this case contains some discussion of the value of Late-Successional Reserves, and it also contains an analysis of the North Project's effect on critical habitat that is independent of the Late-Successional Reserves discussion." F&R, 10 (citing *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.* (*EPIC*), 451 F.3d 1005 (9th Cir. 2006)). But *EPIC* did not involve a challenge to a BiOp or any ESA claims for that matter. As KS Wild explained in its reply brief, ECF 40 at 8–9, and as the Ninth Circuit took care to note, the plaintiffs' NEPA challenge in *EPIC* "involved a different statutory scheme than the one at issue in *Gifford Pinchot*." *EPIC*, 451 F.3d at 1013.[1] Thus even if *EPIC*'s statements can be read as addressing the ESA's "adverse modification" standard, *see* 16 U.S.C. § 1536(a)(2) *and* 50 C.F.R. § 402.02 (defining "destruction or adverse modification"), it would be dicta.

---

[1]  The NEPA regulations direct federal agencies to consider the 'degree' to which critical habitat is 'adversely affected,' whereas the ESA prohibits any 'adverse modification' of critical habitat." *Compare* 40 C.F.R. § 1508.27(b)(9); *with* 16 U.S.C. § 1536(a)(2), *and* 50 C.F.R. § 402.02.

More importantly, the Ninth Circuit in *EPIC* held that—unlike in *Gifford Pinchot Task Force*—reliance on LSRs did not "pervade" the critical habitat analysis, but rather that the biological opinion contained significant analysis of the Project's effect on critical habitat that was independent of the LSRs discussion. *EPIC*, 451 F.3d at 1012. Here, the BiOp does more than acknowledge the existence of LSRs: it relies solely on that land use allocation to authorize logging of critical habitat in the Harvest Land Base without analyzing how that logging will affect the recovery of the northern spotted owl.

### C.    The BiOp Fails to Consider the Lifespan of the Northern Spotted Owl.

When consulting under Section 7(a)(2), FWS must evaluate the negative effects of a project over a time frame that takes into account the lifecycle and behavior of affected listed species. *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.* ("*PCFFA I*"), 265 F.3d 1028, 1037 (9th Cir. 2001); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation* ("*PCFFA II*"), 426 F.3d 1082, 1094 (9th Cir. 2005). The *PCFFA* line of cases involved coho salmon, which live for approximately 3 years. In *PCFFA I*, the consulting agency relied on restored terrestrial habitat and forest regrowth to provide for the various lifecycle needs of salmon to offset adverse effects from logging. The Ninth Circuit held this approach unlawful because restoration and regrowth would not occur until many years in the future, during which multiple generations of coho would have insufficient habitat to survive. *PCFFA I*, 265 F.3d at 1037–38. Similarly, in *PCFFA II*, the consulting agency relied on the later phases of a phased irrigation project that were likely to sustain viable coho salmon populations but did not analyze how the first two phases, lasting 8 years, would avoid jeopardy to the species. *PCFFA II*, 426 F.3d at 1094–95.

The same situation is present in this case. The North Project authorizes logging around currently occupied sites until they are abandoned, and then authorizes logging within the newly unoccupied sites. FWS AR 001566, 001578–79, 001599. This approach will preclude recolonization of past sites, and is likely to result in the local extirpation of spotted owls from the planning area over the lifespan of the project. FWS AR 001499, 1579; BLM AR 000557. While the BiOp discloses information concerning northern spotted owl biology in a section addressing the range-wide status of the species, the BiOp fails to analyze the North Project's effects in light of the ever-declining amount—eventually reaching zero and persisting for the foreseeable future—of suitable owl habitat in the Project area. What is missing in these sections of the BiOp is any discussion of whether and to what extent the northern spotted owl can survive, recover, and recolonize the project area after the 100–120-year period during which all northern spotted owl sites are expected to be abandoned, logged, and converted to nonhabitat. *See* FWS AR 001562–64. The failure to assess what this outcome means for the conservation of the species contravenes the Ninth Circuit's admonition in *PCFFA I* and *II* that the agency must factor short-term adverse effects into its analysis of effects over a timeframe that exceeds the lifespan of the species.[2]

**D.    FWS's Determination of Zero Incidental Take is Unlawful.**

Magistrate Clarke affirmed FWS's conclusion that implementation of the North Project is unlikely to result in incidental take of northern spotted owls because timber harvest will not occur on occupied sites. F&R, 12 (citing FWS AR 001579, 001604). But FWS's conclusion is

---

[2] In upholding the BiOp, Magistrate Clarke relied on the government's contention that harvest would stop and be reevaluated should any northern spotted owls be detected in the harvest area. F&R, 9. But as discussed in the following section, the method the BiOp uses for determining occupancy deviates from past practice and the best available science, and is further confounded by the presence of barred owls on the landscape.

unlawful for three reasons: it fails to account for other potential forms of take, it deviates without explanation from the best available science as well as agency guidance and past practice, and it does so for economic reasons that Congress did not intend the agency to consider.

First, FWS failed to consider possible causes of take including habitat fragmentation and indirect effects of implementing the North Project. The North Project will cause the "capability of the local landscape to provide suitable habitat to breed, feed, and shelter [to be significantly impacted[,]" FWS AR 001579, will degrade habitat to the extent that the occupancy and reoccupancy of all spotted owl sites in the project area will be precluded for up to 120 years, and cause the development of future habitat to be "significantly delayed," FWS AR 001566, 001578–79, 001599. FWS and BLM admit the Project will result in all currently occupied sites becoming unoccupied and then harvested, precluding reoccupancy for up to 120 years. FWS AR 001499, 1579; BLM AR 000557. These effects significantly impair northern spotted owl breeding and feeding habits and constitute take. *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1238 ("significant impairment of the species' breeding or feeding habits" accompanied by "habitat degradation" that "retards . . . recovery of the species" may constitute take) (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1513 (9th Cir. 1994)).

