# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KLAMATH-SISKIYOU
WILDLANDS CENTER, et al.,

        Plaintiffs,                          Case No. 1:19-cv-1810-CL

    v.

                                                    JUDGMENT

UNITED STATES BUREAU OF LAND
MANAGEMENT, et al.,

        Federal Defendants,

    and

MURPHY COMPANY,

        Intervenor-Defendant.

_____

MCSHANE, Judge:

    Based on the record, Judgment for Defendants.

IT IS SO ORDERED.

    DATED this 16th day of November, 2021.

                       _____/s/ Michael J. McShane_____
                               Michael McShane
                        United States District Judge

1 –JUDGMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KLAMATH-SISKIYOU WILDLANDS
CENTER, et al.,

         Plaintiffs,                            Case No. 1:19-cv-1810-CL

    v.

UNITED STATES BUREAU OF LAND              ORDER
MANAGEMENT, et al.,

         Federal Defendants,

    and

MURPHY COMPANY,

         Intervenor-Defendant.

_____

MCSHANE, Judge:

Magistrate Judge Mark D. Clarke filed a Findings and Recommendation (ECF No. 46),
and the matter is now before this court. *See* 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b).
Plaintiffs filed objections to the Findings and Recommendation. ECF No. 50. Accordingly, I
have reviewed the file of this case *de novo*. *See* 28 U.S.C. § 636(b)(1)(c); *McDonnell Douglas
Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981). I find no error and
conclude the report is correct.

Magistrate Judge Clarke's Findings and Recommendation (ECF No. 46) is adopted.
Plaintiffs' Motion for Summary Judgment (ECF No. 36) is DENIED. Defendant's Cross Motion

1 –ORDER

for Summary Judgment (ECF No. 38) is GRANTED. Intervenor-Defendant's Cross Motion for

Summary Judgment (ECF No. 37) is GRANTED to the extent it aligns with BLM's motion.

IT IS SO ORDERED.

DATED this 16th day of November, 2021.

_____/s/ Michael J. McShane_____
Michael McShane
United States District Judge

2 –ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


KLAMATH-SISKIYOU                         Civ. No. 1:19-cv-01810-CL
WILDLANDS CENTER, *et al.*

      Plaintiffs,

    v.                                       FINDINGS AND
                                         RECOMMENDATION

UNITED STATES BUREAU
OF LAND MANAGEMENTS, *et al.*

      Federal Defendants,

   and

MURPHY COMPANY

      Intervenor-Defendant.

---

CLARKE, Magistrate Judge.

    Plaintiffs Klamath-Siskiyou Wildlands Center, Oregon Wild, Cascadia Wildlands, and

Soda Mountain Wilderness Council (collectively, "Plaintiffs") move for summary judgment

against defendant Bureau of Land Management ("BLM") for violations of the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA"). Defendant BLM and defendant-intervenor Murphy Company ("Murphy") filed cross-motions for summary judgment. Oral argument was heard on April 14, 2021. For the reasons discussed below, Plaintiffs' Motion for Summary Judgment (Dkt. #36) should be DENIED. Defendant's Cross Motion for Summary Judgment (#38) should be GRANTED. Intervenor-Defendant's Cross Motion for Summary Judgment (#37) should be GRANTED to the extent that it aligns with BLM's motion.

## BACKGROUND

Plaintiffs challenge the North Landscape Project ("North Project"), a site-specific management approach for conducting annual timber sales in the Klamath Falls Resource Area in accordance with the 2016 Southwestern Oregon Resource Management Plan ("2016 RMP"). Plaintiffs challenge the North Project over its potential impacts to the Northern Spotted Owl ("NSO"), a threatened species that has been the subject of environmental litigation for years.

The Oregon & California Revested Lands Act ("O&C Act") covers roughly 2.1 million acres of land across Oregon and California and requires the BLM to determine and declare the "annual productive capacity" of these lands. 43 U.S.C. § 2601. The O&C Act states that designated O&C land "shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the [principle] of sustained yield for the purpose of providing a permanent source of timber supply . . . ." *Id.*

The Federal Land and Policy Management Act ("FLPMA") establishes standards for public land use planning and obligates the BLM to manage its lands under principles of multiple use and sustained yield. 43 U.S.C. § 1732(a); *Public Lands Council v. Babbit*, 167 F.3d 1287,

1301 (10th Cir.1999), *aff'd* 529 U.S. 728 (2000). FLPMA requires the Secretary of the Interior

to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or

areas for the use of the public lands." 43 U.S.C. § 1712(a). FLPMA requires BLM to develop

land use plans called "resource management plans" ("RMPs") that govern the use of BLM land.