Magistrate Clarke found that FWS had made a "factual determination that the temporal link between the habitat modification and the northern spotted owl's presence was too long to establish proximate cause for incidental take," and deferred to "FWS's scientific judgment in making this determination." F&R, 13. But the ESA regulations define "effects of the action" as including consequences that "may occur later in time," and do not contemplate that the passage of time, without more, may erode proximate cause or a finding of incidental take. 50 C.F.R. § 402.02 (defining "effects of the action"). Regardless, and critically, this rationale was offered not

in the North BiOp but for the first time in Federal Defendants' reply brief, ECF 42 at 14, rendering it an improper post hoc rationalization that should be rejected. *Overton Park*, 401 U.S. at 419 (rejecting "litigation affidavits" from agency officials as "merely 'post hoc' rationalizations").

Magistrate Clarke also noted that the Ninth Circuit upheld the spotted owl survey protocol in *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1241 (9th Cir. 2015), but this is a red herring. Plaintiffs in that case argued that FWS failed to consider how the presence of barred owls may affect spotted owl response to auditory surveys. *Id*. FWS has since addressed this issue by updating its survey protocol. FWS AR 001519. Here, KS Wild does not challenge the nature or use of surveys as one factor relevant to determining take, but rather the BiOp's exclusive reliance on it—rather than in conjunction with habitat fitness—in determining incidental take. As the North BiOp itself acknowledges, "[s]ite occupancy varies among years; historic spotted owl sites may be unoccupied for more than three years, and then are subsequently reoccupied by owls. . . . sites that are unoccupied for a number of years may be reoccupied in the future." FWS AR 001544. FWS has observed that at least 4 of the 11 northern spotted owl sites in the action area have had 3–4 year periods without detections, followed by reoccupancy that could not be accounted for by any change in habitat condition. FWS AR 000324, 001557–58. These are precisely the reasons why habitat fitness metrics should be considered in any incidental take determination, but FWS has eschewed this important "relevant factor."

Magistrate Clarke also relied on two cases rejecting the argument that incidental take of northern spotted owls can be presumed from habitat modification. F&R, 12 (citing *Conservation Cong. v. Heywood*, No. 2:11-CV-02250-MCE, 2015 WL 5255346, at *14 (E.D. Cal. Sept. 9, 2015), *aff'd*, 690 F. App'x 541 (9th Cir. 2017); *Conservation Cong. v. U.S. Forest Serv.*, No.

2:12-cv-02800-TLN-CKD, 2014 WL 2092385, at *11 (E.D. Cal. May 16, 2014)). Here, KS Wild

does not argue that incidental take should be *presumed* based on habitat modification, but rather

that the possibility for incidental take should be *informed* by habitat fitness metrics, consistent

with past practice and agency guidance. These unpublished out-of-District cases are therefore

inapposite.

Second, the BiOp deviates from the best available science, agency guidance, and past

practice in assessing take, which Magistrate Clarke did not address in his F&R. KS Wild

identified a number of points in the record where the agencies recognized the need for a case-by-

case analysis, taking into account habitat fitness and the potential for reoccupation, in calculating

take. ECF 40 at 13. For example, Federal Defendants' Information Bulletin instructs that,

consistent with past practice, "[a]ny estimate of [incidental take] needs to take into account

variance in actual home range/core areas estimated from empirical studies and the composition

and arrangement of habitat elements[.] . . . This is consistent with past and expected future Level

1 Team analysis"). BLM AR 006063, 006055, 006057, 006062.

Not only did the BiOp fail to consider habitat fitness when calculating take, it also

unlawfully failed to acknowledge its departure from past practice or offer a reason for this

departure. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en

banc) (when a federal agency departs from long-standing policy and practice, it must "display[]

awareness that it is changing its position" and "if the new policy rests upon factual findings that

contradict those which underlay its prior policy," the agency must provide a "reasoned

explanation for disregarding facts and circumstances that underlay or were engendered by the

prior policy"); *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 362 (4th Cir. 2019)

(agency must explain a change in view between biological opinions); *Rock Creek Alliance v.*

*FWS*, 390 F. Supp. 2d 993, 1010 (D. Mont. 2005) (same). A close read of internal deliberative documents reveals that agency staff were aware of this departure from past practice, yet this awareness—much less any explanation—was not revealed in public-facing agency documents. FWS AR 000250 ("The approach to achieve no take . . . appears to be a departure from the way in which the Klamath Falls Fish and Wildlife Office has assessed the potential for take on previous section 7 consultations . . . ."). Magistrate Clarke did not address this flaw in the incidental take determination in his Findings and Recommendation.

Third, KS Wild identified internal discussions in the record demonstrating that the departure from guidance and past practice followed from the agencies' consideration of economic factors that Congress did not intend be considered, namely, internal pressure for BLM to meet its timber sale quota. ECF 36 at 23. BLM voiced frustration with being "unable to convince" a FWS biologist that the two-year occupancy methodology was sufficient and asserted "[t]his project is the sole source of our ASQ for 2018 and for the next ten years so this needs to be resolved quickly if we are to meet our targets." BLM AR 004272. BLM declined FWS's invitation to adopt a more protective incidental take methodology, stating, among other reasons, that that doing so "could result in failure to meet annual ASQ targets."[3] BLM AR 005883–84. Magistrate Clarke did not address this flaw in the incidental take determination in his Findings and Recommendation.