*Id.* § 1712. BLM must then manage its lands in conformity with the applicable RMP. *Id.* §

1732(a); 43 C.F.R. § 1610.5-3(a).

BLM worked with the Forest Service to adopt resource management plans for Western

Oregon as part of the 1995 Northwest Forest Plan ("NWFP"). AR 014408. The NWFP gave

effect to both the ESA and the O&C Act by restricting timber harvest on portions of the O&C

lands to conserve NSO habitat, while permitting timber harvest on other portions of those lands.

*See Pac. Rivers v. U.S. Bureau of Land Mgmt.*, No. 6:16-cv-01598-JR, 2018 WL 6735090 (D.

Or. Oct. 12, 2018), *adopted*, 2019 WL 1232835 (D. Or. March 15, 2019).

BLM revised the NWFP-based RMPs, which resulted in the creation of the 2016 RMP.

AR 014768-70. The 2016 RMP reflected the input of dozens of formal cooperators including

federal and state agencies, tribes, and local governments, and were supported by a Final

Environmental Impact Statement spanning four volumes and over 2,000 pages. AR 014726-

016827. BLM also formally consulted with the Fish and Wildlife Service ("FWS") and the

National Marine Fisheries Service. The FWS authored a final BiOp for the 2016 RMP, in which

the agency formally issued "no jeopardy" and "no adverse-modification" findings for several

listed species, including the NSO. AR 018033-38.

The 2016 RMP allocates varying amounts of land to six different land use categories.

AR 014449. BLM committed approximately eighty percent of the entire RMP planning area to

reserves, including Late-Successional Reserves that are managed to develop, maintain, and

promote NSO nesting/roosting and foraging habitat. AR 014844-47; 006762-63. BLM allocated the remaining twenty percent of land to the "Harvest Land Base," which is managed primarily to "achieve continual timber production that can be sustained through a balance of growth and harvest," and to offer the allowable quantity of timber volume for sale as required under the O&C Act. AR 014844-47. In January 2017, the Cascade-Siskiyou National Monument in Klamath County was expanded by presidential proclamation. The monument expanded into the "Harvest Land Base," causing even less acres to be available for timber harvest. AR 000056.

BLM developed the North Project in 2018 to comply with its timber harvest obligations under the O&C Act and the 2016 RMP. AR 000057. The North Project consists of 11,879 acres of land in the Klamath Falls Resource Area, and 9,073 of those acres are analyzed for harvest. AR 000060, 000099. BLM states that annual timber sales under the North Project will likely average around 500 acres per year. AR 000001; 000041.

BLM initiated formal ESA Section 7 consultation with FWS regarding the North Project. FWS issued the Biological Opinion ("BiOp") for the North Project in July 2018. AR 000298-443. The BiOp states that the North Project will not jeopardize the NSO as a species, nor adversely modify the species' critical habitat. *Id.*

BLM also conducted an Environmental Assessment ("EA") for the North Project, in which the BLM analyzed the effects of annual timber harvest within the project area. AR 000076. The EA analyzes a management approach under which BLM can offer six million board feet (MMbf) of timber (plus or minus forty percent variance) per year through annual timber sales, each accompanied by its own sale-specific decision record. *Id.* Annual timber sales must comply with the 2016 RMP's direction to avoid incidental take of NSOs. To accomplish this, the North Project pairs NSO survey protocols with a pool of potential harvest

acres to allow BLM the ability to modify timber sales to alternative timber units if NSO occupancy is detected. AR 000057, 000077; 000550, 000558-62, 000575-79.

BLM has issued four timber sale decision records under the North Project. BLM awarded the contract for the Sweet Vidalia Sale in 2018, and harvest of 4.5 MMbf was completed in October 2019. AR 000240. BLM offered the Stag Sale for 5.8 MMbf in 2019, but modified the sale to 4.5 MMbf following a determination of NSO occupancy in one of its proposed harvest units. AR 000190; 000042. In 2020, BLM offered the Terminus Sale for 2.8 MMbf. AR 000010.