Rather than utilize a case-by-case method considering such factors as habitat quality and quantity, history of occupancy and reoccupancy, and barred owl presence (consistent with the best available science, past practice, and agency guidance), FWS chose a methodology that

---

[3] Notably, there is no discussion in the record regarding what repercussions BLM (or FWS) might face should BLM be unable to meet its timber target. Without clear ramifications for this failure, its threat is empty.

would fast-track logging at the expense of protecting the northern spotted owl. In doing so, FWS

failed to use the best available science as required under the ESA, 16 U.S.C. § 1536(a)(2), and

unlawfully "relied on factors which Congress had not intended it to consider[.]" *Motor Vehicle*

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). As the

Supreme Court has held, "the plain language of the [ESA], buttressed by its legislative history,

shows clearly that Congress viewed the value of endangered species as 'incalculable[,]'" and

courts "emphatically do not" have the authority to balance economic concerns "against a

congressionally declared 'incalculable' value.'" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 187–88

(1978).

## V.    THE NORTH REVISED ENVIRONMENTAL ASSESSMENT VIOLATES NEPA.

### A.    The North REA Unlawfully Tiers to the BLM's 2016 RMP EIS.

Rather than conduct an analysis of how the Project affects northern spotted owls, the

North REA unlawfully relies on the BLM's 2016 RMP and FEIS for the requisite site-specific

analysis. BLM AR 000080, 000085, 000089. Magistrate Clarke upheld BLM's reliance on the

programmatic analysis in its 2016 RMP EIS, F&R, 14–19, but this reliance is misplaced because

the programmatic EIS does not consider the site-specific project-level effects of the North

Project on spotted owls as NEPA requires.

Under NEPA, an agency must consider the direct, indirect, and cumulative effects of

past, present, and reasonably foreseeable future actions on the environment. 40 C.F.R. § 1508.7

(defining cumulative effects); *Pit River Tribe v. U.S. Forest Serv*., 469 F.3d 768, 784 (9th Cir.

2006); *Resources Ltd. v. Robertson*, 35 F.3d 1300, 1306 (9th Cir. 1993). As the Ninth Circuit has

explained:

> In the context of national forest management, we defined the programmatic stage as the
> level "at which the [agency] develops alternative management scenarios responsive to
> public concerns, analyzes the costs, benefits and consequences of each alternative in an

environmental impact statement ('EIS'), and adopts an amendable forest plan to guide management of multiple use resources." *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 923 n. 2 (9th Cir. 1999). Following the programmatic stage is the "implementation stage during which individual site specific projects, consistent with the forest plan, are proposed and assessed." *Id.* A programmatic EIS must provide "sufficient detail to foster informed decision-making," but an agency need not fully evaluate site-specific impacts "until a critical decision has been made to act on site development." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir.2003) (*quoting N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir.1992) (quotation marks omitted)).

*'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1094 (9th Cir. 2006). However, once the BLM makes "a critical decision . . . to act on site development"—here, to authorize logging in a specific area—the BLM must conduct a project-specific analysis of relevant effects stemming from that site-specific action. *Id.* Although BLM may "incorporat[e] by reference"[4] the programmatic analysis conducted in the RMP EIS and "tier"[5] to it, the fact that the EIS discusses the same issue (here, spotted owls) does not obviate the need to fully analyze the localized effects of the North Project on that resource. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (Ninth Circuit precedent "does not support the proposition that any scale of logging project is exempt from a project-specific EIS simply because an EIS for a forest plan contemplates that logging may occur.").

As the Court explained in *Rumsfeld*, agencies cannot fully analyze the effects of a programmatic decision—particularly one like a forest plan that does not authorize site-specific actions—without knowing where, when, and how implementation decisions will be made. 464 F.3d at 1094; *see also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 736–37 (1998) (holding challenge to forest plan unripe, where further factual development would aid court's resolution of legal issues presented). Once it is clear where, when, and how the implementation

---

[4] 40 C.F.R. § 1502.21.
[5] 40 C.F.R. § 1508.28.

decision will occur, then the agency must *fully* analyze the effects of that site-specific action. *Rumsfeld*, 464 F.3d at 1094. This is not to say that the agency cannot incorporate by reference some (or all) of the preliminary programmatic analysis in the later project-level analysis, but rather that it must take its analysis one step further and analyze how a specific action will affect the environment in that particular implementation location. That stepped-down analysis did not occur in this case.

As the Ninth Circuit recently explained, "this line of precedent makes sense: a site-specific project demands site-specific analysis. Agencies cannot rely on a general discussion in a programmatic EIS or other document to satisfy its NEPA obligations for a site-specific action." *Protect Our Communities Found. v. LaCounte*, 939 F.3d 1029, 1039 (9th Cir. 2019) (*citing W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013), *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003), and *KS Wild*, 387 at 998); *see also Cascadia Wildlands v. BLM*, 410 F. Supp. 3d 1146, 1157–58 (D. Or. 2019) (rejecting BLM's argument that site-specific timber sale effects were considered in BLM's 2016 RMP FEIS). Indeed, "nothing in the tiering regulations suggests that the existence of a programmatic EIS for a forest plan obviates the need for any future project-specific [environmental analysis]." *Blackwood*, 161 F.3d at 1214.

Here, the RMP FEIS did not and could not analyze the site-specific impacts of the North Project on spotted owls because the Project did not exist at the time the RMP was finalized; and, the RMP expressly states that it "does not include any implementation decisions," because those decisions "can be carried out only after completion of further appropriate NEPA analysis or documentation, consultation, and decision-making processes." BLM AR 014767. As Magistrate Clarke noted, BLM's programmatic analysis in the RMP EIS *does* analyze "the effects of various

management alternatives on the NSO's habitat-conservation needs throughout the United States and across the various owl physiographic provinces," "forecasts . . . anticipated changes to northern spotted owl habitat from forest ingrowth and forest treatments at the much larger, and more appropriate, scales," "quantified and analyzed how managing the entire Harvest Land Base . . . for sustained-yield harvest would impact the NSO as a species," "evaluated the impacts of timber harvest on NSO recovery" across all 2.6 million acres of Oregon and California lands, conducted a "barred owl and spotted owl conflict analysis" at that scale, and "analyzed the effects of preserving additional land in the Harvest Land Base for refugia beyond the large reserve blocks already set aside" on the recovery of the owl across the species' range. F&R, 15–19. But simply because BLM conducted this analysis at a very large programmatic scale does not demonstrate that the BLM conducted an adequate *localized* effects analysis for the North Project.