## LEGAL STANDARD

Plaintiffs move for summary judgment on their two Administrative Procedures Act ("APA") claims for violations of the ESA and NEPA. The APA allows the reviewing court to set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law." 5 U.S.C. § 706(2)(A). "A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Review under the APA is "searching and careful." *Ocean Advocates v. United States Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004). The court must ensure that the agency took a "hard look" at the environmental consequences of its proposed action. *Oregon Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997). However, the court may not substitute its own judgment for that of the agency. *Ocean Advocates*, 402 F.3d at 858. It must presume the agency acted properly and affirm the agency when "a reasonable basis exists for its decision." *Indep. Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).

## DISCUSSION

### I. Plaintiffs' site-specific challenges are not precluded.

Before addressing the merits of Plaintiffs' challenges, BLM argues that Plaintiffs' claims are barred because they are really an attack on the underlying 2016 RMP, which has been upheld by this Court. "Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997). Res judicata applies when there is "(1) an identity of claims, (2) a final judgment on the merits, and (3) privity between the parties." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (internal citations omitted). The Ninth Circuit explained that "[t]he central criterion in determining whether there is an identity of claims between the first and second adjudications is whether the two suits arise out of the same transactional nucleus of facts." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001) (internal citations omitted).

The validity of the 2016 RMP and its supporting documents have been challenged by all but one of the plaintiffs in this case and was upheld by this Court with a final judgment on the merits. *See Pac. Rivers v. U.S. BLM*, 2018 WL 6735090 (D. Or. Oct. 12, 2018) *aff'd sub nom.*

*Pac. Rivers v. BLM*, 815 F. App'x 107 (9th Cir. 2020). Therefore, this Court will not consider

attacks on the programmatic analyses supporting the 2016 RMP and its land use allocation

framework. However, the case at hand is not barred by claim preclusion because this suit and

the prior suit do not arise out of the same transactional nucleus of facts. In the prior litigation,

plaintiffs challenged the validity of the 2016 RMP and the BLM's decision to withdraw from the

Northwest Forest Plan. In the present litigation, Plaintiffs challenge the North Project, which is a

site-specific project that implements the 2016 RMP. While the 2016 RMP is relevant to this

litigation, Plaintiffs in this case could not have brought a challenge to the North Project in the

prior litigation because the North Project did not exist at that time. Therefore, Plaintiffs' claims

challenging the government's site-specific analysis and consultation on the North Project are not

barred by the prior litigation.

II.     **The North Project and the supporting Biological Opinion do not violate the ESA.**

Plaintiffs claim that the Biological Opinion for the North Project violates the ESA for

three reasons: 1) it failed to consider the effects to NSOs over a timeframe relevant to the

species; 2) it failed to adequately consider how recovery efforts for the NSO will be impacted

and wrongfully relied on Late-Successional Reserve land use allocation; and 3) FWS's

determination that the North Project will not result in incidental take is arbitrary and capricious.

For these reasons, Plaintiffs claim that BLM relied on a legally flawed Biological Opinion in

violation of its duty under Section 7 of the ESA. The Court disagrees.

Section 7 of the ESA requires every federal agency, in consultation with FWS, to ensure

that its actions are "not likely to jeopardize the continued existence of any endangered . . . or

threatened species or result in the destruction or adverse modification of a species' critical

habitat." 16 U.S.C. § 1536(a)(2). The result of consultation is a "biological opinion," with a

determination either that an action is likely or is not likely to jeopardize the continued existence

of a listed species and either is likely or is not likely to result in the destruction or adverse

modification of a species' critical habitat. 16 U.S.C. § 1536(b). In carrying out consultation

under the ESA, FWS must use "the best scientific and commercial data available." 16 U.S.C. §

1536(a)(2); 50 C.F.R. § 402.14(g)(8). "[F]ailure to do so violates the APA." *San Luis & Delta-*

*Mendoza Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). The purpose of the best-

available-data standard is to ensure a biological opinion is not based on "speculation and

surmise." *Id.* (citing *Bennett v. Spear*, 520 U.S. 154, 176 (1997)); *see also Ctr. for Biological*

*Diversity v. U.S. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1127 (N.D. Cal. 2006) ("To the

extent that there is any uncertainty as to what constitutes the best available scientific information,

Congress intended 'to give the benefit of the doubt to the species.").