In each instance where BLM's analysis fell short, the Findings and Recommendation point back to BLM's programmatic analysis that expressly did not consider site-specific environmental consequences of implementation decisions. BLM AR 014767. Adopting the reasoning of the Findings and Recommendation and taking it to its logical conclusion, BLM would never need to conduct site-specific analysis because it would be exceedingly unlikely verging on impossible that the effects of any site-specific project would exceed the range of "impacts analyzed in the 2016 PRMP/FEIS" given the million-acre scale of that programmatic analysis. *See*, F&R, 16-17. This turns the entire purpose of NEPA on its head. *Kern v. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002) ("While NEPA empowers neither the plaintiffs nor this court to second-guess the BLM's management decisions, it does require the BLM to articulate, publicly and in detail, the reasons for and likely effects of those management decisions").

Because the RMP FEIS does not contain the requisite site-specific analysis of the effects of the North Project, "tiering to the RMP EIS cannot save the EA[]." *KS Wild v. BLM*, 387 F.3d 989, 997 (9th Cir. 2004); *Blackwood*, 161 F.3d at 1214. The BLM's failure to consider the direct, indirect, and cumulative effects of the North Project on the northern spotted owl is therefore arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2)(A).

## B.    The North REA Fails to Consider the Direct, Indirect, and Cumulative Effects of the Project.

A close reading of the Findings and Recommendation reveals that Magistrate Clarke did not conclude that the North REA adequately considered the effects of the Project on the northern spotted owl. Instead, the Findings and Recommendation concluded that the requisite project-level analysis could be found in BLM's 2016 RMP EIS. *See*, *e.g.*, F&R, 17 ("BLM concluded in the North Project EA that there are no project-specific negative impacts to NSOs as a species or their habitat that alter or exceed the range of impacts analyzed in the [RMP] FEIS"). As discussed *supra*, however, the programmatic analysis expressly did not consider the effects of implementation decisions such as the North Project. BLM AR 014767. Consequently, the North REA violates NEPA because it does not conduct an adequate analysis of the direct, indirect, and cumulative effects of the Project.

During the development of the North Project, KS Wild asked the BLM to address how the Project would affect the northern spotted owl and its continued viability and recovery given: (1) the removal of 9,073 acres of currently suitable habitat, including the complete removal of 4,864 acres of designated critical habitat for the species; (2) the increased occupancy of barred owls as a result of habitat removal for spotted owls that facilitates spotted owl non-occupancy; (3) the lack of suitable spotted owl habitat and occupied sites on adjacent nonfederal lands; (4) northern spotted owl survival and recovery in the event that the experimental barred owl control

program is successful; (5) the value of retaining currently occupied sites as refugia for displaced

northern spotted owls; and (6) how the Project may result in a competitive advantage to barred

owls. The North REA did not address these issues, and instead punted the effects analysis of the

Project back to the programmatic analysis contained in the RMP EIS. The Findings and

Recommendation erroneously sanctioned BLM's tiering in four ways.

First, regarding the effects to spotted owls from the removal of 9,073 acres of suitable

habitat and 4,864 acres of critical habitat, the Findings and Recommendation state that "[i]n its

FEIS for the 2016 RMP, BLM used its expertise, numerous scientific studies, and technical

habitat and population response modelling to conduct an analysis of the effects of various

management alternatives on the NSO's habitat-conservation needs throughout the United States

and across the various owl physiographic provinces, including the Oregon Eastern Cascades

Physiographic Province that encompasses the North Project area," and endorsed BLM's

incorporation by reference of this analysis into the North REA. F&R, 15–16. But KS Wild has

not challenged the RMP's modeling or analysis in this case, and instead has pointed out that this

broadscale analysis does not inform the public about the effects of the North Project on the owls

and habitat located in the North planning area. The Findings and Recommendation state that "it

was proper for the North EA to tier to the FEIS for the 2016 RMP because the anticipated effects

of the North Project to the NSO, NSO habitat, and the ability of NSOs to disperse across the

landscape are within the impacts analyzed in the 2016 PRMP/FEIS," F&R, 16, but reliance on

the RMP is misplaced because the "anticipated effects of the North Project to the NSO" are

never actually disclosed in the North REA: the North REA circuitously points back to the RMP

for this analysis.

Second, regarding effects of the North Project on the recovery of the northern spotted owl, the Findings and Recommendation state that "[t]he 2016 FEIS also explicitly evaluated the impacts of timber harvest on NSO recovery," and that "[i]t was appropriate for BLM to conduct its species recovery analysis at the 2016 FEIS/RMP level so that it could evaluate the impacts of the various alternatives on the NSO species as a whole, across the entire range. In the North EA, BLM properly tiered to this recovery analysis, concluding that the site-specific impacts of the North Project are within the range of impacts disclosed in the FEIS." F&R, 17. But again, the "site-specific impacts of the North Project" are not actually disclosed in the North REA: BLM may have presumed that they were "within the range of impacts disclosed in the [RMP] EIS," but the actual nature of those impacts were neither disclosed to the public nor analyzed in the North REA.[6]

Third, the Findings and Recommendation concluded that the BLM did not need to consider the effects of the North Project on the spotted owl should the experimental barred owl control program be successful, reasoning that the "probable environmental consequences" were speculative. F&R, 18 (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998) and quoting *Or. Nat. Resources Council*, 109 F.3d at 526). Magistrate Clarke appears to have reached this conclusion based on the government's assertion that the program "has not yet been implemented," *id.*, but this assertion is erroneous. The Fish and Wildlife Service actually *completed* the experimental barred owl control program in August 2021 and has published the results of the study, which concluded that

> Removal of barred owls had a strong, positive effect on survival of sympatric spotted owls and a weaker but positive effect on spotted owl dispersal and recruitment. After

---

[6] Indeed, "range" of impacts is just that: a spectrum of consequences, spanning greater and lesser effects. Where on that spectrum the North Project lands has not been disclosed and analyzed by BLM.

removals, the estimated mean annual rate of population change for spotted owls stabilized in areas with removals (0.2% decline per year), but continued to decline sharply in areas without removals (12.1% decline per year). The results demonstrated that the most substantial changes in population dynamics of northern spotted owls over the past two decades were associated with the invasion, population expansion, and subsequent removal of barred owls. Our study provides experimental evidence of the demographic consequences of competitive release, where a threatened avian predator was freed from restrictions imposed on its population dynamics with the removal of a competitively dominant invasive species.