  First, the Court finds that the government reasonably considered the effects of the North

Project on the NSO as a species over a timeframe that is relevant to the NSO's life cycle. The

government has pointed directly to areas in the record where the life cycle and the reproductive

biology of the NSO is discussed. AR 001503-13 (discussing lifespan, sexual maturity, and

ability to reproduce). The government also points to portions of the record that discuss the

effects of the action on the NSO and critical habitat. AR 001560-81. The government addressed

recovery of the NSO in its critical habitat analysis. *See, e.g.*, AR 001550 ("Section 5.4.6 of [the

North Project BiOp] describes how the [North Project] incorporates elements of the 2011

Revised Recovery Plan for the Northern Spotted Owl."); AR 001566 ("The potential impacts to

the recovery of northern spotted owls are further discussed in sections 5.4.6 and 5.4.7 below.");

AR 001579-001581 (analyzing the effects of the North Project on NSO recovery); AR 001604

("The proposed action is not expected to compromise the capability of ECS 1 or critical habitat

unit 8 to fulfill the intended conservation functions of demographic support and connectivity . . . [or] result in an appreciable reduction of the conservation role of the range-wide designation of [NSO] critical habitat.").

The Ninth Circuit's decision in *Pac. Coast Federation of Fishermen's Ass'n v. U.S. BLM* turned on the government's reliance on the long-term beneficial effects of the action while ignoring the short-term adverse effects. 426 F.3d 1082, 1089, 1091 (9th Cir. 2005). Here however, FWS evaluated the short-term effects of the North Project on the lifecycle of the NSO within the project area. *See, e.g.,* AR 001556-59 (evaluating the current habitat of 11 NSO activity centers as "below the recommend[ed] thresholds at either the core area or the home range scale"); AR 001561-001566 (evaluating the effect of treatment in the action area); AR 001566-76 (evaluating the effect of treatment on NSO activity centers). FWS did not purport to rely on long-term mitigation or beneficial effects from the North Project to reach its no jeopardy and no adverse modification conclusions. Instead, FWS was candid in admitting that there may be some adverse effects from the North Project, but ultimately concluded that these effects do not rise to the level of jeopardy or adverse modification of critical habitat because harvest will not occur in occupied areas. AR 001602 ("[W]e do not expect these specific harvests to influence the numbers or reproduction of spotted owls at the local, action area or range-wide scales in the long-term because this harvest of unoccupied forest stands during the interim period will not impact territorial or reproducing spotted owls and will avoid impacts to territories that are expected to provide for future populations of spotted owls"). The government has been clear that if any NSOs are detected in the harvest area, that timber harvest would stop and be reevaluated. This practice was followed for the Stag Sale in 2019, when the area designated for harvest was reduced following a determination of NSO occupancy in one of the proposed harvest units. AR

000190; 000042. Therefore, the Court finds that the government fulfilled its obligation to analyze the direct and indirect effects of the North Project on the NSO and critical habitat in the context of the NSO life cycle.

Second, the Court finds that the government reasonably analyzed the effects of the North Project on designated critical habitat and adequately considered how these effects will impact NSO recovery efforts. FWS reasonably determined that the North Project will affect only a small portion of the suitable habitat within the range of the NSO species. AR 001602 ("The affected habitats in the action area represent less than 1% of the nesting/roosting and foraging habitat available for the species across its range."). Plaintiffs assert that the Ninth Circuit in *Gifford Pinchot* held that FWS may not rely on Late-Successional Reserves in its analysis of effects to critical habitat. *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1076 (9th Cir. 2004), *superseded on other grounds, Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017). However, in a subsequent Ninth Circuit opinion, the court noted that the critical error in *Gifford Pinchot* was that the government "essentially treated [Late-Successional Reserves ("LSRs")] as a substitute for critical habitat." *Env't Prot. Info. Ctr. ("EPIC") v. U.S. Forest Serv.*, 451 F.3d 1005, 1012-13 (9th Cir. 2006) (finding reliance on LSRs permissible so long as LRs are not used as a "substitute" for critical habitat). In this case, the government did not substitute Late-Successional Reserves for critical habitat, nor did it rely on Late-Successional Reserves as a basis for its no jeopardy conclusion. Just like in *EPIC*, the FWS BiOp in this case contains some discussion of the value of Late-Successional Reserves, and it also contains an analysis of the North Project's effect on critical habitat that is independent of the Late-Successional Reserves discussion. AR 001581-82.