United States Fish and Wildlife Service, *Barred Owl Study Update*, OREGON FISH AND WILDLIFE OFFICE (Sept. 11, 2021), https://www.fws.gov/oregonfwo/articles.cfm?id=149489616 (providing link to the "recent publication" of quoted study results). The experimental program has been ongoing since 2013 in California and 2015 in Oregon, and is required by BLM's 2016 RMP, AR 014527, meaning that it was a "present" action for the purposes of NEPA, and therefore not speculative. 40 C.F.R. § 1508.7.

Because barred owl control effectively allows extant northern spotted owls to persist and recolonize available suitable habitat, the availability of suitable habitat is the primary limiting factor for northern spotted owl survival and recovery. FWS AR 016364–65. Thus, the North REA's conclusion that barred owls will supplant northern spotted owls in the project area regardless of how fast BLM destroys suitable northern spotted owl habitat through logging, and therefore retention, now, of suitable spotted owl habitat has no value, BLM AR 000089, is erroneous. Given the possibility—now actualized—that barred owl control would be successful in giving spotted owls the ability to persist in the face of barred owl competition,[7] BLM should

---

[7] The Findings and Recommendation also conclude that "the record simply doesn't support" KS Wild's claim that "BLM failed to analyze the conflict between barred owls and NSOs." F&R, 18. As with BLM's other failures to consider the direct, indirect, and cumulative effects of the North Project, BLM and Magistrate Clarke wrongly relied on the programmatic analysis in the RMP EIS to meet BLM's NEPA obligation. *Id.* While the RMP EIS did discuss in general terms the interspecies competition between spotted and barred owls, how this competition plays out in the

have analyzed how the elimination of more than 9,000 acres of spotted owl habitat would affect the ability of spotted owls to persist, recolonize the North Project area, and ultimately recover to the point where ESA protections are no longer warranted.

Likewise and finally, BLM's failure to consider retaining rather than liquidating additional suitable habitat as refugia for spotted owls in the North Project area violated NEPA. Regarding this issue too, BLM and the Findings and Recommendation tier to the RMP EIS's analysis rather than addressing the site-specific effects of the North Project and how retaining additional suitable habitat in the planning area would afford the spotted owl much-needed additional demographic support.[8] F&R, 19. Spotted owl experts have observed that barred owls adapt more readily to inferior habitat conditions and that the "availability of old forests and associated prey species are likely to be the most strongly limiting factors in the competitive relationships between these species[,]" highlighting "the importance of maintaining high quality habitat in late-successional forests." BLM AR 018425–26. The reduction in forest cover can be expected to disproportionately affect northern spotted owls relative to barred owls, leaving barred owls better adapted to the post-logging landscape than northern spotted owls. This effect of habitat removal is likely to compound the barred owl threat to northern spotted owls in the project area for decades to come, but is not considered as a direct, indirect, or cumulative effect in the North REA.

---

North Project area given the localized arrangement of habitat, birds, and other factors was not discussed in the North REA.

[8] Since 2016, millions of acres of suitable habitat across the spotted owl's range have burned in large wildfires, reducing the amount of suitable habitat available to the species. This reduction in available habitat further suggests that retaining extant habitat as refugia is a relevant factor that BLM should have considered in the North Project REA.

On this issue, the Findings and Recommendation erroneously state that "[r]etaining additional unoccupied habitat in the North Project area solely for the purpose of supporting NSO recovery would likely be found inconsistent with the management directions in the RMP and perhaps even violate FLPMA." F&R, 19 (citing the RMP provision that the BLM may "not defer or forego timber harvest of stands in the Harvest Land Base for reasons not described in the management direction" at BLM AR 014533). Not only is a potential FLPMA violation not before this Court and is thus a distraction, but also this statement overlooks the fact that the Endangered Species Act may compel the BLM to protect additional spotted owl habitat regardless of the provisions in the RMP,[9] and the fact that the RMP contains other provisions requiring the BLM to retain all suitable spotted owl habitat. BLM AR 014512, 014521 ("Manage ESA-listed species *consistent with recovery plans*, conservation agreements, species management plans, and *designated critical habitat*, and species-specific or project-specific conservation measures developed with the U.S. Fish and Wildlife Service, *including the protection and restoration of habitat, altering the type, timing, and intensity of actions*, and implementing other strategies designed to recover populations of species") (emphases added). Additionally, the spotted owl recovery plan recommends retaining all extant suitable spotted owl habitat. FWS AR 016284 ("given the continued decline of the species, the apparent increase in severity of the threat from barred owls, and information indicating a recent loss of genetic diversity for the species," FWS "recommends retaining more occupied spotted owl sites and unoccupied, high value spotted owl habitat on all lands"), FWS AR 016340 ("Because spotted owls on established territories are likely to be more successful if they remain in those locations

---

[9] 16 U.S.C. § 1536(a)(1) ("All other Federal agencies shall . . . utilize their authorities in furtherance of the purposes of this Act by carrying out programs for the conservation of endangered species and threatened species").