Moreover, Plaintiffs' arguments regarding recovery of the NSO expand the government's obligations beyond those required by the ESA. The obligation of the government is not to restore or recover the NSO, but to implement reasonable and prudent alternatives to avoid destruction or adverse modification of critical habitat. *See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1051-52 (9th Cir. 2015) (plaintiffs' "objections to the Biop . . . in this case can appropriately be characterized as claiming that the [action] does not do enough to ensure the survival . . . Adopting this position, however, would impermissibly broaden FWS's obligations, both as the action agency and as the consulting agency."); *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1244 (9th Cir. 2015) ("The purpose of the Recovery Plan is evident—promote recovery of the spotted owl. Although they are not necessarily mutually exclusive, recovery and jeopardy are two distinct concepts."); *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1114 n.8 (9th Cir. 2015) ("It is undisputed that, generally, FWS recovery plans are not mandatory. The Endangered Species Act does not mandate compliance with recovery plans for endangered species.").

Third, the Court finds FWS's incidental take statement reasonable. The ESA prohibits the "take" of endangered and threatened species. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect . . . ." *Id.* § 1532(19). "Harming a species may be indirect, in that the harm may be caused by habitat modification, but habitat modification does not constitute harm unless it 'actually kills or injures wildlife.'" *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 924–25 (9th Cir. 2000). Once FWS has determined that an action is not likely to jeopardize a listed species or result in the destruction or adverse modification of its critical habitat, it must determine whether an action is likely to result in any "incidental take" of endangered or threatened species. If FWS determines that an action is

reasonably certain to result in incidental take of that species, it must issue an "Incidental Take

Statement." 50 C.F.R. § 402.14(g)(7); 16 U.S.C. § 1536(b)(4).

Here, FWS determined that incidental take from the North Project is not anticipated

because timber harvest will not occur on NSO occupied sites. AR 001579; 001604. The

government will continue to deploy a process referred to as the "survey protocol" to determine

site occupancy before a timber sale. The survey protocol includes additional spot-checks to

ensure that the possibility of NSO occupation between surveys and harvest would not lead to

unexpected incidental take. AR 001634; AR 016233-37 (spot-check protocol); *see also* AR

001499 (incorporating Appendix B protocol as part of the proposed action). The survey protocol

used for determining NSO occupancy was upheld by the Ninth Circuit in *Cascadia Wildlands v.*

*Thrailkill*, 806 F.3d at 1241.

Plaintiffs criticize the government's use of the survey protocol as the sole criterion for

establishing the possibility of take and argue that they should have also considered habitat

fitness. However, the argument that incidental take of NSOs can be presumed from habitat

modification has been rejected at least twice before. *Conservation Cong. v. Heywood*, No. 2:11-

CV-02250-MCE, 2015 WL 5255346, at *14 (E.D. Cal. Sept. 9, 2015), *aff'd*, 690 F. App'x 541

(9th Cir. 2017) (rejecting the argument that habitat degradation from timber harvest will lead to

unaccounted for take of NSOs); *Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-cv-

02800TLN-CKD, 2014 WL 2092385, at *11 (E.D. Cal. May 16, 2014) (same). In *Arizona*

*Cattle Growers' Association*, the Ninth Circuit acknowledged that a factual determination based

on evidence that a species was not present in an area is a proper basis for a decision that there

would be no incidental take. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d

1229, 1238 (9th Cir. 2001)273 F.3d at 1244-47 (affirming that "the mere potential for harm . . . is

insufficient"). The specific characteristics of a species and its presence within a certain temporal window is critical to establishing when habitat modification "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 712 (1995) (J. O'Connor concurring). Here, FWS made a factual determination that the temporal link between the habitat modification and the NSO's presence was too long to establish proximate cause for incidental take. The possibility of re-occupation was also found unlikely considering the use of post-survey spot checks required by BLM's survey protocol. The Court will defer to FWS's scientific judgment in making this determination. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 626 (9th Cir. 2014) (affording FWS "substantial deference" in the context of an ITS determination).

For these reasons, the Court finds that the North Project BiOp complies with the ESA, and the government's reliance on the BiOp satisfies the government's obligations under the ESA.