(Franklin et al. 2000), managing to retain spotted owls at existing sites should be the most effective approach to bolstering the demographic contribution of a habitat conservation network and the highest priority for land managers").

In sum, the Findings and Recommendation incorrectly endorsed BLM's reliance on the programmatic analysis in its 2016 RMP EIS regarding northern spotted owls, rather than requiring BLM to conduct a site-specific project-level effects analysis of how the North Project implementation decision will affect the species. This was reversible error.

## VI.    THE FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT VIOLATES NEPA.

The BLM failed to prepare an EIS for the North Project, despite the presence of several factors indicating possible significant environmental consequences of the proposed action. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) ("We have held that one of these factors may be sufficient to require preparation of an EIS"). The deficiencies described below—both individually and in combination—indicate that the EA fails to meet the minimum NEPA requirements, and an environmental impact statement is therefore required. 40 C.F.R. § 1500.1(b). The agency's decision to implement and proceed with the proposed action without first preparing an EIS is arbitrary, capricious, and not in compliance with NEPA. 5 U.S.C. § 706(2)(A).

Magistrate Clarke dismissed KS Wild's arguments that several significance factors compel the preparation of an EIS with a single sentence, stating that "Plaintiffs' arguments under 40 C.F.R. § 1508.27—that the effects of the North Project are highly uncertain and highly controversial; that the North Project will establish a precedent for future actions; and that the Project will have significant adverse effects on NSOs and NSO habitat—fail to convince the Court that there are any new or significant environmental effects stemming from the North

Project that were not already considered in the FEIS for the 2016 RMP." F&R, 20. Not only is this conclusion unsupported by any factual or legal analysis, but also it is premised on a misunderstanding of the extent to which BLM may rely on the programmatic analysis contained in the RMP EIS. *See supra* Section V.A. (discussing tiering). The Court's inquiry is not whether the North Project has "new or significant environmental effects . . . that were not already considered" in the 2016 RMP EIS, but rather whether the *effects of the North Project* rise to the level of significance requiring the preparation of an EIS. *LaCounte*, 939 F.3d at 1039; *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013); *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003), *opinion clarified*, 366 F.3d 731 (9th Cir. 2004); *KS Wild*, 387 F.3d at 998; *Cascadia Wildlands*, 410 F. Supp. 3d at 1157–58 (rejecting BLM's argument that site-specific timber sale effects were considered in BLM's 2016 RMP FEIS).

The Ninth Circuit routinely evaluates the need for a site-specific project-level EIS, despite the existence of an EIS supporting the overarching forest plan. *Blackwood*, 161 F.3d at 1214 (rejecting argument that "any scale of logging project is exempt from a project-specific EIS simply because an EIS for a forest plan contemplates that logging may occur"); *KS Wild*, 387 F.3d at 997; *see also Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1284 (D. Or. 2013) (requiring EIS for site-specific project implementing forest plan regardless of forest plan EIS analysis); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810–12 (9th Cir. 1999) (same); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) (same). The Magistrate should have evaluated each relevant significance factor against the North REA and assessed whether significant environmental consequences may result, *Ocean Advocates*, 402 F.3d at 865, independent of the significant environmental consequences identified in the RMP EIS. Indeed, it is possible and perhaps likely that *both* the RMP and site-specific projects

developed under it may have significant effects such that an EIS is appropriate for both levels of environmental review. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) (site-specific EIS required despite existence of EIS for general land management plan); *Kern*, 284 F.3d at 1071–79; *KS Wild*, 387 F.3d at 997–98; *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv*., 549 F.3d 1211, 1218–19 (9th Cir. 2008) (same); *Neighbors of Cuddy Mountain v. U.S. Forest Serv*., 137 F.3d 1372, 1378–80 (9th Cir. 1998) (same); *Or. Nat. Res. Council v. BLM*, 470 F.3d 818, 823 (9th Cir. 2006) (same). Consequently, a categorical rejection of that possibility that rests on the analysis in the RMP EIS alone is reversible error.

KS Wild demonstrated that there are four significance factors that taken individually and together warrant the preparation of an EIS. 40 C.F.R. §§ 1508.27(b)(4), (b)(5), (b)(6), (b)(9). Because Magistrate Clarke did not substantively address these factors in his F&R, KS Wild explains below why these factors compel the preparation of an EIS.

**A.    The degree to which the effects on the quality of the human environment are likely to be highly controversial, highly uncertain, or involve unique or unknown risks (40 C.F.R. §§ 1508.27(b)(4)-(b)(5)).**

In evaluating whether a federal agency should have prepared an EIS due to a federal action's highly controversial or uncertain effects, a court will hold that "a project is 'highly controversial' if there is a substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use. A substantial dispute exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions. Mere opposition alone is insufficient to support a finding of controversy." *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 870 (9th Cir. 2020) (internal citations, alterations, and quotations omitted). Similarly, "an agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain [or involve unique or unknown risks]. Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such

data may prevent speculation on potential effects. An EIS is not required anytime there is some uncertainty; rather, the effects of the project must be highly uncertain." *W. Watersheds Project v. BLM*, 552 F. Supp. 2d 1113, 1135–36 (D. Nev. 2008) (internal citations, alterations, and quotations omitted).

There are a number of effects of the North Project on northern spotted owls that are highly controversial, highly uncertain, or involve unique or unknown risks, thus compelling the preparation of an EIS. First, the North REA does not assess how the complete removal of more than 9,000 acres of suitable spotted owl habitat (the majority of which is critical habitat) will affect the ability of the species to recover: it is highly uncertain whether this population of owls, which is already experiencing severe downward population pressure and recently produced no young, will persist, much less recover to the point where the protection of the ESA is no longer required. It is highly uncertain what will be the fate of the currently extant northern spotted owls in the North project area once suitable (but unoccupied) habitat is logged: given the absence of habitat on nonfederal lands, neither the BLM nor FWS have disclosed to where these owls will disperse or whether they will survive at all.