### III.     National Environmental Procedure Act

Plaintiffs claim that the North Project Revised Environmental Assessment ("North EA") violates NEPA because it fails to consider the direct, indirect, and cumulative effects of the North Project on the NSO and its continued viability and recovery. Plaintiffs also claim that the government was required to prepare an Environmental Impact Statement ("EIS") and its failure to do was arbitrary and capricious. The Court disagrees.

The purpose of NEPA is twofold: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements

designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 3695 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted). However, "NEPA itself does not mandate particular results, but simply the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351. As such, "NEPA does not require particular environmental standards or mandate that agencies achieve substantive environmental results." *Greater Yellowstone Coal v. Lewis*, 628 F.3d 1134, 1150 (9th Cir. 2010). In reviewing agency decisions, courts are generally "most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012) (internal quotation marks and citation omitted).

After careful consideration, the Court finds that the North EA properly tiers to the Final Environmental Impact Statement ("FEIS") for the 2016 RMP. "NEPA requires that, 'to the fullest extent possible . . . all agencies of the Federal Government shall' complete an environmental impact statement (EIS) in connection with 'every recommendation or report on proposals for legislative and other major Federal actions significantly affecting the quality of the human environment.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640-41 (9th Cir. 2014) (alteration in original) (quoting 42 U.S.C. § 4332(2)(C)). "In addition to the proposed agency action, every EIS must '[r]igorously explore and objectively evaluate all reasonable alternatives' to that action. 40 C.F.R. § 1502.14(a). While NEPA generally requires environmental impact statements, it also "encourage[s]" agencies to "tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20. "Any environmental document in compliance with NEPA may be combined with any other

agency document to reduce duplication and paperwork." 40 C.F.R. § 1506.4.  NEPA regulations

also provide that, when a broad EIS has been prepared (like one prepared for an RMP) and a

subsequent EA is then prepared for an action included in the broader program (like a timber

harvest), "the subsequent [EA] need only summarize the issues discussed in the broader [EIS,]"

"incorporate discussions from the broader statement by reference[,]" and "concentrate on the

issues specific to the subsequent action." 40 C.F.R. § 1502.20.  Tiering is "expressly permitted

and encouraged under NEPA, so long as the tiered-to document has been subject to NEPA

review." *W. Watersheds Proj. v. Lueders*, 122 F. Supp. 3d 1039, 1047 (D. Nev. 2015) (internal

citation omitted).

In its FEIS for the 2016 RMP, BLM used its expertise, numerous scientific studies, and

technical habitat and population response modelling to conduct an analysis of the effects of

various management alternatives on the NSO's habitat-conservation needs throughout the United

States and across the various owl physiographic provinces, including the Oregon Eastern

Cascades Physiographic Province that encompasses the North Project area.  AR 015734-52,

015759-63; AR 015743-015748 (Figures 3-188 and 3-189 display modeling results by modeling

region and by physiographic province); AR 015759 (summarizing the results of the modeling

analysis).  Then, in the North EA, BLM explicitly incorporated by reference the FEIS's

modeling analysis and "forecasts includ[ing] anticipated changes to northern spotted owl habitat

from forest ingrowth and forest treatments at the much larger, and more appropriate, scales." AR

000076; *see also* AR 000080-81 (incorporating analysis of the effects of removing or

downgrading NSO habitat); AR 000085 (incorporating the FEIS's population analysis); AR

000089 (assessing the FEIS's population and habitat modelling in light of new survey data).

Because the North Project area falls within the modeling region analyzed in the FEIS, the agency

reasonably concluded that "[r]eplicating that FEIS NSO modeling effort at the scale of the project area is unnecessary for NSO analysis because it would not meaningfully inform the decision maker beyond the analysis performed in the FEIS." AR 000076.