Second, the experimental barred owl control program is highly controversial in that neither the FWS nor the BLM know whether it will be successful. Early results suggest it may be, BLM AR 012576, which then raises the highly uncertain question of whether northern spotted owls in the North project area will have sufficient suitable habitat to recolonize the area once competitive barred owls are removed: there is no information in the record about this possible—indeed, desirable—outcome. If the barred owl control program *is* successful, it is highly uncertain whether there will be any spotted owls remaining to reoccupy the newly-vacant habitat: the administrative record does not address this issue. There are substantial unknown risks

to the species of assuming spotted owls will recolonize the North project area if there is no suitable habitat there for up to 120 years because it has been logged.

Third, BLM's premise that it is futile to retain unoccupied suitable habitat for future spotted owl colonization should the barred owl control program be effective is highly controversial and uncertain, and involves unique and unknown risks to the spotted owl. Not only is this premise not based on any sort of biological evidence in the record, but it also "writes off" the ability of a listed species to persist, even though FWS has repeatedly stated that retention of suitable habitat is essential to the species' conservation and recovery. FWS AR 016284, 016546–47, 016588. BLM, therefore, is gambling with a species' survival based on a premise—that habitat does not matter—that has been repeatedly rejected by FWS. Rather than hew to the best available science, BLM has proposed—and FWS has blessed—a decadal timber sale that will liquidate the limited suitable owl habitat that remains anywhere in this portion of southwest Oregon. Given the owl's continued precarious survival status, eliminating all suitable habitat in the Project area involves unique and unknown risks to the species.

Fourth, FWS has dramatically shifted its position in terms of how it determines incidental take for spotted owls, choosing to rely on occupancy surveys alone rather than to utilize surveys in conjunction with biological habitat thresholds. BLM has encouraged and accepted this shift in approach. FWS AR 000243; BLM AR 005884. In the past, FWS would find incidental take if habitat for the owl was reduced below threshold levels, FWS AR 000167–68, 000250, 000319, 000324; but now, the agency will only look to whether surveys result in affirmative detections over a two-year period. FWS AR 001604. As discussed *supra*, this methodology is flawed, as demonstrated first by the fact that spotted owl surveys are regularly confounded by barred owl presence, and second by the fact that FWS and BLM determined that the East Miner's Creek site

was unoccupied based on a lack of detections from the mid-1990s to 2011, thus releasing these acres for logging; but surveys in 2020 revealed a single owl occupying the site. BLM AR 004983, 005001. While a positive outcome that spot surveys located this bird, clearly (as FWS acknowledges but disregarded here) more than just surveys dictate whether spotted owls are present and using extant suitable habitat. FWS and BLM's new approach to determining owl occupancy is highly controversial and uncertain, and its long-term effect on spotted owl persistence and recovery involves unknown risks to the species.

Finally, FWS and BLM rely heavily on the Late-Successional Reserve land use allocation to provide for the habitat needs of the spotted owl. Not only has this approach been rejected by the Ninth Circuit, *see Gifford Pinchot*, 378 F.3d at 1076, but also there is no evidence in the record that this approach will be successful. Instead, it is the *hypothesis* of the BLM and FWS that the reserves will be sufficient to carry the agencies' ESA obligations; but there is no administrative record data to support this hypothesis and given the precarious status of the species, relying on an untested hypothesis is highly controversial and uncertain, and involves unknown risks to the species' survival and recovery.

Because none of this analysis exists in the 2016 RMP EIS, "tiering to the RMP EIS cannot save the EA." *KS Wild*, 387 F.3d at 997. Neither the opposing parties nor Magistrate Clarke identify anywhere in the RMP FEIS where the agency analyzed how the complete removal of more than 9,000 acres of suitable spotted owl habitat (the majority of which is critical habitat) will affect the ability of the species to recover; whether the North Project owls will persist, much less recover to the point where the protection of the ESA is no longer required; what the fate of the currently extant northern spotted owls in the North project area will be once suitable (but unoccupied) habitat is logged; whether the highly controversial experimental barred

owl control program will be successful[10] and how its success or failure may affect spotted owls; the agency's highly controversial and uncertain premise that it is futile to retain unoccupied suitable habitat for future spotted owl colonization should the barred owl control program be effective; the agencies' new approach to determining owl occupancy by relying only on surveys rather than surveys and habitat fitness is highly controversial and uncertain, and its long-term effect on spotted owl persistence and recovery involves unknown risks to the species; and the agencies' reliance on the uncertain and untested hypothesis that the Late-Successional Reserves will be sufficient to carry the agencies' ESA obligations involves unknown risks to the species' survival and recovery.

KS Wild has raised substantial questions regarding the degree to which the effects of the Project are likely to be highly controversial, highly uncertain, or involve unique or unknown risks, requiring the preparation of an EIS. *Blackwood*, 161 F.3d at 1212; *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998), *overruled on other grounds*, *Lands Council*, 537 F.3d 981 (2008). Preparation of an EIS would bring to light information that could resolve some of these highly controversial and uncertain effects of the North Project. The Ninth Circuit has held that an EIS is appropriate under 40 C.F.R. §§ 1508.27(b)(4)–(b)(5) when the lack of data about a project's effects could be cured by a more through EIS that would develop or obtain that missing information. *Blackwood*, 161 F.3d at 1213–14; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001), *abrogated on other grounds*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010); *W. Watersheds Project*, 552 F. Supp. 2d at 1135–36. "The purpose of an EIS is to obviate the need for such speculation by insuring that available data

---

[10] BLM (and Magistrate Clarke to some degree, F&R, 18–19) characterizes the success of the barred owl control program "speculative," but any speculation around the program could be resolved by collecting data to resolve the supposition.

are gathered and analyzed prior to the implementation of the proposed action." *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (citing *Foundation for N. American Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982)).