This Court recently found that a site-specific project EA may properly tier to a programmatic species-level analysis in the FEIS for the 2016 RMP where that analysis contemplates specific activities within a planning area. *See Klamath Siskiyou Wildlands Ctr. v. BLM ("Griffin Half Moon")*, Case No. 1:19-cv-02069-CL, 2021 WL 400137, at *4, *6 (D. Or. Jan. 21, 2021). In that case, this Court found it appropriate to tier to the 2016 FEIS's analysis of the effects on the pacific fisher because it provided a "detailed quantified analysis of the effects of timber harvesting on the species" and the EA "included site-specific disclosures regarding the impacts of the Project on the fisher." *Id.* By contrast, this Court found tiering to the analysis about the great grey owl insufficient because it lacked the necessary site-specific disclosures and merely acknowledged that the great grey owl was at risk. In this case, the FEIS contains the necessary analysis for the NSO. The FEIS analysis of effects on NSOs is based more than 30 years of intensive NSO research and progressive model development. AR 015717- 015722, 015727- 015728, 015733-015742, 015759- 015761, 015763-015764, 015766, 015770 (NSO methodology). Just as BLM disclosed in *Griffin Half Moon* that the timber sale would affect fisher habitat as "anticipated under the RMP," BLM has similarly disclosed that the North Project will reduce the total acres of NSO habitat and reduce the potential for NSO occupancy as anticipated in the 2016 RMP/FEIS. Therefore, it was proper for the North EA to tier to the FEIS for the 2016 RMP because the anticipated effects of the North Project to the NSO, NSO habitat, and the ability of NSOs to disperse across the landscape are within the impacts analyzed in the 2016 PRMP/FEIS.

Moreover, the Court finds that the government properly considered the direct, indirect, and cumulative effects of the North Project on the NSO.  The FEIS for the 2016 RMP quantified and analyzed how managing the entire Harvest Land Base, including the North Project area, for sustained-yield harvest would impact the NSO as a species. AR 015108-015113, 015714-84, 016016-016017. The FEIS sufficiently analyzed the RMP's direct, indirect, and cumulative impacts to NSOs at the programmatic level, and the North EA included its own discussion of the North Project's site-specific effects on the NSO.  BLM concluded in the North Project EA that there are no project-specific negative impacts to NSOs as a species or their habitat that alter or exceed the range of impacts analyzed in the FEIS. AR 000072-93, 000081, 000085.

The 2016 FEIS also explicitly evaluated the impacts of timber harvest on NSO recovery. BLM analyzed how the various alternatives would affect each of the conservation needs and relevant recovery actions that FWS identified as important to NSO recovery.  AR 015715-015783; *see also* AR 020522, 020546, 020552, 020570 (2011 NSO Recovery Plan); AR 003911, 003922 (describing NSO conservation needs).  The NSO range covers more than 57 million acres in the United States, with more than 12.1 million acres of habitat and an additional 25.8 million acres of dispersal habitat. AR 004980, 005000, 005010.  It was appropriate for BLM to conduct its species recovery analysis at the 2016 FEIS/RMP level so that it could evaluate the impacts of the various alternatives on the NSO species as a whole, across the entire range.  In the North EA, BLM properly tiered to this recovery analysis, concluding that the site-specific impacts of the North Project are within the range of impacts disclosed in the FEIS. *See* BLM AR 000084-85 ("Because both action alternatives for the North Project incorporate all the relevant management direction and guidance from the RMP/ROD for the NSO, and because the rates of timber production (and habitat removal) analyzed in the FEIS would not be exceeded, the North

Project would be consistent with the 2011 revised NSO recovery plan"); AR 000090 (section analyzing the "effect of new information on analysis of BLM contribution to NSO conservation [and] recovery."). BLM also addressed NSO recovery in the Biological Assessment it prepared for the North Project, which is referenced in and tied to the EA. AR 000563.

Plaintiffs argue that BLM should have analyzed what it might mean for the recovery of spotted owls in the North Project area if the barred owl control program is successful. The government asserts that the barred owl control program covers a much larger range than that of the North Project, is experimental, and has not yet been implemented. While NEPA encourages the government to be forward thinking, it requires only that the EIS contain a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998) (quoting *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997)). The potential future success of a not-yet-implemented experimental program that will be conducted over an area beyond the North Project was not a "probable environmental consequence" that BLM was required to assess in the North EA.

Plaintiffs also argue that BLM failed to analyze the conflict between barred owls and NSOs, but the record simply doesn't support such a claim. *See* AR 000091 (analyzing the likelihood of additional barred owls displaced by the North Project invading NSO sites); AR 000091-92 (listing the scientific bases underlying BLM's conclusion that the North EA is unlikely to have discernable effects on NSOs inside or outside the North Project area stemming from competition with displaced barred owls). BLM incorporated the barred owl and spotted owl conflict analysis in the FEIS and concluded that "any indirect effects of forest harvest in the [Harvest Land Base] (such as potential displacement of NSOs by harvest-displaced barred owls)

- including the North Project are not expected to alter current NSO population trajectories." AR 000092.