**B.    The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration (40 C.F.R. § 1508.27(b)(6)).**

The North Project represents the first—and as yet only—example of the Klamath Falls Resource Area's timber sale offerings under the BLM's 2016 RMPs. BLM AR 000080, 000058 ("The North Project Area consists of the only current feasibly grouped collection of forest stands that meets the design criteria and can immediately meet the KFRA's [Allowable Sale Quantity or timber target] in a sustained manner"). The North Project will also be the only environmental analysis for logging that the Klamath Falls Resource Area plans to conduct for the foreseeable future, given that the Resource Area is depauperate in merchantable timber due to past logging. BLM AR 008062. Therefore, the North Project is an action that establishes a precedent for future action, as it is the *only* action authorizing logging in the Resource Area, and therefore represents the first, last, and only "decision in principle about a future consideration," i.e. the decision to offer timber for sale from the Resource Area. In the past, the BLM would have put forward several timber offerings from the Resource Area over the life of the Resource Management Plan. The decision to offer all of the Resource Area's timber target in a single environmental analysis is precedential because this type of decision has never been made in the past, and it will be the only decision to offer timber here that the BLM makes.

"[P]reparation of an EA is usually highly specific to the project and the locale, thus creating no binding precedent," *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011), and "courts have therefore been reluctant to conclude that 40 C.F.R. § 1508.27(b)(6) provides an independent basis for preparing an EIS." *Friends of the Wild Swan v. U.S. Forest*

*Serv.*, 875 F. Supp. 2d 1199, 1218 (D. Mont. 2012), *aff'd in part, vacated in part on other*

*grounds, remanded sub nom. Friends of the Wild Swan v. Garcia*, 650 F. App'x 400 (9th Cir.

2016). However, the Ninth Circuit has explained that the purpose of 40 C.F.R. § 1508.27(b)(6)

"is to avoid the thoughtless setting in motion of a chain of bureaucratic commitment that will

become progressively harder to undo the longer it continues." *Presidio Golf Club v. Nat'l Park*

*Serv.*, 155 F.3d 1153, 1162–63 (9th Cir. 1998) (internal quotations omitted, citing *Sierra Club v.*

*Marsh*, 769 F.2d 868, 879 (1st Cir. 1985)). In the present case, there will be no further

environmental analysis addressing logging in the Resource Area: the decision to log has been

made in the North Project REA, and the bureaucratic commitment to that decision means that the

decision will be progressively harder—indeed, impossible—to undo because it is the only

decision BLM states it will make affecting the timber resource in the Resource Area. BLM AR

000080, 000058. Consequently, the facts of the decision in this case set this situation apart from

other cases where the courts have declined to find that this significance factor lends weight to KS

Wild's claim that an EIS should have been prepared.

> **C.    The degree to which the action may adversely affect an endangered or
> threatened species or its habitat that has been determined to be critical under
> the Endangered Species Act of 1973 (40 C.F.R. § 1508.27(b)(9)).**

The North Project "may affect and is likely to adversely affect" the Threatened northern

spotted owl and will result in the elimination of 4,864 acres of designated spotted owl critical

habitat. FWS AR 001598. As a result of the Project, the BLM expects that 5 currently occupied

spotted owl sites will be lost, and that there will be no suitable habitat for the species in the

project area for 120 years. FWS AR 001566; BLM AR 000557 ("the expected life of this EA is

long enough that currently occupied [northern spotted owl] territories may become unoccupied

within the life of the EA which would potentially 'free up' currently . . . encumbered proposed

sale acres"). The lack of suitable spotted owl habitat is likely to create a competitive advantage

for the barred owl, which, in conjunction with the lack of suitable habitat, will create a situation where it is unlikely that the spotted owl will recolonize the North Project area in the foreseeable future. BLM AR 012576–77; FWS AR 001579.

Courts have held that the removal of acreages of suitable spotted owl habitat much lower than that which will be eliminated as a result of the North Project requires an EIS. *Or. Wild v. BLM*, No. 6:14-cv-0110-AA, 2015 WL 1190131, *9–10 (D. Or. Mar. 14, 2015) (timber sale removing less than 190 acres of critical NSO habitat (including 153 acres of NRF habitat), even with "no nests or projected taking of spotted owls" was significant under 40 C.F.R. § 1508.27(b)(9) and supported the need for an EIS); *KS Wild v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1080–81 (E.D. Cal. 2004) (FWS "likely to adversely affect" finding "is an important factor supporting the need for an EIS"). The Ninth Circuit similarly has held that the lack of information about a project's effect on listed species, *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 828–29 (9th Cir. 2008), *appeal dismissed as moot, Alaska Wilderness League v. Salazar*, 571 F.3d 859 (9th Cir. 2009), or information that itself indicates there will be a significant effect on a listed species, also compels the preparation of an EIS, *Nat. Res. Def. Council v. Winter*, 518 F.3d 658, 692–93 (9th Cir. 2008), *rev'd on other grounds*, 555 U.S. 7 (2008). Given that the North Project is likely to significantly adversely affect the northern spotted owl, in conjunction with other significance factors, BLM should have prepared an EIS for the Project.

## VII.    CONCLUSION.

For the foregoing reasons, KS Wild respectfully objects to the Findings and Recommendation issued by Judge Clarke and respectfully asks the Court to vacate the Findings and Recommendation and grant summary judgment in favor of KS Wild on all claims.

Respectfully submitted September 27, 2021.

       /s/ Susan Jane M. Brown        
SUSAN JANE BROWN (OSB #054607)
Western Environmental Law Center
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323 | Phone
brown@westernlaw.org

Sangye Ince-Johannsen (OSB #193827)
Western Environmental Law Center
120 Shelton McMurphey Blvd, Ste 340
Eugene, OR 97401
(541) 778-6626 | Phone
sangyeij@westernlaw.org

*Attorneys for Plaintiffs*