The North Project EA also considers retaining habitat refugia for displaced owls to occupy. AR 000092-93. BLM addressed the North Project's potential effects on future NSO reoccupancy and was candid in acknowledging that implementing the harvest as proposed would reduce the likelihood of NSO reoccupancy in the near future. AR 000562-63. The FEIS for the 2016 RMP analyzed the effects of preserving additional land in the Harvest Land Base for refugia beyond the large reserve blocks already set aside and found the difference in recovery outcomes negligible. Therefore, the North Project EA concluded that harvesting less timber or setting aside more land for refugia at the small scale of the North Project, which represents less than 2% of the total Harvest Land Base, would also result in negligible differences for NSO recovery as a species. Moreover, the RMP directs BLM "not [to] defer or forego timber harvest of stands in the Harvest Land Base for reasons not described in the management direction. . ." AR 014533. Retaining additional unoccupied habitat in the North Project area solely for the purpose of supporting NSO recovery would likely be found inconsistent with the management directions in the RMP and perhaps even violate FLPMA. *See Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1135 (9th Cir. 2007) ("Once [resource management] plans are in place, FLPMA mandates that the BLM act 'in accordance' with them." (citing 43 U.S.C. § 1732(a)).

Finally, and for all of the reasons listed above, the Court agrees with defendants that BLM was not required to prepare an EIS for the North Project. The North Project EA and Finding of No Significant Impact, which properly tiers to the 2016 RMP FEIS, fulfilled BLM's obligation to take a hard look at the North Project and its timber harvests. "A comprehensive programmatic impact statement generally obviates the need for a subsequent site-specific or

project-specific impact statement, unless new and significant environmental impacts arise that were not previously considered." *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 783 (9th Cir. 2006) (quoting *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994)). Plaintiffs' arguments under 40 C.F.R. § 1508.27—that the effects of the North Project are highly uncertain and highly controversial; that the North Project will establish a precedent for future actions; and that the Project will have significant adverse effects on NSOs and NSO habitat—fail to convince the Court that there are any new or significant environmental effects stemming from the North Project that were not already considered in the FEIS for the 2016 RMP.

Plaintiffs may disagree with BLM's substantive conclusions regarding the effects of NSO habitat removal, but their claim that BLM did not fully consider the issue is not supported by the overwhelming evidence presented by the government. Plaintiffs paint a picture that the North Project will result in the elimination of more than 9,000 acres of NSO habitat in one quick timber harvest, but the Court is satisfied that the North Project incorporates design features and protocols to ensure individual NSOs occupying the area will not be adversely affected and that timber harvest will not cause abandonment of any occupied site. The North Project analyzes annual timber harvest from within a pool of 9,300 acres to account for flexibility in avoiding adverse effects to NSOs, and sales will likely average around 500 acres per year. *See* AR 000001; 000041. This Court understands the importance of protecting the NSO and other threatened or endangered species. However, Congress was clear through the O&C Act that timber harvest must happen. Every tree cannot be saved. NEPA does not require an agency to choose the most environmentally sound course of action following its required analysis, and NEPA does not require BLM to prove that each site-specific timber project implemented under

the RMP will benefit the NSO. In reviewing Plaintiffs' NEPA claims, the Court must determine not whether BLM chose the alternative most likely to benefit the NSO, but whether BLM "presented a 'full and fair discussion of significant environmental impacts.'" *Lands Council v. McNair*, 537 F.3d 981, 1001 (9th Cir. 2008) quoting 40 C.F.R. § 1502.1. In this case, the Court finds that the government fulfilled its NEPA obligations.

### RECOMMENDATION

For the reasons stated above, the Court recommends Plaintiffs' Motion for Summary Judgment (Dkt. #36) be DENIED and Defendant's Cross Motion for Summary Judgment (#38) be GRANTED. Intervenor-Defendant's Cross Motion for Summary Judgment (#37) should be GRANTED to the extent that it aligns with BLM's motion.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure Rule 4(a)(1) should not be filed until entry of the district court's judgment or appealable order. The Report and Recommendation will be referred to a district judge. Objections to this Report and Recommendation, if any, are due fourteen (14) days from today's date. If objections are filed, any response to the objections is due fourteen (14) days from the date of the objections. *See* Fed. R. Civ. P. 72, 6.

DATED this ____24____ day of August, 2021.

MARK D. CLARKE
United States Magistrate Judge